SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and CASCADIA WILDLANDS, <br><br> *Plaintiffs,* <br><br> vs. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> *Defendant.* | Civ. Case No.  1:21-cv-58 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (Violations of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*) |

## INTRODUCTION

1.      This is a civil action against the U.S. Fish and Wildlife Service ("FWS"). Plaintiffs allege FWS violated the Endangered Species Act ("ESA") when it issued a Biological Opinion ("BiOp") finding the U.S. Bureau of Land Management's ("BLM") Bear Grub and Round Oak timber sales on the Medford District in Oregon were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of northern spotted owl critical habitat, and concluded it was unnecessary to authorize any incidental take of northern spotted owls.

2.      In 2020, BLM and FWS engaged in formal consultation on the Medford District BLM's Fiscal Year 2020 Batch of Projects, pursuant to Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2) (2018). On July 24, 2020, FWS transmitted its BiOp on this batch of timber sales, which is comprised of the Medford District's Bear Grub and Round Oak timber sales ("FY 2020 BiOp").

3.      Combined, the Bear Grub and Round Oak timber sales authorize timber harvest and fuel reduction maintenance on approximately 8,142 acres of BLM-administered land in southwest Oregon. Implementation of the projects will result in the removal or downgrade of 3,978 acres of northern spotted owl habitat and adversely affect 37 known northern spotted owl sites, including many that are already habitat-limited, and two known occupied sites that are habitat-limited.

4.      Despite the timber sales' extensive adverse effects to northern spotted owls and designated critical habitat, FWS concluded that the timber sales were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, and that the timber sales would result in no incidental take of northern spotted owls. FWS reached these conclusions by unlawfully relying on conservation measures and key assumptions that are not binding, enforceable, or reasonably certain to occur.

5.      Plaintiffs are bringing this action because FWS has approved two large BLM logging projects that specifically target northern spotted owl habitat in forests that FWS has deemed "critical" to the

survival and recovery of the species. These timber sales are authorized at a time when northern spotted owl populations are plummeting, FWS has determined that uplisting the species to Endangered is "warranted but precluded" by higher priority action, all while the emerging threat of competition from the invasive barred owl has reduced northern spotted owl reproduction to record low levels. FWS's decision to allow extensive removal of habitat critical to the survival of the species will increase the competitive advantage of encroaching barred owls and fatally undermines the recovery goals developed by the Service.

## JURISDICTION

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). The current cause of action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*; and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. The FY 2020 BiOp constitutes final agency action subject to immediate judicial review. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 176, 178 (1997). The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706. An actual, justiciable controversy exists between Plaintiffs and Defendant.

## VENUE

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Defendant is a federal agency of the United States government and all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and all Plaintiffs have their principal places of business within this District.

8.      Divisional venue is proper in this Court pursuant to Local Rule 3-2(a), because the FY 2020 BiOp concerns the Medford District BLM's 2020 batch of timber sales, a substantial portion of the Bear Grub timber sale area is in Jackson County and Josephine County, and all or most of the Round Oak timber sale area is in Jackson County.

## PARTIES

9.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's primary office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in monitoring, commenting on, and challenging in court actions affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by the Bear Grub and Round Oak timber sales.

10.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon and with additional offices in Roseburg, Oregon and Cordova, Alaska. Representing over 6,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the Bear Grub and Round Oak timber sale areas for a variety of professional and personal pursuits including viewing threatened and endangered species. Implementation of these timber sales would irreparably harm the interests of Cascadia Wildlands and its members.

11.     Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its

members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Bear Grub and Round Oak timber sale areas for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of these timber sales would irreparably harm the interests of Oregon Wild and its members.

12.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency of the U.S. Government within the U.S. Department of the Interior. The U.S. Fish and Wildlife Service is charged with the management of fish, wildlife, and natural habitats.

## LEGAL AND FACTUAL BACKGROUND

**The Administrative Procedure Act**

13.     The Administrative Procedure Act (APA) provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

14.     Under the APA, a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

15.     An agency's decision is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).

**The Endangered Species Act**

16.     Congress enacted the Endangered Species Act (ESA) in 1973 in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be

conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

17.     Congress further declared its policy that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the ESA's purposes. 16 U.S.C. § 1531(c).

18.     Section 4 of the Endangered Species Act requires FWS to "designate any habitat" of a listed species that is "considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). The ESA defines critical habitat as "the specific areas within the geographical area occupied by the species, at the time it is listed[,] . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection . . . ." 16 U.S.C. § 1532(5)(A)(i).

19.     Section 4 of the ESA also directs FWS to develop and implement "recovery plans . . . for the conservation and survival" of listed species and incorporate "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species . . . ." 16 U.S.C. §§ 1533(f)(1) & 1533(f)(1)(B)(i).

20.     Section 7 of the Endangered Species Act requires every federal agency, in consultation with FWS, to insure that its actions are "not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification of" a listed species' critical habitat. 16 U.S.C. § 1536(a)(2). The result of consultation is a biological opinion ("BiOp"), which concludes with a determination that an action either is likely or is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(b).

21.     If FWS concludes in its BiOp that an action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, it

must issue an incidental take statement specifying a limited number of individuals that may be incidentally taken. 16 U.S.C. § 1536(b)(4).

22.    The Secretary of Interior and the Secretary of Commerce co-administer the ESA and have delegated the authority to implement the ESA to FWS and the National Marine Fisheries Service, respectively. 16 U.S.C. § 1532(15).

23.    The ESA's implementing regulations were amended on August 27, 2019, before the FY 2020 BiOp was prepared and transmitted. 84 Fed. Reg. 45,016 (Aug. 27, 2019). These regulations are the subject of ongoing litigation. *Ctr. for Biological Diversity v. Bernhardt*, No. 19-cv-05206 (N.D. Cal. May 18, 2020); *California v. Bernhardt*, No. 19-cv-06013, 2020 WL 3097091 (N.D. Cal. May 18, 2020); *Animal Legal Defense Fund v. Bernhardt*, No. 19-cv-06812 (N.D. Cal. May 18, 2020).

24.    FWS has defined "jeopardize the continued existence of" as meaning "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

25.    FWS has defined "destruction or adverse modification" as meaning "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." 50 C.F.R. § 402.02.

**The Northern Spotted Owl** (*Strix occidentalis caurina*)

26.    The northern spotted owl is a medium-sized dark brown owl, with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks.

27.    The northern spotted owl is one of the most studied birds in the world.

28.    The northern spotted owl occupies late-successional and old-growth forest habitat in the Pacific Northwest, from southern British Columbia as far south as Marin County, California.

29.    Northern spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover and protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

30.    Northern spotted owls also require habitat to disperse to new territories. Dispersal habitat may include younger and less diverse forest stands than foraging habitat, such as even-aged, pole-sized stands, but such stands should contain some roosting structures and foraging habitat to allow for temporary resting and feeding for dispersing juvenile owls. Dispersal habitat is essential to maintaining stable populations of owls by filling territorial vacancies when resident northern spotted owls die or leave their territories, and to providing adequate gene flow across the range of the species. Dispersal habitat, at a minimum, consists of stands with adequate tree size and canopy closure to provide protection from avian predators and at least minimal foraging opportunities.

31.    While northern spotted owls are capable of dispersing across landscapes with relatively large openings, the best available science suggests the probability of successful dispersal is highest in mature and old growth forest stands characteristic of NRF habitat, where there is more likely to be adequate cover and food supply.

32.    In southwest Oregon, dusky-footed wood rats and flying squirrels are a primary prey species for northern spotted owls. Small mammals such as red tree voles, deer mice and red-backed voles along with birds and insects comprise a smaller proportion of overall diet for northern spotted owls in southwest Oregon. Woodrats are abundant in old growth and complex forests, but are also found

in high densities in early-seral or edge habitat. Flying squirrels are most abundant in classic multi-layered old growth forest, but are also found in high-stem-density closed-canopy forest.

33.    Northern spotted owl occupancy of a territory is determined based on a series of protocol surveys that take place over a period of two years. *See* FWS, *Protocol for Surveying Proposed Management Activities that may Impact Northern Spotted Owls* (Feb. 7, 2011; revised Jan. 9, 2012).

34.    The probability of occupancy is increased when core areas contain a range of habitat conditions suitable for use by spotted owls, and the survival and fitness of northern spotted owls is positively correlated with larger patch sizes or proportion of older forests. Franklin, Alan B., *Climate, Habitat Quality, and Fitness in Northern Spotted Owl Populations in Northwestern California*, ECOLOGICAL MONOGRAPHS 70(4), 573 (2000); Dugger, Katie M., *The Relationship Between Habitat Characteristics and Demographic Performance of Northern Spotted Owls in Southern Oregon*, THE CONDOR 107, 876 (2005). Depending on the availability of habitat, fitness may be compromised when additional habitat losses occur. Habitat-fitness and landscape models have demonstrated the importance of having sufficient amounts of NRF habitat within core use areas to adequately provide for northern spotted owl survival and reproduction, along with access to prey. Survival of northern spotted owls is negatively correlated with forest fragmentation.

35.    Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. Barred owls are slightly larger and more aggressive than northern spotted owls, and compete for the same habitat and prey, although barred owls use a wider range of habitat types and prey on a wider range of prey species.

36.    Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, FWS listed the northern spotted owl as a threatened species under the Endangered Species Act on June 26, 1990. Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)). In

response to a petition to reclassify the northern spotted owl as an endangered species, and a lawsuit challenging its failure to respond to that petition, FWS concluded that reclassification is "warranted but precluded by higher priority actions." 12-Month Finding for the Northern Spotted Owl, 85 Fed. Reg. 81,144 (Dec. 15, 2020). FWS's failure to reclassify the northern spotted owl as an endangered species is the subject of ongoing litigation. *Envtl. Prot. Info. Ctr. v. U.S. Fish & Wildlife Serv.*, 3:20-cv-08657 (N.D. Cal. Dec. 8, 2020).

**The Northern Spotted Owl Recovery Plan**

37.     FWS first published a recovery plan for northern spotted owl in 2008, and last revised it in 2011. Endangered and Threatened Wildlife and Plants; Revised Recovery Plan for the Northern Spotted Owl, 76 Fed. Reg. 38,575 (July 1, 2011) (Notice of document availability) ("Recovery Plan").

38.     According to the Recovery Plan, not only is "managing sufficient habitat for the spotted owl now and into the future is important for its recovery," but also ". . . [b]ased on the best available scientific information, competition from the barred owl . . . poses a significant and complex threat to the spotted owl."

39.     The Recovery Plan contains "Recovery Actions" that are necessary to conserve and recover the northern spotted owl. Recovery Action 10 requires agencies to "[c]onserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population." Recovery Plan III-43. Recovery Action 32 states that "[b]ecause spotted owl recovery requires well distributed, older and more structurally complex multi-layered conifer forests on Federal and non-federal lands across its range, land managers should work with the Service . . . to maintain and restore such habitat . . . . These high-quality spotted owl habitat stands are characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees." Recovery Plan III-67. The Recovery Plan states that "[t]his recovery action may be temporary in

nature, until such time as the competitive pressures of the barred owl on the spotted owl can be reduced to an extent that retention of these stands or patches is not necessary for spotted owl recovery." Until that time, however, retention of high-quality spotted owl habitat is essential to the recovery of the species. Recovery Plan III-68.

40.    The Recovery Plan concludes that, "[b]ecause spotted owls on established territories are likely to be more successful if they remain in those locations (Franklin et al. 2000), managing to retain spotted owls at existing sites should . . . the highest priority for land managers." Recovery Plan III-43.

**Northern Spotted Owl Critical Habitat**

41.    Critical habitat was first designated for the northern spotted owl in 1992, and last revised in 2012. Endangered and Threatened Wildlife and Plants; Revised Critical Habitat for the Northern Spotted Owl: Final Rule, 77 Fed. Reg. 71,876 (December 4, 2012) ("Critical Habitat Rule").

42.    The Critical Habitat Rule defines "primary constituent elements" ("PCEs") as "those specific elements of the physical or biological features that provide for a species' life-history processes and are essential to the conservation of the species." 77 Fed. Reg. 71,904.

43.    The physical or biological features "essential to the conservation of the northern spotted owl" are forested lands that can be used for nesting, roosting, foraging, or dispersing.

44.    The PCEs of northern spotted owl critical nesting habitat "typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 inches (76 cm) [diameter at breast height]) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly." 77 Fed. Reg. 71,905.

45.     Habitat that meets the species' needs for nesting and roosting generally also provides for foraging and dispersal. However, habitat that supports foraging or dispersal does not always support the other PCEs and does not necessarily provide for nesting or roosting. 77 Fed. Reg. 71,905.

46.     Subunits 3, 5, and 6 of the Klamath East Critical Habitat Unit ("KLE-3", "KLE-5", and "KLE-6", respectively) overlap the Bear Grub and Round Oak timber sales. Each critical habitat unit has a particular purpose for which it was designated. According to the Critical Habitat Rule, "[s]pecial management considerations or protection are required in" KLE-3, KLE-5, KLE-6, "to address threats to the essential physical or biological features from current and past timber harvest, losses due to wildfire and the effects on vegetation from fire exclusion, and competition with barred owls." 77 Fed. Reg. 71,933–35.

47.     KLE-3's functions include east-west connectivity between subunits and critical habitat units, and demographic support. KLE-3 facilitates spotted owl movements between the western Cascades and coastal Oregon and the Klamath Mountains. There are approximately 100 total historic spotted owl site centers located on BLM lands in KLE-3. 77 Fed. Reg. 71,934.

48.     KLE-5's functions include north-south connectivity and demographic support. There are approximately 40 total historic spotted owl site centers located on BLM lands in KLE-5. 77 Fed. Reg. 71,934–35.

49.     KLE-6's functions include north-south connectivity and demographic support. There are approximately 80 total historic spotted owl sites on federal lands in KLE-6. 77 Fed. Reg. 71,935.

50.     All of the unoccupied and likely occupied sites within KLE-3, KLE-5, KLE-6, including those targeted for logging by BLM, are "essential for the conservation of the species." 77 Fed. Reg. 71,931, 71,934–35. An increase and enhancement of habitat (as opposed to habitat removal) in these subunits "is necessary to provide for viable populations of northern spotted owls over the long term

by providing for population growth, successful dispersal, and buffering from competition with the barred owl." *Id.*

51.     Inside and outside of designated critical habitat, spotted owl "core areas" should contain 50 percent (250 acres) or more acres of nesting-roosting habitat, and "home ranges" should contain 40 percent (1,158 acres) or more combined acres of nesting-roosting habitat, in order to avoid site abandonment. 2016 RMP, 154.

52.     A spotted owl "activity center" or "territory" includes a spotted owl core area surrounded by a larger home range.

**Northern Spotted Owl Demography, Persistence, and Recovery**

53.     In the Pacific Northwest, researchers have been tracking the demography of the spotted owl for decades, including tracking estimated populations across the range of the species. Despite the protections afforded by listing under the Endangered Species Act, the spotted owl continues to decline. In 2016, researchers estimated that the spotted owl population has declined 3.8% per year rangewide. In 2018, researchers estimated that populations in all 11 demography study sites are now declining, and at an accelerated rate.

54.     Given the continued decline of northern spotted owl populations, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the subspecies, retaining both occupied northern spotted owl sites and unoccupied, high-value northern spotted owl habitat across the northern spotted owl's range are key requirements of recovery.

55.     Detectability of northern spotted owls is known to decrease with the presence of barred owls. Olson, Gail S. et al, *Modeling of Site Occupancy Dynamics for Northern Spotted Owls, with Emphasis on the Effects of Barred Owls*, J. OF WILDLIFE MGMT. 69(3), 924 (2005).

56.     Recent research has also documented the importance of maintaining suitable northern spotted owl habitat in landscapes where barred owls are present. Wiens, David J., *Competitive Interactions and Resource Partitioning Between Northern Spotted Owls and Barred Owls in Western Oregon*, WILDLIFE MONOGRAPHS 185, 38 (2014) corroborated other studies which found that the "loss of habitat will likely further constrain the two species to the same set of limited resources, thereby increasing competitive pressure and leading to additional negative impacts on spotted owls." The findings of Dugger, Katie M., *The effects of habitat, climate, and Barred Owls on long-term demography of Northern Spotted Owls*, THE CONDOR 118 (2016) were also consistent with other studies which provided "recommendations to preserve as much high-quality habitat in late successional forests as possible across the range of the subspecies."

57.     Reduced habitat and increased habitat fragmentation will also increase the potential for competitive interactions between northern spotted and barred owls. The action area and the larger landscape in which it occurs are highly fragmented by a "checkerboard" ownership, wherein every other square mile of land owned and managed by BLM alternates with lands managed by other landowners, primarily industry timberland owners. In the action area and the larger landscape, FWS considers most private industrial timber lands to be non-habitat. As implementation of timber sales further reduces the amount of suitable northern spotted owl habitat on BLM lands, competition between northern spotted owls and barred owls is expected to increase in remaining areas of suitable habitat in and around the project areas.

58.     Northern spotted owls in the Bear Grub and Round Oak timber sale planning areas are declining precipitously, and increased habitat fragmentation and barred owl encroachment will likely result in the extirpation of spotted owls from the planning areas.

**Wildfire Risk in Southwestern Oregon**

59.     The best available science indicates that forests in western North America are significantly departed from historical conditions. Intensive timber harvest has removed large-diameter fire-resilient tree species, and the advent of fire suppression in the early 20th century has removed the primary disturbance agent—wildfire—from the landscape. Because the region evolved with wildfire, the absence of this disturbance agent, plus historic timber harvest, has resulted in dense, overstocked forests that are especially prone to wildfire in many places.

60.      The best available science also indicates that intensive timber harvest that removes all or most of the forest canopy and establishes young, second-growth early seral stands further increases the risk of future wildfire. Donato, D.C. et al, *Post-Wildfire Logging Hinders Regeneration and Increases Fire Risk*, SCIENCE 311 (Jan. 20, 2006). This wildfire risk effect is especially pronounced in checkerboard landownership patterns that characterize the Bear Grub and Round Oak timber sale project areas. Zald, Harold S. J. and Dunn, Christopher J., *Severe fire weather and intensive forest management increase fire severity in a multi-ownership landscape*, ECOLOGICAL APPLICATIONS, 1-13 (2018); Clark, Darren A. et al, *Relationship Between Wildfire, Salvage Logging, and Occupancy of Nesting Territories by Northern Spotted Owls*, J. OF WILDLIFE MGMT. 77(4), 672–688 (2013). By contrast, maintaining late successional stands including northern spotted owl habitat can buffer the negative effects of climate change, by enhancing resistance to high-severity fires. Lesmeister, Damon B. et al, *Mixed-severity wildfire and habitat of an old-forest obligate*, ECOSPHERE 10(4) (April 2019).

61.     Global climate change is resulting in hotter, drier summers, and less snow accumulation during the winters in the region. As a result, "fire season" in southwestern Oregon has grown longer and more unpredictable.

62.     In addition, humans have proliferated into the "wildland-urban interface," or the area between human development and undeveloped forestlands: this zone has increased by 41%— or 46 million acres—over the past 20 years. United States Forest Service, Areas where homes, forests mix

increased rapidly over two decades, Northern Research Station (May 19, 2019),

https://www.nrs.fs.fed.us/news/release/wui-increase.

**The 2016 Resource Management Plan for Southwestern Oregon**

63.    Congress enacted the Federal Land Policy and Management Act ("FLPMA") in 1976, in part

"to provide for the management, protection, development, and enhancement of the public lands."

Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present

and future use of public lands be "projected through a land use planning process." 43 U.S.C. §

1701(a)(2). Furthermore, Congress expressed its belief that our public land should "be managed in a

manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and

atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA requires

BLM to develop land use plans, called resource management plans ("RMP"), that govern the use of

the land it manages. 43 U.S.C. § 1712. Once a land use plan has been developed, BLM is required to

manage its lands in conformity with the plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5–3(a).

64.    BLM revised the RMP for Southwestern Oregon, including the Medford District, in 2016

("2016 RMP"). The 2016 RMP governs the Bear Grub and Round Oak timber sales. FWS prepared

a BiOp for the 2016 RMP in 2016 ("2016 RMP BiOp").

65.    The 2016 RMP created a system of land use allocations that BLM uses in planning timber

sales. These allocations include in pertinent part the Harvest Land Base ("HLB"), where BLM

focuses its timber sale planning in order to meet its Allowable Sale Quantity ("ASQ") or prescribed

timber harvest production level; and Late-Successional Reserves ("LSRs"), large blocks of habitat

where BLM intends to "focus the recovery of northern spotted owl." The management objectives

for the HLB include managing forest stands to achieve continual timber production, and offer such

timber for sale to meet the ASQ. The management objectives for the LSR include maintaining

existing and promoting the development of new NRF habitat for the northern spotted owl.

66.     Despite the declared management objective for the LSR land use allocation, BLM has planned and continues to plan timber sales—including the two challenged in this case—that involve downgrading and removing substantial amounts of late-successional habitat. The Medford District BLM has recently proposed an "Integrated Vegetation Management Effort" that would result in the downgrading of thousands of acres of suitable northern spotted owl habitat within LSRs, belying its contention that the LSRs are reserves for the recovery of listed species.

**The Medford District BLM's Fiscal Year 2020 Projects**

67.     On May 21, 2020, the Medford District of BLM transmitted its Biological Assessment ("BA") for the Medford BLM FY 2020 projects, comprised of the Bear Grub and Round Oak timber sale projects ("FY 2020 BA"). In the FY 2020 BA, BLM determined that both timber sales may affect, and are likely to adversely affect northern spotted owls and their designated critical habitat, and therefore required formal consultation under Section 7(a)(2) of the ESA.

68.     On July 24, 2020, the Roseburg Field Office of FWS transmitted its combined FY 2020 BiOp for the Bear Grub and Round Oak timber sales. In the FY2020 BiOp, FWS concluded that the Bear Grub and Round Oak timber sales, including implementation of measures to avoid take of northern spotted owls, is not likely to jeopardize the continued existence of the northern spotted owl or to destroy or adversely modify its critical habitat.

69.     The Bear Grub and Round Oak timber sales are located in southwest Oregon, between the Cascade mountain range and the Coast Range.

70.     As pictured below, both timber sales are located on BLM land that is heavily checkerboarded.

71.     ///

72.     ///

73.     ///



74.



75.

76.     There are 7,571 acres of mapped LSR in the Bear Grub and Round Oak action areas.

77.     Combined, the Bear Grub and Round Oak timber sales authorize the removal or downgrade

of 3,100 acres of nesting, roosting, and foraging (NRF) habitat; and the removal of an additional 878

acres of dispersal-only (D) habitat.

78.     There are 25 known northern spotted owl sites with home ranges entirely within the Bear Grub timber sale action area. 579 acres of NRF habitat within these home ranges would be removed or downgraded. There are 12 additional northern spotted owl home ranges partially overlapping the Bear Grub timber sale action area.

79.     There are 18 known northern spotted owl sites with home ranges entirely within the Round Oak timber sale action area. 1,869 acres of NRF habitat within these home ranges would be removed or downgraded. There are 4 additional northern spotted owl home ranges partially overlapping the Round Oak timber sale action area.

80.     Of the 43 known northern spotted owl sites with home ranges entirely within the two timber sale action areas, FWS determined that 37 sites (86%) would likely be adversely affected. Of those 37 sites, two are confirmed occupied, and the occupancy status of two more is unknown.

81.     The FY2020 BiOp authorizes the removal and modification of "substantial amounts" of habitat in two occupied northern spotted owl sites that are already habitat deficit according to the best available scientific information, meaning they are already below the threshold for incidental take. FWS determined logging at these sites "would exacerbate the overall poor habitat conditions . . . and therefore" is "likely to adversely affect spotted owl occupying these sites." FWS has not explained why the two timber sales will not result in take when these sites are already habitat-deficit.

82.     Logging in the Bear Grub and Round Oak timber sales "would remove large trees that could serve as spotted owl nest structure, reduce the overall average canopy cover within the affected stand to near or below approximately 40 percent, diminish the existing multi-canopy (layers), and other key habitat features, rendering the affected stands non-functional as spotted owl nesting habitat. These treatments, primarily large tree removal, are expected to result in mostly unusable NRF habitat within the affected stands for decades post-treatment."

83.    The Bear Grub and Round Oak timber sale projects authorize logging in occupied northern spotted owl home ranges. The Bear Grub and Round Oak timber sale projects do not prohibit logging trees immediately adjacent to known nest trees. The FY 2016 BiOp anticipates that nest trees could be damaged by yarding cables during harvest.

84.    The FY 2020 BiOp recites a number of Project Design Criteria ("PDCs"). One PDC allows BLM to "modify all projects, anywhere in the process of project completion, should new information regarding effects to . . . listed species . . . arise." Other PDCs include a prohibition on removing known nest trees; a requirement that units be dropped or modified to eliminate potential adverse effects that could lead to an incidental take determination in the event spotted owls are located during remaining protocol surveys; retaining multiple canopy levels, decadent components, and an average of 60% canopy cover in NRF habitat; seasonal operating restrictions; and limiting the size of small openings in canopy cover. The FY2020 BiOp states that these PDCs are "expected to be implemented to the fullest extent practicable." Throughout the FY2020 BiOp, and in its conclusion, FWS relied on these measures in determining that the Bear Grub and Round Oak timber sales are not likely to jeopardize the continued existence of the northern spotted owl or destroy or adversely modify its critical habitat.

85.    In reaching this conclusion, FWS also relied on the "future development of spotted owl habitat and management of barred owls" in the LSR, which it "expect[s] to provide for territories that will support future spotted owl populations."

86.    In its incidental take statement, FWS determined that the Bear Grub and Round Oak timber sales could expose northern spotted owls to undefined "stressors," but determined these adverse effects would be mitigated by implementation of "project design criteria such as timing restrictions to avoid or minimize disturbance of spotted owls," and by modifying or dropping treatment units to

avoid take if spotted owls are detected. Because of these measures, FWS "does not anticipate the Bear Grub and Round Oak [timber sales] will incidentally take any spotted owls."

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Endangered Species Act

### FWS failed to consider important aspects of the problem in the FY 2020 BiOp

87.    Plaintiffs reallege all preceding paragraphs.

88.    In a BiOp, FWS is required to analyze and determine whether BLM's actions are likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). In doing so, FWS must utilize the best scientific and commercial data available. *Id.* A BiOp is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem . . . ." *Native Fish Soc. v. Nat'l Marine Fisheries Servs.*, 992 F. Supp. 2d 1095, 1111 (D. Or. 2014) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 42 (1983)). "In the context of the ESA, the 'problem' is whether a proposed project will cause jeopardy to a listed species[,] and 'any effect that is likely to adversely affect the species is plainly an important aspect of the problem.'" *Native Fish Society*, 992 F. Supp. 2d at 1111 (quoting *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1270 (E.D. Cal. 2010)).

89.    First, in the FY 2020 BiOp FWS failed to consider effects on spotted owl recovery, unlawfully focusing its analysis only on the short-term survival of the species and failing to adequately analyze how the Bear Grub and Round Oak timber sales could affect the likelihood of northern spotted owl recovery in the longer term. FWS dismissed the likely "reductions to reproduction, survival, feeding and sheltering" of northern spotted owls, based on the "intent" that logging will provide "long-term benefits to spotted owls" by "creating" suitable habitat decades in the future, after the treatments: essentially, FWS relies on the regrowth of suitable habitat in the

future to provide benefits to the species. FWS failed to analyze whether and how northern spotted owls in the project areas will survive and recover before these purported long-term benefits materialize. This failure is compounded by the fact that presently-occupied northern spotted owl sites may be logged when the occupant owl(s), predictably, disappear.

90.    Second, in the FY 2020 BiOp FWS failed to consider effects to northern spotted owls outside of known home ranges, commonly called "floaters." The best scientific and commercial data available indicates that such owls are critically important to maintaining overall population viability. Franklin, Alan B., *Population Regulation in Northern Spotted Owls* (1992), reprinted in Wildlife 2001: Populations, ELSEVIER APPLIED SCIENCE, 815–27 (London 1992). Adverse effects to floaters translate directly into adverse effects to northern spotted owl dispersal, re-establishment, and recovery. FWS's failure to consider important effects to floaters renders its "no jeopardy" and "no incidental take" determinations arbitrary and capricious.

91.    Third, in the FY 2020 BiOp FWS failed to consider how the removal, downgrade, and modification of suitable spotted owl habitat through the Bear Grub and Round Oak timber sales will disproportionately and adversely impact northern spotted owls by giving barred owls a greater competitive advantage over northern spotted owls in the timber sale project areas post-harvest. The best scientific and commercial data available indicates that barred owls outcompete northern spotted owls across all habitat types and are more adaptable to lower quality habitat than northern spotted owls.

92.    Fourth, in the FY 2020 BiOp FWS assumed that barred owls will remain the primary limiting factor on northern spotted owl survival and recovery, but failed to consider the possibility that the experimental barred owl control program will succeed, in which case a lack of suitable spotted owl habitat will again be the primary limiting factor for spotted owl survival and recovery in the Bear Grub and Round Oak timber sale project areas.

PAGE 22 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

93.     FWS's failure to analyze in the FY 2020 BiOp the Bear Grub and Round Oak timber sales'
effects on spotted owl recovery, effects on spotted owls outside of known home ranges, effects on
barred owl competitive advantage, and effects on spotted owl survival and recovery in the event the
experimental barred owl control program succeeds, is arbitrary and capricious, and not in
accordance with the ESA, in violation of the APA. 5 U.S.C. § 706(2)(A).

94.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this
litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF

### Violation of the Endangered Species Act

### FWS improperly relied on conservation measures in reaching its no jeopardy and no destruction or adverse modification conclusions

95.     Plaintiffs reallege all preceding paragraphs.

96.     When preparing a BiOp under Section 7(a)(2) of the ESA, FWS may rely on mitigation and
conservation measures in determining an action is unlikely to jeopardize the continued existence of a
listed species or result in the destruction or adverse modification of its critical habitat only if such
measures "constitute a clear, definite commitment of resources, and [are] under agency control or
otherwise reasonably certain to occur." *Ctr. for Biological Diversity v. Bernhardt*, No. 18-73400, 2020 WL
7135484, at *12 (9th Cir. Dec. 7, 2020) (citations omitted). Such measures "must be subject to
deadlines or otherwise-enforceable obligations; and most important, they must address the threats to
the species in a way that satisfies the jeopardy and adverse modification standards." *Id.* (citing *Ctr. for
Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002). Mitigation measures relied
on in a BiOp "cannot refer only to generalized contingencies or gesture at hopeful plans; they must
describe, in detail, the action agency's plan to offset the environmental damage caused by the
project." *Id.*

97.     In concluding that the Bear Grub and Round Oak timber sales are not likely to jeopardize the continued existence of the spotted owl or result in the destruction or adverse modification of its critical habitat, FWS relied improperly on a number of PDCs and other measures and assumptions that are not reasonably certain to occur, or address threats to the species in a way that satisfies the jeopardy and adverse modification standards.

98.     One PDC allows BLM to "modify all projects, anywhere in the process of project completion, should new information regarding effects to . . . listed species . . . arise." This PDC is unenforceably vague, and does not constitute a clear and definite commitment of resources. The FY2020 BiOp "expect[s]" several other PDCs will be "implemented to the fullest extent practicable[,]" including not removing known nest trees; a requirement that units be dropped or modified to eliminate potential adverse effects that could lead to an incidental take determination in the event spotted owls are located during remaining protocol surveys; retaining multiple canopy levels, decadent components, and an average of 60% canopy cover in NRF habitat; seasonal operating restrictions; and limiting the size of small openings in canopy cover. However, these measures are only expected to be implemented "to the fullest extent practicable," and FWS failed to define under what circumstances implementation of one or more PDCs might not be practicable. Therefore, these PDCs are not enforceable, do not constitute a clear and definite commitment of resources, are not reasonably certain to occur. Throughout the FY 2020 BiOp, and in its conclusion, FWS expressly relied on these PDCs in determining that the Bear Grub and Round Oak timber sales are not likely to jeopardize the continued existence of the spotted owl or destroy or adversely modify its critical habitat.

99.     In reaching its conclusion that the Bear Grub and Round Oak timber sales are not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat, FWS also relied on the anticipated future development of

northern spotted owl habitat in the LSRs to provide for future spotted owl populations. In the FY 2020 BiOp FWS assumed that the reserve system is "sufficient . . . to assure spotted owl persistence" for fifty years, but this reserve system was planned based on a model that assumed the continuation of wildfire trends documented between 1996 and 2006. Both climate change and land use change on non-federal lands have increased the risk of wildfire to northern spotted owl habitat in southwest Oregon. The FY2020 BiOp itself acknowledges that, "given the increased frequency of large wildfires, and the disproportionate impact of fires in the large reserves in southwest Oregon," habitat protection in the LSR "may be challenged in the near future." In 2020 alone, wildfires burned 234,047 acres of BLM-managed land in Oregon. Because of climate change, wildfire, drought, and other stochastic events in southwest Oregon beyond the control of the agency, the development of such habitat in the LSRs is speculative at best, "gestur[ing] at hopeful plans" rather than setting forth a "clear, definite commitment of resources" that is "under agency control or otherwise reasonably certain to occur." *Ctr. for Biological Diversity*, 2020 WL 7135484, at *12.

100.    In the FY2020 BiOp FWS also relied explicitly on the assumption that the Bear Grub and Round Oak projects will be "implemented over several years," thus "distributing" adverse effects to northern spotted owls. However, this assumption is based on "past implementation experience," is unenforceably vague, does not follow from any clear and definite commitment of agency resources, and is not reasonably certain to occur given present economic uncertainties. The assumption that "distributing" adverse effects to spotted owls over time somehow moderates those adverse effects or otherwise does not result in incidental take of the species is not based on the best available scientific and commercial information.

101.    The decision of FWS to rely on PDCs, measures, and key assumptions that are not reasonably specific, certain to occur, capable of implementation, subject to deadlines or otherwise-enforceable obligations, and/or that address the threats to the species in a way that satisfies the

jeopardy and adverse modification standards, is arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

102.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

**THIRD CLAIM FOR RELIEF**

**Violation of the Endangered Species Act**

**FWS's failure to authorize incidental take for the Bear Grub and Round Oak timber sales is arbitrary and capricious**

103.    Plaintiffs reallege all preceding paragraphs.

104.    When FWS concludes that an action is not likely to jeopardize the existence of a listed species or adversely modify its habitat, but is likely to cause incidental take, FWS must issue an incidental take statement. 16 U.S.C. § 1536(b)(4); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007). An incidental take statement "specifies the impact of such incidental taking on the species . . . ." 16 U.S.C. § 1536(b)(4)(C)(i).

105.    The FY 2020 BiOp concludes that implementation of the Bear Grub and Round Oak timber sales are not reasonably certain to result in incidental take of spotted owls, because of PDCs and because BLM will drop areas from treatment or modify treatment prescriptions where spotted owls are detected. However, the FY 2020 BiOp states that adverse effects are anticipated at 37 spotted owl sites due to diminished quantity and quality of habitat resulting in reductions to reproduction, survival, feeding and sheltering. In particular, adverse effects are anticipated at two sites, designated 0971O and 4079O, "where the current amount of NRF habitat in the core-use area is below the habitat range as informed by best available information *and* where substantial amounts of dispersal-only habitat removal . . . or NRF habitat modification are proposed within the core-use area. Treatments in these specific core-use areas would exacerbate the overall poor habitat conditions at

sites 0971O and 4079O and therefore, treatments are likely to adversely affect spotted owl

occupying these sites." BiOp, 70 (emphasis original). The FY2020 BiOp fails to explain why planned

treatments in sites 0971O and 4079O will not cause incidental take.

106.    FWS's determination of no incidental take is inconsistent with the fact that the timber sales

will result in further fragmentation of the already fragmented northern spotted owl habitat in the

planning area, impair breeding and feeding behaviors, and exacerbate barred owl encroachment—

effects that are reasonably certain to cause the abandonment of some or all occupied nest sites in the

action areas, retard recovery, and therefore constitute take. *Ariz. Cattle Growers' Ass'n v. U.S. Fish &*

*Wildlife Serv.*, 273 F.3d 1229, 1238 (9th Cir. 2001) ("significant impairment of the species' breeding or

feeding habits" accompanied by habitat degradation that "retards . . . recovery of the species" may

constitute take) (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994)).

107.    FWS's conclusion that the Bear Grub and Round Oak timber sales will not result in

incidental take is arbitrary and capricious and violates the ESA. 5 U.S.C. § 706(2)(A).

108.    FWS's conclusion that no incidental take authorization is required is arbitrary, capricious,

and violates the ESA. 5 U.S.C. § 706(2)(A).

109.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this

litigation pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412.

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Declare that the FY 2020 BiOp is unlawful because it is arbitrary, capricious, an abuse of

     agency discretion, and not in accordance with law;

2.    Declare that the FY 2020 BiOp violates the ESA and its implementing regulations;

3.    Declare that the Incidental Take Statement is unlawful because it is arbitrary, capricious,

     an abuse of agency discretion, and not in accordance with law;

4.  Declare that the Incidental Take Statement violates the ESA and its implementing regulations;

5.  Enter an order vacating the FY 2020 BiOp and remanding it to FWS until such time as FWS demonstrates to this Court that it has complied with the law;

6.  Enter an order vacating the Incidental Take Statement and remanding it to FWS until such time as FWS demonstrates to this Court that it has complied with the law;

7.  Award Plaintiffs their costs of suit and attorneys' fees; and

8.  Grant Plaintiffs such other and further relief as the Court may deem just, proper, and necessary.

Respectfully submitted and dated this 14th Day of January, 2021.

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Ph. (541) 778-6626
sangyeij@westernlaw.org

Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

*Attorneys for Plaintiffs*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs state that they have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted and dated this 14th of January, 2021.

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Ph. (541) 778-6626
sangyeij@westernlaw.org

Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

*Attorneys for Plaintiffs*