SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and CASCADIA WILDLANDS, <br><br> *Plaintiffs,* <br><br> vs. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> *Defendant*, <br><br> and <br><br> BOISE CASCADE WOOD PRODUCTS, L.L.C., and TIMBER PRODUCTS COMPANY, <br><br> *Defendant-Intervenors.* | Civ. Case No. 1:21-cv-00058-CL <br><br> **PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION** <br><br> ORAL ARGUMENT REQUESTED |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

DOCUMENTS CITED ............................................................................................... v

TABLE OF ACRONYMS ......................................................................................... vii

MOTION ..................................................................................................................... 1

MEMORANDUM ........................................................................................................ 2

I.     INTRODUCTION ............................................................................................. 2

II.    JURISDICTION ............................................................................................... 5

III.   LEGAL BACKGROUND ................................................................................. 5

      A.    The Endangered Species Act ................................................................ 5

      B.    The Administrative Procedure Act ....................................................... 7

IV.   FACTUAL BACKGROUND ............................................................................ 7

      A.    The Northern Spotted Owl (*Strix occidentalis caurina*) ................... 7

      B.    The Barred Owl (*Strix varia*) ............................................................ 8

      C.    The Medford District BLM's FY 2020 Projects ................................. 9

V.    TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION STANDARD IN ESA CASES .......................................................................... 10

VI.   KS WILD HAS RAISED SERIOUS QUESTIONS AND IS LIKELY TO PREVAIL ON THE MERITS ................................................................................. 12

      A.    FWS Failed to Consider Important Aspects of Northern Spotted Owl Conservation in the BiOp .................................................................. 12

           1.   *FWS Failed to Consider the Long-Term Effects of the Action on Northern Spotted Owls Given the Comparatively Shorter Life Span of the Species.* ............................................................ 13

           2.   *FWS Failed to Consider the Effects of the Action on Nonresident Northern Spotted Owls Known as "Floaters"* ............................. 15

           3.   *FWS Failed to Consider the Effects of the Action in Light of the Possible Success of the Ongoing Experimental Barred Owl Control Program* ....... 18

      B.    The BiOp Unlawfully Relies on Measures Not Reasonably Certain to Occur ..... 21

           1.   *Project Design Criteria* ............................................................. 21

           2.   *Late-Successional Reserves* ..................................................... 24

      C.    FWS's No Incidental Take Determination Violates the ESA .............. 26

VII.  KS WILD WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY IN THE ABSENCE OF A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION ................................................................................................... 30

VIII. THE BALANCE OF THE EQUITIES TIPS SHARPLY IN FAVOR OF KS WILD ..... 33

IX.   NO BOND SHOULD BE REQUIRED IN THIS CASE ................................... 35

X.    CONCLUSION ................................................................................................ 35

# TABLE OF AUTHORITIES

## Cases

### United States Supreme Court

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................5
*Michigan v. EPA*, 576 U.S. 743 (2015) ...........................................................29, 30
*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...............................31
*Sampson v. Murray*, 415 U.S. 61 (1974) ......................................................34, 35
*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................11, 33
*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .............................................11

### United States Courts of Appeals

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................... *passim*
*Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229 (9th Cir. 2001) ............................7
*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) ........................................18, 19, 20
*California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*,
        766 F.2d 1319 (9th Cir. 1985) ....................................................................35
*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) .............................................20
*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ......................31
*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) ...................21, 23, 26, 27
*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) ...................30
*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ........................................18, 20
*Los Angeles Mem. Coliseum v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980) ..............34
*Nat'l Wildlife Fed'n v. Burlington N. R. R.*, 23 F.3d 1508 (9th Cir. 1994) ............................29, 31
*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005) .............11, 33
*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ........21, 23, 26
*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007) ...............................26, 27
*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.* (*PCFFA I*),
        265 F.3d 1028 (9th Cir. 2001) ................................................................14, 15
*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation* (*PCFFA II*),
        426 F.3d 1082 (9th Cir. 2005) .............................................................13, 14, 15
*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ....................................32
*Turtle Island Restoration Network v. U.S. Dept. of Commerce*, 878 F.3d 725 (9th Cir. 2017).....30
*Wash. Toxics Coal. v. EPA*, 413 F.3d 1024 (9th Cir. 2005) ...................................11, 33

### United States District Courts

*Am. Forest Res. Council v. Hammond*, 422 F. Supp. 3d 184 (D.D.C. 2019) ........................2
*Audubon Soc'y of Portland v. FWS*, 21-cv-00443 (D. Or. Mar. 23, 2021) ...........................3
*Carpenters Industrial Council v. Bernhardt*, 13-cv-00361-RJL (D.D.C. April 26, 2020).............3
*Ctr. for Biological Diversity v. FWS*,
        No. C-08-1278 EMC, 2011 WL 6813200 (N.D. Cal. Dec. 28, 2011) .............................31
*Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964 (N.D. Cal. 1990) .............................30
*Mayo v. U.S. Gov't Printing Office*, 839 F. Supp. 697 (N.D. Cal. 1992) ........................1
*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095 (D. Or. 2014) .............12
*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290 (D. Or. 2011) ...........33
*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
        No. 3:10-cv-1129-AC, 2013 WL 1294647 (D. Or. Mar. 27, 2013)..................................30

*Or. Nat. Desert Ass'n v. Kimbell*,
    No. 07-1871-HA, 2009 WL 1663037 (D. Or. June 15, 2009)..........................................33
*Or. Nat. Desert Ass'n v. Tidwell*,
    No. 07-1871-HA, 2010 WL 5464269 (D. Or. Dec. 30, 2010)..........................................30
*Pac. Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018)...............2
*Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489 (D. Or. 1992)............................................32
*Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991)..............................32, 35
*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
    723 F. Supp. 2d 1247 (E.D. Cal. 2010)..........................................................................12
*Wilderness Soc'y v. Tyrrel*, 701 F. Supp. 1473 (E.D. Cal. 1988) ..................................................35


**Federal Statutes**

5 U.S.C. §§ 701 *et seq*..................................................................................................................5
5 U.S.C. § 702.................................................................................................................................7
5 U.S.C. § 704............................................................................................................................5, 7
5 U.S.C. § 705.................................................................................................................................7
5 U.S.C. § 706(2)(A)......................................................................................................................7
16 U.S.C. §§ 1531 *et seq*..............................................................................................................5
16 U.S.C. § 1531(b)........................................................................................................................5
16 U.S.C. § 1532.....................................................................................................................5, 6, 7
16 U.S.C. § 1533(a)(3)....................................................................................................................6
16 U.S.C. § 1533(f)(1)....................................................................................................................6
16 U.S.C. § 1536(a)(2)....................................................................................................................6
16 U.S.C. § 1536(b)................................................................................................6, 7, 25, 26, 27
16 U.S.C. § 1538(a)(1)(B)..............................................................................................................7
28 U.S.C. § 1331.............................................................................................................................5
28 U.S.C. § 1391.............................................................................................................................5
28 U.S.C. § 2201.............................................................................................................................5
28 U.S.C. § 2202.............................................................................................................................5


**Federal Regulations & Federal Register Notices**

50 C.F.R. § 17.3..............................................................................................................................7
50 C.F.R. § 17.11(h)........................................................................................................................7
50 C.F.R. § 402.14(d)......................................................................................................................6
50 C.F.R. § 402.14(g)(7).................................................................................................................6
*Determination of Threatened Status for the Northern Spotted Owl*,
    55 Fed. Reg. 26,114 (June 26, 1990).................................................................................7
*Revised Critical Habitat for the Northern Spotted Owl: Final Rule*,
    77 Fed. Reg. 71,876 (Dec. 4, 2012) ..................................................................................8
*Proposed Rule; Endangered and Threatened Wildlife and Plants; Revised Designation of
    Critical Habitat for the Northern Spotted Owl*, 85 Fed. Reg. 48,487 (Aug. 11, 2020).......3
*Endangered and Threatened Wildlife and Plants; 12-Month Finding for the Northern Spotted
    Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020) .....................................................................3
*Final Rule; Endangered and Threatened Wildlife and Plants; Revised Designation of Critical
    Habitat for the Northern Spotted Owl*, 86 Fed. Reg. 4,820 (Jan. 15, 2021)......................3

**Miscellaneous**

FED. R. CIV. PRO. 65(a) ........................................................................1

FED. R. CIV. PRO. 65(b) ........................................................................1

FWS, Barred Owl Study Update........................................................19

FWS, Endangered Species Consultation Handbook ....................12

**DOCUMENTS CITED**

| BRIEF CITATION | DOCUMENT TITLE | BROWN DECLARATION EXHIBIT |
|---|---|---|
| The BiOp | *Medford District of the Bureau of Land Management's FY20 Batch of Projects that May Affect the Northern Spotted Owl and its designated Critical Habitat (Reference Number 01EOFW00-2020-F-0508)* | Exhibit A |
| FWS 2021b | Memorandum from State Supervisor, Oregon Fish and Wildlife Office, to Acting Assistant Regional Director, Ecological Services, Interior Regions 9/12, Portland, Oregon (Jan. 15, 2021) | Exhibit B |
| Recovery Plan | 2011 Northern Spotted Owl Recovery Plan | Exhibit C |
| Franklin et al. 1992 | Franklin, A.B. 1992. *Population regulation in northern spotted owls: theoretical implications for management*. Pages 815-827 in D. R. McCullough and R. H. Barrett (eds.)., Wildlife 2001: Populations. Elsevier Applied Sciences, London, England. | Exhibit D |
| Forsman et al. 2002 | Forsman, E.D., Anthony, R. G., Reid, J. A., Loschl, P. J., Sovern, S. G., Taylor, M., Biswell, B. L., Ellingson, A., Meslow, E. C., Miller, G. S., Swindle, K. A., Thrailkill, J. A., Wagner, F. F., and D. E. Seaman. 2002. *Natal and breeding dispersal of northern spotted owls. Wildlife Monographs*, No. 149. 35 pp. | Exhibit E |
| Wiens et al. 2020 | Wiens, J.D., Dugger, K.M., Lesmeister, D.B., Dilione, K.E., and Simon, D.C., 2020, *Effects of barred owl (Strix varia) removal on population demography of northern spotted owls (Strix occidentalis caurina) in Washington and Oregon—2019 annual report*: U.S. Geological | Exhibit F |

| | Survey Open-File Report 2020–1089, 19 p., https://doi.org/10.3133/ofr20201089 | |
|---|---|---|
| Reid et al. 1992 | Reid, J.A.; Forsman, E.D.; Lint, J.B. 1992. *Demography of spotted owls in west central Oregon*. Proceedings of the 62nd annual meeting of the Cooper Ornithological Society symposium; 1992 June 22-28; Seattle, WA (excerpts) | Exhibit G |
| Information Bulletin | Information Bulletin No. OR-2017-063, *Timber Sale Planning Approaches to Avoid Take of Northern Spotted Owls Under the 2016 Resource Management Plans* (July 21, 2017) | Exhibit H |

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| ASQ | Allowable Sale Quantity |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| ESA | Endangered Species Act |
| FWS | Fish and Wildlife Service |
| HLB | Harvest Land Base |
| ITS | Incidental Take Statement |
| LSR | Late-Successional Reserve |
| LUA | Land Use Allocation |
| NRF | Nesting, Roosting, Foraging |
| NSO | Northern Spotted Owl |
| O&C | Oregon & California |
| PDC | Project Design Criteria |
| RMP | Resource Management Plan |

## MOTION

Pursuant to FED. R. CIV. PRO. 65(a) and (b), Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, and Cascadia Wildlands (collectively, "KS Wild"), respectfully move this Court for a temporary restraining order/preliminary injunction in this case. *Mayo v. U.S. Gov't Printing Office*, 839 F. Supp. 697, 701 (N.D. Cal. 1992), *aff'd*, 9 F.3d 1450 (9th Cir. 1993) (irreparable injury must be both likely and immediate to secure TRO). KS Wild seeks injunctive relief against the logging of older forest that currently functions as suitable northern spotted owl ("NSO") habitat. *See* Fiscal Year 2020 biological opinion (the "BiOp"), 16 (noting that "Twenty-six percent (2,131 acres) of the proposed action is planned in lands that do not currently function as spotted owl habitat:" KS Wild does not seek injunctive relief against this 26% of the action).

Federal defendants have informed KS Wild that implementation of the Lodgepole and Ranchero timber sales authorized by the BiOp is underway, and that logging of suitable spotted owl habitat is ongoing. Pursuant to Local Rule 7-1(a), KS Wild certifies that that it has consulted with the opposing parties regarding this motion, and that federal Defendants Fish and Wildlife Service and Defendants-Intervenors Boise Cascade oppose the motion. Oral argument on the motion is requested.

The questions to be decided by this motion are as follows:

1.     Did the Fish and Wildlife Service (FWS) violate the Endangered Species Act (ESA) when it failed to consider important aspects of northern spotted owl conservation in the BiOp?

2.     Did FWS violate the ESA when it relied on unenforceable and uncertain conservation measures in concluding no jeopardy or adverse modification in the BiOp?

3.     Did FWS violate the ESA when it determined zero incidental take in the BiOp?

4.      Has KS Wild met its burden such that a temporary restraining order/preliminary

injunction should issue?

As logging is currently underway, KS Wild respectfully asks this court to issue a

temporary restraining order/preliminary injunction barring further implementation of the BiOp

pending a decision on the merits. This motion is supported by the following Memorandum and

declarations of George Sexton and Susan Jane M. Brown[1] filed herewith.

## MEMORANDUM

## I.      INTRODUCTION.

The northern spotted owl is one of the most studied raptors in the world, and one of the

most notorious residents of the Pacific Northwest. Today, the most recent chapter in the spotted

owl's history is unfolding before a watchful public and judiciary. In 2016, the Bureau of Land

Management (BLM) revised its Resource Management Plan (RMP) to exclude the Oregon and

California lands (O&C) from inclusion in the landmark Northwest Forest Plan, strongly

proportioning the O&C lands into various land use allocations including Late-Successional

Reserves (LSRs) where spotted owl conservation and recovery would be prioritized, and the

Harvest Land Base (HLB) where it would not. The 2016 RMP has withstood judicial review in

this Court and the Ninth Circuit, *Pac. Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 WL 6735090

(D. Or. Oct. 12, 2018), *aff'd*, 815 F. App'x 107 (9th Cir. 2020), but has failed to do so in a

different jurisdiction where its ultimate fate currently resides, *see Am. Forest Res. Council v.*

*Hammond*, 422 F. Supp. 3d 184 (D.D.C. 2019), *appeal filed sub nom. Am. Forest Res. Council v.*

*United States*, 20-5008 (D.C. Cir. Jan. 24, 2020).

---

[1] The Declaration of Susan Jane M. Brown is filed herewith to provide the Court with the
necessary documents to resolve this motion given that federal defendants have not yet filed an
administrative record for this case.

In 2020, federal defendant FWS settled a lawsuit with the timber industry over the 2012 designation of northern spotted owl critical habitat. *Carpenters Industrial Council v. Bernhardt*, 13-cv-00361-RJL (D.D.C. April 26, 2020) (order on stipulated settlement agreement). As a result of that settlement agreement, FWS agreed to consider revising the 2012 critical habitat designation, and in August 2020 proposed to eliminate approximately 200,000 acres of critical habitat on O&C lands. *Proposed Rule; Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl*, 85 Fed. Reg. 48,487 (Aug. 11, 2020). At the same time, and in response to federal litigation compelling a response, FWS determined that uplisting of the northern spotted owl from Threatened to Endangered was warranted but precluded by higher priority conservation actions. *Endangered and Threatened Wildlife and Plants; 12-Month Finding for the Northern Spotted Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020). FWS determined that listing the spotted owl as Endangered was warranted but precluded, based on past and current habitat loss from logging and natural disturbance, as well as from the competitive pressure on the spotted owl from the invasive barred owl. *Id*. at 81,145–46.

In January 2021, FWS issued a final rule eliminating 3.4 million acres of northern spotted owl critical habitat in Oregon, Washington, and California. *Final Rule; Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl*, 86 Fed. Reg. 4,820 (Jan. 15, 2021). FWS's 2021 Final Critical Habitat Rule was immediately challenged in this Court, *Audubon Soc'y of Portland v. FWS*, 21-cv-00443 (D. Or. Mar. 23, 2021) (complaint), but apparently had long been strongly criticized by career wildlife biologists at FWS, including the State Supervisor of the Oregon Fish and Wildlife Office. Noting that the 2021 Final Rule was likely to result in the extinction of the species, Oregon State Supervisor Dr. Paul Henson explained that "[m]ost of this exclusion is concentrated in Oregon

and, due to its geographic location and habitat quality, it represents a significant portion of the

NSO's most important remaining habitat." FWS 2021b, 1. Dr. Henson then explained that

> The best scientific information strongly suggests that the NSO population is in a
> precipitous decline, and the Service recently concluded that the NSO warranted uplisting
> to endangered status under the Act. The subspecies is essentially extinct in British
> Columbia, rapidly declining to near extirpation in Washington and parts of Oregon, and
> in the earlier stages of similar declines in the rest of its range. As the statutory definition
> of "endangered" states, the NSO is in very real "danger of extinction throughout all or a
> significant portion of its range." The Director's statement, "yet the NSO population
> continues to persist," seems to suggest the NSO population will continue to persist into
> the foreseeable future. The science simply does not support this suggestion (see below).
> Significant changes to habitat conservation will exacerbate this decline by working
> synergistically with the impacts from barred owl.

*Id*. at 2. Dr. Henson added that "it must be noted that the impact of barred owls on NSO has

made the conservation of extant habitat even more pressing, at least in the near term until a

barred owl management plan is in place and shown to be effective." *Id*. Given the perilous status

of the species, Dr. Henson concluded that:

> (1) NSO populations are declining precipitously due to a combination of historic habitat
> loss and more recent competition with the barred owl; <u>and</u> (2) the only way to arrest this
> decline and have a high probability of preventing extinction (in any timeframe) is to
> manage the barred owl threat and conserve adequate amounts of high quality habitat
> distributed across the range in a pattern that provides acceptable levels of connectivity as
> well as protection from stochastic events.

*Id*. at 4 (emphasis in original).

Against this backdrop, KS Wild challenges FWS's BiOp for the Bear Grub and Round

Oak projects, which will eliminate 3,919 acres of suitable northern spotted owl habitat, including

1,537 acres of designated critical habitat under the ESA. BiOp, i, 60, 94. Although FWS issued

the BiOp prior to eliminating 3.4 million acres of northern spotted owl critical habitat and the

drafting of Dr. Henson's memo, the context is the same: the spotted owl is plummeting towards

extinction due to habitat loss and competition from the barred owl, which can only be arrested by

lethal control of barred owls and protecting more suitable spotted owl habitat from loss to the

axe. Early results from an experimental barred owl control program suggest it is working: a promising step towards addressing one existential threat to the imperiled species.

The other threat—loss of suitable spotted owl habitat to logging—is the subject of this emergency motion for a temporary restraining order/preliminary injunction.

## II.    JURISDICTION.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question). The causes of action arise under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*; and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*; and their implementing regulations. The BiOp constitutes final agency action subject to immediate judicial review. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The requested relief is proper under 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706. An actual, justiciable controversy exists between Plaintiffs and Defendants.

Venue in this Court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The FWS officials who authorized and approved the challenged decisions are headquartered in Roseburg, Oregon, which is located within this district. Plaintiffs have offices within this district.

## III.    LEGAL BACKGROUND.

### A.    The Endangered Species Act.

Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and to "provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An Endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A Threatened species is "any species which is

likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. *Id.* § 1532(20).

The ESA requires FWS to designate any critical habitat for listed species. *Id.* § 1533(a)(3). The ESA defines critical habitat as "the specific areas within the geographical area occupied by the species, at the time it is listed[,] . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection[.]" *Id.* § 1532(5)(A)(i). The ESA also directs FWS to develop and implement recovery plans for listed species. *Id.* § 1533(f)(1).

Section 7 of the ESA requires every federal agency, in consultation with FWS, to insure its actions are "not likely to jeopardize the continued existence" of a listed terrestrial species "or result in the destruction or adverse modification" of a listed terrestrial species' critical habitat. *Id.* § 1536(a)(2). The result of Section 7 consultation is a biological opinion that determines whether an action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of its critical habitat. *Id.* § 1536(b). The BiOp must be based on "the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(d).

Once FWS has determined that an action is not likely to jeopardize a listed species or result in the destruction or adverse modification of its critical habitat, it must determine whether that action is likely to result in any "incidental take" of endangered or threatened species. 16 U.S.C. § 1536(b)(4). If FWS determines that an action "is reasonably certain" to result in incidental take, it must issue an incidental take statement ("ITS"). *Id.*; 50 C.F.R. § 402.14(g)(7). The ITS must (i) specify the impact of incidental taking; (ii) specify reasonable and prudent

measures that are necessary or appropriate to minimize such impact; and (iv) set forth the terms and conditions that the agency and/or third party must comply with in order to implement specified reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C).[2]

**B.     The Administrative Procedure Act.**

The APA confers a right of judicial review on any person that is adversely affected by final agency action. 5 U.S.C. §§ 702, 704. Upon review, the court shall "hold unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Id*. § 706(2)(A).

**IV.     FACTUAL BACKGROUND.**

**A.     The Northern Spotted Owl (*Strix occidentalis caurina*).**

The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and "dark brown eyes surrounded by prominent facial disks." Northern Spotted Owl Recovery Plan, A-1 ("Recovery Plan"). Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, FWS listed the northern spotted owl as a threatened species under the ESA on June 26, 1990. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

---

[2] Without an ITS, an action agency is liable for any "take" it causes to listed species. 16 U.S.C. § 1538(a)(1)(B); *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1239 (9th Cir. 2001) (an ITS "functions as a safe harbor provision immunizing persons" and agencies from liability under Section 9 of the ESA). Take means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in such conduct." 16 U.S.C. § 1532(19). Harm is defined to include significant habitat modification or degradation that results in death or injury to a listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. 50 C.F.R. § 17.3.

Spotted owls rely on late-successional and old-growth forest habitat older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. *Revised Critical Habitat for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876, 71,884 (Dec. 4, 2012). These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. *Id*. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. *Id*. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat. "Dispersal-only" habitat is "habitat that does not meet the criteria to be NRF habitat, but has adequate cover to facilitate movement between blocks of NRF habitat." BiOp, 9.

### B.    The Barred Owl (*Strix varia*).

Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. Barred owls are slightly larger and more aggressive than spotted owls and compete for the same habitat. BiOp, 143–44. According to FWS, "managing sufficient habitat for the spotted owl now and into the future is important for its recovery . . . . Based on the best available scientific information, competition from the barred owl (S. varia) poses a significant and complex threat to the spotted owl." Recovery Plan, vi.

"There is consensus in the literature on the negative influence barred owls are having on northern spotted owl site occupancy, fecundity, reproduction, apparent survival, and detectability, and that data indicates that over the last ten-fifteen years, they are contributing to declines in spotted owl populations." BiOp, 144 (citing studies). This decline has accelerated in

recent years, prompting Oregon State Supervisor Dr. Henson to explain that the only way to

"arrest this decline and have a high probability of preventing extinction (in any timeframe) is to

manage the barred owl threat <u>and</u> conserve adequate amounts of high quality habitat distributed

across the range in a pattern that provides acceptable levels of connectivity as well as protection

from stochastic events." FWS 2021b, 4 (emphasis in original).

### C.    The Medford District BLM's FY 2020 Projects

On July 24, 2020, the Roseburg Field Office of FWS transmitted its BiOp for the

Medford District BLM's FY 2020 Batch of Projects, comprised of the Bear Grub and Round Oak

timber sales ("the action"). Sexton Decl., ¶¶ 7-10. The action authorizes timber harvest and fuel

reduction maintenance on 8,142 acres of O&C land in southwest Oregon. BiOp, 4. The Bear

Grub timber sale authorizes the removal or downgrading of 695 acres of spotted owl NRF

habitat, and the removal of 599 acres of dispersal-only habitat. *Id*. at 60. FWS determined that

the Bear Grub timber sale project is likely to adversely affect 23 of 25 spotted owl sites in the

project area. *Id*. at 69. The Round Oak timber sale authorizes the removal or downgrading of

2,346 acres of NRF habitat, and removal of 279 acres of dispersal-only habitat. *Id*. at 60.

The Round Oak timber sale project is likely to adversely affect 14 of 18 spotted owl sites

in the project area. *Id*. at 69. Due to the authorized logging, some of the northern spotted owl

sites are expected to remain unoccupied for decades. *Id*. at 61, 10, 67, 93, 100. The action will

affect 2,178 acres of spotted owl critical habitat in three different critical habitat sub-units. BiOp,

93. The primary impacts to critical habitat will be removal and downgrade of approximately

1,207 acres NRF habitat. *Id*.

According to surveys current at the time the BiOp was transmitted, 2 spotted owl sites in

the action areas are occupied, 39 spotted owl sites are unoccupied, and 2 have unknown status.

BiOp, 71. Importantly, nonterritorial spotted owls, called "floaters," "are difficult to detect in surveys because many floaters either do not respond to surveys or respond in very tenuous fashion such that they are difficult to capture or resight." *Id*. at 65. Moreover, the presence of barred owls has been shown to suppress spotted owl survey responses, reducing the detectability of spotted owls. *Id*. at 146.

The Bear Grub project lies within the Oregon Klamath Province, while the Round Oak project lies within the Oregon Cascades West Province. BiOp, 4. The Oregon Klamath and Oregon Cascades West Provinces "have been noted as an important area for spotted owl conservation," with spotted owls there serving as likely "source" populations for surrounding provinces, and as a "principal zone for productivity for spotted owl populations," respectively. *Id*. at 49. "Protecting and enhancing performance in both sources and sinks may be essential for range-wide population persistence." *Id*. Despite this importance, the action areas are also characterized by a checkerboard pattern of ownership, with BLM-managed land interspersed with private land largely managed for intensive industrial timber harvest. *Id*. at 105.

The action was planned under BLM's 2016 Resource Management Plan ("RMP") for southwest Oregon. The 2016 RMP includes a number of land use allocations ("LUAs"); pertinent here, the Late Successional Reserves ("LSR") and the Harvest Land Base ("HLB"). BiOp, ii. Under the 2016 RMP, the HLB is managed for the attainment of the declared Allowable Sale Quantity ("ASQ") or "timber target." *Id*. at 17. The LSRs are "primarily dedicated to maintaining and promoting the development of habitat for the northern spotted owl and other late-successional species." *Id*. at 7. The LSRs are "the focal point for spotted owl recovery under the BLM's revised RMP." *Id*. at ii.

## V.     TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION STANDARD IN ESA CASES.

Typically, a plaintiff seeking a temporary restraining order/preliminary injunction[3] "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). In cases brought under the ESA, however, Congress has already determined that the balance of equities and public interest favor an injunction. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"). As the Ninth Circuit explained, "Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005), *abrogated on other grounds*, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793–94 (9th Cir. 2005) ("In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests").

Courts apply a "sliding scale" approach in their consideration of the success and harm factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (continuing to apply the sliding scale approach after *Winter*). Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. *Id*. at 1131. Plaintiffs, therefore, need only raise "serious questions going to the merits," so long as they can

---

[3] Plaintiffs seek a combined temporary restraining order and preliminary injunction because implementation of the Lodgepole and Ranchero timber sales that remove suitable habitat is ongoing. Additional harvest of suitable owl habitat may also soon commence.

demonstrate that the balance of hardships tips sharply in their favor and that the other *Winter*

factors have been met. *Id*. at 1135.

## VI.    KS WILD HAS RAISED SERIOUS QUESTIONS AND IS LIKELY TO PREVAIL ON THE MERITS.

### A.    FWS Failed to Consider Important Aspects of Northern Spotted Owl Conservation in the BiOp.

A BiOp is arbitrary and capricious if it "entirely failed to consider an important aspect of

the problem[.]" *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1111

(D. Or. 2014) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 42 (1983)). As this Court has explained, "[i]n the context of the ESA, the 'problem' is

whether a proposed project will cause jeopardy to a listed species[,] and 'any effect that is likely

to adversely affect the species is plainly an important aspect of the problem.'" *Id*. (quoting *S.*

*Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1270 (E.D.

Cal. 2010)). An agency action is "not likely to adversely affect" a listed species "when effects on

listed species are expected to be discountable, or insignificant . . . Insignificant effects relate to

the size of the impact and should never reach the scale where take occurs. Discountable effects

are those extremely unlikely to occur. Based on best judgment, a person would not: (1) be able to

meaningfully measure, detect, or evaluate insignificant effects; or (2) expect discountable effects

to occur." FWS, Endangered Species Consultation Handbook, xv–xvi, *available at*

https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf; *see S. Yuba River*

*Citizens League*, 723 F. Supp. 2d at 1270 (relying on the Section 7 Handbook definition in

holding that a BiOp failed to consider important aspects of the problem).

The BiOp here fails to consider three important aspects of spotted owl conservation in the

BiOp: 1) the long-term effects of the action on northern spotted owls given the comparatively

shorter life span of the species; 2) the effects of the action on nonresident northern spotted owls known as "floaters;" and 3) the effects of the action in light of the possible success of the ongoing experimental barred owl control program.

       1.  *FWS Failed to Consider the Long-Term Effects of the Action on Northern Spotted Owls Given the Comparatively Shorter Life Span of the Species.*

During the consultation process, FWS "must consider near-term habitat loss to populations with short life cycles." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation* (*PCFFA II*), 426 F.3d 1082, 1094 (9th Cir. 2005). According to the best available science, northern spotted owls have a mean lifespan of 6.5 years. Reid et al. 1992. However, the effects of the action—which include "reductions to reproduction, survival, feeding and sheltering," damage to nest trees, and in 12 sites, "proposed treatments in the nest patch," BiOp, 69, 25, 68[4]—will persist "for decades," *id.* at 61 ("these treatments, primarily large tree removal, are expected to result in mostly unusable NRF habitat within the affected stands for decades post-treatment," and "[b]ecause incidental take of spotted owls is to be avoided under this consultation, only the unoccupied spotted owl sites will be subject to the associated demographic impacts. These sites however, may become unavailable to spotted owls for decades"), 10, 67, 93, 100. Moreover, because the action is located within the HLB LUA, FWS expects the action area to remain unsuitable for spotted owl use for the duration of the BLM's RMP, which authorizes a high level of timber harvest over time in this land use allocation. *Id.* at 61 ("This LUA is the portion of the landscape not being relied upon for supporting reproducing populations of spotted owls and where BLM is targeting timber removal at unoccupied sites . . . and not where recovery

---

[4] The BiOp explains that "[m]any of the sites under the proposed action are currently in habitat limited situations (Table 16), based on best available information and further reductions in NRF habitat are likely to have negative effects on spotted owl demographic parameters." BiOp, 68.

of the spotted owl will be focused"). FWS failed to analyze how these dire effects enduring for many decades is consistent with the far shorter life cycle of the northern spotted owl, rendering its "no jeopardy" BiOp arbitrary and capricious. *PCFFA II*, 426 F.3d at 1084.

In *PCFFA II*, the Ninth Circuit admonished that a consulting agency "does not avoid the likelihood of jeopardy to a listed species when it disregards the life cycle of the species in crafting the measures designed to protect it. Nor can the agency provide only partial protection for a species for several generations without any analysis of how doing so will affect the species." *Id*. at 1084. In that case, the consulting agency concluded that a federal irrigation project would jeopardize ESA-listed coho salmon, and proposed a Reasonable and Prudent Alternative to avoid jeopardy through a three-phase plan. *Id*. Under this plan, the coho salmon's water flow needs would not be met for the first two phases, lasting eight years, while the action agency developed a "water bank," developed a governmental task force, and conducted scientific studies. *Id*. at 1088–89. The Ninth Circuit found that the consulting agency failed to consider what effect the first two phases of the plan would have on coho salmon survival and recovery, during which the species would experience multiple generational cycles without its long-term flow needs met. *Id*. at 1093. The Ninth Circuit found it "evident that the agency 'entirely failed to consider an important aspect of the problem'—namely, that the species it must protect will experience five generational cycles over the time span [of the project]." *Id*. at 1094.

Similarly, in *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.* (*PCFFA I*), 265 F.3d 1028, 1031, 1037 (9th Cir. 2001), the Ninth Circuit affirmed the district court's holding that NMFS "failed to adequately assess the short term impacts of . . . timber sales" on listed fish when it only considered the effects of timber harvest after 10 years, explaining that "[t]his generous time frame ignores the life cycle and migration cycle of

anadromous fish," which was shorter than 10 years. The Ninth Circuit concluded that "[g]iven the importance of the near-term period on listed species survival it is difficult to justify NMFS's choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger." *Id*. at 1038.

Here, the BiOp acknowledges implementation of the action will result in the loss of 3,919 acres of suitable spotted owl habitat, and that the action area will remain unsuitable for spotted owl occupation for decades. BiOp, 60–61. But the mean life span for spotted owls is 6.5 years, a much shorter period than FWS expects the effects of the action to last. The BiOp is silent on what will happen to the local and rangewide populations of spotted owls in the intervening "decades," which is especially problematic given the precarious status of the species. Under Ninth Circuit case law, the BiOp "ignores the life cycle" of northern spotted owls and is arbitrary and capricious. *PCFFA I*, 265 F.3d at 1037–38 ("[g]iven the importance of the near-term period on listed species survival it is difficult to justify [FWS's] choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger"). FWS failed to consider the possibility that the action's short-term adverse effects on northern spotted owls will never be ameliorated and may cause the local extirpation of northern spotted owls, rendering the BiOp arbitrary and capricious. *PCFFA II*, 426 F.3d at 1094 (agency "entirely failed to consider an important aspect of the problem—namely, that the species it must protect will experience [10 to 20] generational cycles" before the project's harms begin to dissipate).

    2.   *FWS Failed to Consider the Effects of the Action on Nonresident Northern Spotted Owls Known as "Floaters."*

The BiOp explains that

Northern spotted owl populations consist of the territorial, resident owls, for which we have documented occupancy throughout much of the owl's range, but also include nonterritorial (non-breeding) adult "floaters" spotted owls. Nonterritorial spotted owls are

present on the landscape and use closed canopy forest habitat to support transient and colonization phases until they recruit into the breeding population. However, nonterritorial spotted owls are difficult to detect in surveys because many floaters either do not respond to surveys or respond in very tenuous fashion such that they are difficult to capture or resight (Forsman et al. 2002, p. 26).

BiOp, 65. Further, the best available science explains that most floaters do not enter the resident population (i.e., find a mate) until "several years after their birth," Franklin et al. 1992, 815,[5] meaning that effects of an action on floaters is only identified once they enter "the census population" of resident birds. Franklin et al. 1992, 816, 824; Forsman et al. 2002, 26–27, 30. Owl experts believe that floaters inhabit the periphery of resident owl territories and make occasional forays into these territories to "test" the commitment of resident owls to established territories, Forsman et al. 2002, 14, and because floaters are lurking uninvited in these territories, they typically do not respond vociferously to auditory surveys. Forsman et al. 2002, 14, 26–27, 30.

The health of the floater population is important because floaters buffer the overall population of resident owls: "[d]eclines in the [residential] component initially would be dampened by increased recruitment of floaters. If the number of floaters is sizeable, then the number of territory holders would appear stable for some time before a decline is observed." Franklin et al. 1992, 816; Forsman et al. 2002, 4 ("patterns of movement and behavior of non-territorial "floaters" can have profound can have effects on population dynamics and may mask long-term changes in populations"). Given that the resident population of spotted owls is already in sharp decline, the population of floaters is likely similarly in decline, which is a relevant factor to determining the overall effects of the action. Franklin et al. 1992, 822 (explaining that if the resident population became closed to floaters, "the population there would eventually become extinct"). Indeed, experts speculate that most female members of resident populations first enter

---

[5] References are to internal pagination.

that population as floaters, as opposed to being born into it, Franklin et al. 1992, 823, and that the success of large landscape conservation plans such as the BLM's RMP "will depend heavily on the maintenance of female floater populations," Franklin et al. 1992 at 824.

Despite the essential nature of the floater population in the action area to the conservation of the species, FWS failed to conduct an analysis of how the action may affect floater owls or their habitat.[6] Instead, the BiOp repeats the preceding scientific conclusions regarding the role that floaters play in overall population dynamics, but arrives at a conclusion that is not supported by the facts found: "With the barred owl impact reducing spotted owl populations and demographic rates and the overall lack of occupied territories on the . . . action areas, it is likely the floater population has decreased and thus not replacing the territory holders. Given the lack of territory occupancy, these acres should be accessible to nonbreeding spotted owls to be colonize as territory holders." BiOp, 65. While these statements are true insofar as they go, the fact is that floaters not only are *not* colonizing vacant territories according to surveys[7]—which raises serious concerns about the viability of the resident owl population in the action area, Franklin et al. 1992, 822—but also *floaters will be unable to colonize the action area in the*

---

[6] While the ability of juvenile owls to disperse from the natal nest can be addressed by a consideration of the available dispersal habitat between the natal nest and unoccupied territories, BiOp, 55–56, plaintiffs' claim focuses on whether floater owls—which are not exhibiting natal dispersal behavior—are able to find sufficient suitable habitat to colonize once the dispersal period has concluded. Thus, this claim is properly understood as not whether juvenile owls can disperse from the natal nest, but rather whether they will persist and find sufficient suitable habitat once the dispersal period has concluded. Because these owls may "float" for five or more years, Forsman et al. 2002, 26, simply examining the availability of dispersal-quality habitat is insufficient to assess the effects of the action on floaters.

[7] Floater owls, even if identified through surveys, will not be protected: FWS states that only "if *resident* spotted owls are located, [then] units will be dropped or modified to minimize or avoid effects that lead to a determination of harm." BiOp, 77.

*future because BLM does not intend to allow suitable habitat to regrow here because it is*

*located in the harvest land base land use allocation.*

The BiOp never addresses these two issues and how they might influence spotted owl

conservation and recovery: (1) the lack of floater recolonization of purportedly vacant territories;

and (2) that the action area might never be recolonized due to continual harvest of suitable

habitat here. The best available science has warned managers since at least 1992 that floater owls

were indispensable to the viability of the metapopulation, and that as goes the floater owl

population, so goes the continued existence of the species. Franklin et al. 1992, 822 (if the

resident population is closed to floaters, "the population there would eventually become

extinct"). The BiOp ignores this warning and instead authorizes the removal of 3,919 acres of

suitable habitat, which is likely to push the spotted owl closer to extinction. This, despite the

agency's own recent acknowledgement that retention of all suitable habitat—regardless of

whether it is occupied by resident owls—is essential to the conservation and recovery of the

species. FWS 2021b, 2 ("it must be noted that the impact of barred owls on [northern spotted

owls] has made the conservation of extant habitat even more pressing, at least in the near term

until a barred owl management plan is in place and shown to be effective"); *see also* Recovery

Plan, III-45, III-43 ("Recovery Action 10 - Conserve spotted owl sites and high value spotted

owl habitat to provide additional demographic support to the spotted owl population"). Because

FWS failed to "consider an important aspect of the problem," *Lands Council v. McNair*, 629

F.3d 1070, 1074 (9th Cir. 2010), it did not consider the relevant factors and articulate "a rational

connection between the facts found and the choices made," *Arrington v. Daniels*, 516 F.3d 1106,

1112 (9th Cir. 2008), rendering the BiOp arbitrary, capricious, and not in accordance with law.

> 3. *FWS Failed to Consider the Effects of the Action in Light of the Possible*
> *Success of the Ongoing Experimental Barred Owl Control Program.*

Throughout the BiOp, FWS emphasized the threat posed by barred owls on the persistence of the spotted owl. BiOp, 81–92. The BiOp justified the elimination of 3,919 acres of currently suitable habitat with the conclusion that "additional protection of habitat on the landscape does not necessarily improve the situation for spotted owls, while barred owls are on the landscape, *unless barred owls are reduced*." *Id*. at 66 (emphasis added), 37 ("Under the RMP, it was modeled and anticipated that spotted owl populations would continue to decline precipitously and be locally extirpated across the range. This was largely due to due to barred owl competition regardless of how much habitat is conserved and unless the barred owl threat is addressed"). To address the barred owl threat, FWS is currently engaged in an experimental lethal control program of barred owls. FWS, Barred Owl Study Update, *available at* https://www.fws.gov/oregonfwo/articles.cfm?id=149489616 (announcing decision to continue the barred owl removal experiment through August 2021). While final results are not yet known, FWS acknowledges in the BiOp that lethal control of barred owls is working: barred owl "removal studies have demonstrated a positive association between removal of barred owls and population trends of spotted owls[.]" BiOp, 83 (citing studies), 44, 83–84; Wiens et al. 2020, 1 ("removal of barred owls coupled with conservation of suitable habitat conditions can slow or even reverse population declines of spotted owls").

Given that barred owl control appears to be working, the BiOp's premise that retention of existing unoccupied but suitable habitat is unwarranted or has no effect on spotted owl conservation is arbitrary, capricious, and not in accordance with law. The "facts found,"[8]

---

[8] Parroting the Recovery Plan, the BiOp recognizes that "[a]s a general rule, forest management activities that are likely to diminish a home range's capability to support spotted owl occupancy and reproduction in the long-term should be discouraged." BiOp, 101; *see also* Recovery Plan, III-45. Despite the best available information "discouraging" exactly the type of timber harvest

*Daniels*, 516 F.3d at 1112, are that: (1) unoccupied but suitable habitat is often colonized by floaters or resident owls and is therefore important to the conservation of the species, Recovery Plan, III-45; (2) as a result, the best available science recommends retaining suitable habitat like that proposed for logging in the BiOp, Recovery Plan, I-9, III-42–43; and (3) "the impact of barred owls on [northern spotted owls] has made the conservation of extant habitat even more pressing, at least in the near term until a barred owl management plan is in place and shown to be effective," FWS 2021b, 2. But here, the "decision made," *Daniels*, 516 F.3d at 1112, was to conclude that the removal of 3,919 acres of suitable habitat—though it will preclude the use and occupation of the action area for decades, and perhaps into perpetuity due to BLM's intention to manage the action area solely for timber production, BiOp, 10, 61, 67, 93, 100—nevertheless will not jeopardize the continued existence of the species.

FWS' imprimatur for extensive logging of suitable owl habitat does not reflect the fact that if barred owl control is effective, then the existence of suitable habitat will be the limiting factor for spotted owl persistence. BiOp, 37, 43, 52–55 ("The findings of Thomas et al. (1990) illustrate the importance of the amount of suitable habitat within a spotted owl territory to support the life history requirements of the spotted owl"). Under the BiOp, suitable habitat will be substantially lacking in the action area and may undermine the conservation of the species. The impending success of the barred owl control program is an important aspect of the problem of spotted owl conservation that FWS failed to consider in the BiOp, rendering it arbitrary, capricious, and not in accordance with law. *McNair*, 629 F.3d at 1074.

---

challenged here, FWS has eschewed its ESA obligation to "give the benefit of the doubt to the species," *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), in favor of BLM's desire to meet its timber target, BiOp, 5, 15–16, 60, 62, 107; *see also id.* at 102–03 (explaining that the proposed action is consistent with the Recovery Plan "to the extent it was compatible with the primary purpose and need of the forest management projects" to meet the BLM's timber target).

**B.  The BiOp Unlawfully Relies on Measures Not Reasonably Certain to Occur.**

Any measures a BiOp relies on in determining an action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat must constitute a "clear, definite commitment of resources," and be "under agency control or otherwise reasonably certain to occur." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 & n.17 (9th Cir. 2008)). A "sincere general commitment to future improvements—without more specificity—is insufficient." *Nat'l Wildlife Fed'n*, 524 F.3d at 935–36. "Binding mitigation measures cannot refer only to generalized contingencies or gesture at hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project." *Id*. To comply with the ESA, measures relied on in a BiOp "must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Id*. (quoting *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002)).

In concluding that the action is not likely to jeopardize the continued existence of the spotted owl or result in the destruction or adverse modification of its critical habitat, the BiOp relies on a number of Project Design Criteria ("PDCs") and other measures that are not reasonably certain to occur, lack a clear and definite commitment of resources, and fail to sufficiently address threats to the species under the jeopardy and adverse modification standards.

　　　　1.    *Project Design Criteria.*

The BiOp incorporates a series of PDCs, defined as "conservation measures" that "are integrated into the project design to avoid and minimize potential adverse effects of the activity

on listed species and critical habitat." BiOp, 26, 212–15 (listing all PDCs). PDCs include

retention of known nest trees; dropping or modifying units in the event resident spotted owls are

located during subsequent surveys; retaining multiply canopy levels, decadent components, and

an average of 60% canopy cover in NRF habitat; limiting the size of small openings of canopy

cover; and seasonal operational restrictions between March 1 and July 15. *Id*. at 27–30.

　　FWS's analysis of effects to spotted owls and critical habitat in the BiOp "assumes *full*

implementation of the PDCs included as part of BLM's proposed action." *Id*. at 57 (emphasis

added); *see also id.* at 77 (relying on PDCs in discounting possibility that maintain treatments do

not result in adverse effects), 88 (relying on PDCs in discounting possibility of disturbance to

nesting and young owls). In the BiOp's conclusion, FWS cites the PDCs as forming the basis for

its determinations the action is not likely to jeopardize spotted owls or adversely modify their

critical habitat. *Id*. at 105 (conclusion based on "all measures proposed to avoid and minimize

adverse effects"), 106 ("physical impacts to habitat and disturbances to individuals will be

reduced or avoided per measures described in the PDCs").

　　Despite the BiOp's heavy reliance on PDCs, these measures are not reasonably certain to

occur for two reasons. First, the BiOp does not include the PDCs as mandatory "Terms and

Conditions" or "Reasonable and Prudent Measures" of its Incidental Take Statement, because

FWS unlawfully concluded there would be no incidental take of the species from the action.

BiOp, 110; *see infra* § VI-C. Rather, the BiOp provides only a single discretionary

"Conservation Recommendation" that BLM "[i]mplement PDCs as recommended." BiOp, 110.

Regardless, FWS only expects that PDCs will be "implemented to the fullest extent practicable"

and fails to define under what circumstances implementation of one or more PDCs might not be

practicable. *Id*. at 57. Whatever the "fullest extent practicable" may mean, it is not sufficiently

certain to occur to support the BiOp assuming the unqualified "full implementation" of PDCs in its effects analysis. *Id*. at 57; *Bernhardt*, 982 F.3d at 743 (mitigation measures relied on in a BiOp must constitute a "clear, definite commitment of resources").

Second, the terms of the PDCs themselves indicates that they may be waived at the discretion of BLM or FWS. For example, regarding the PDC requiring the retention of important habitat features, the BiOp states that "District wildlife and forestry staff will work together to develop and implement prescriptions to maintain spotted owl habitat per the prescriptions and will change the prescriptions and implementation procedures as needed to fulfill this PDC," but there is no assurance that staff conversations will in fact result in retention of essential spotted owl habitat components. BiOp, 77. Similarly, the BiOp discloses that the seasonal and daily restrictions on logging activities may be waived "at the discretion of the decision maker if necessary to protect public safety," but provides no benchmarks against which such a "need" may be evaluated. *Id*. at 212. In fact, *any* PDC "may be waived in a particular year if nesting or reproductive success surveys conducted according to the endorsed survey guidelines reveal that spotted owls are non-nesting or that no young are present that year." *Id*.

Because the PDCs are discretionary, not enforceable, and are not reasonably certain to occur, the BiOp's reliance on them is arbitrary and capricious.[9] *Bernhardt*, 982 F.3d at 743; *Nat'l Wildlife Fed'n*, 524 F.3d 917, 935–36, n.17 (9th Cir. 2008) (uncertain discretionary

---

[9] Although reinitiation of consultation may be required "if the PDCs are not implemented as described or per agreed upon deviations between the Service and BLM," BiOp, 27, this acknowledgement does not transform the discretionary PDCs into binding limitations on either FWS or BLM for the purposes of this consultation. *Nat'l Wildlife Fed'n*, 524 F.3d at 936, n.17 (if PDCs are not obligatory, "the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur"). Section 7 of the ESA does not countenance relying first on uncertain measures in the BiOp, and then on the possibility of reinitiation should the measures never materialize.

measures may not "be included in the proposed action in order to offset its certain immediate

negative effects, absent specific and binding plans" to implement them).

### 2. Late-Successional Reserves.

Though not defined as a PDC, the BiOp also relies heavily on the future development of

suitable spotted owl habitat in the LSR LUA in discounting adverse effects to spotted owl

habitat—including designated critical habitat—in the HLB. *See* BiOp, 61 (the HLB is "not being

relied upon for supporting reproducing populations of spotted owls, . . . and not where recovery

of the spotted owl will be focused"), 67 ("Future development of spotted owl habitat and

management of barred owls in the LSR LUA is expected to provide for territories that will

support future spotted owl populations"), 93 (loss of spotted owl critical habitat in the HLB

"would be mitigated because during this same time span because critical habitat in the LSR

LUAs are expected to develop spotted owl habitat through ingrowth"), 99 (same), 100 (same).

The BiOp's "no jeopardy" and "no adverse modification" conclusion explicitly assumes that the

spotted owl's conservation needs "will continue to be met at the provincial and range wide scale"

because the projects are "consistent with the management direction and strategy" of the RMP,

which is predicated on the system of HLB and LSR LUAs. *Id*. at 107. Given the high incidence

of high-severity fire across southwest Oregon, any benefits from the retention and development

of habitat in the Late-Successional Reserves are not sufficiently certain to materialize to justify

the BiOp's heavy reliance on them.

The southern and western Oregon Cascades "are impacted by large scale wildfire," BiOp,

50, and "the Klamath Province and the similar dry forests of the southern Oregon Cascades in

particular are threatened by ongoing habitat loss as a result of wildfire and effects of fire

exclusion on vegetation change," BiOp, 101. The BiOp notes that although large-scale wildfire

was already recognized as a threat to the spotted owl and its habitat, new information concerning recent fire seasons "suggests fire may be more of a threat than previously thought." *Id*. at 147.

Spotted owl habitat in the reserves is disproportionately affected by habitat-removing wildfire. Most of the spotted owl habitat lost on federal lands from 1994 through 2012 (73%) occurred within the federally reserved land use allocations, largely as a result of high severity wildfires. BiOp, 34, 106. This trend has continued since 2012. *Id*. at 172 (42.4% of all spotted owl nesting and roosting habitat removed or downgraded in the Cascades West province and 35.9% of all spotted owl nesting and roosting habitat removed or downgraded in the Klamath Mountains province since 2012 was in the reserves and resulting from natural events).

The BiOp's reliance on the Late-Successional Reserves in justifying the removal of extensive suitable habitat in the HLB, despite the high incidence of high-intensity wildfire here, is further confounded by uncertain and potentially dire effects of climate change. Climate change is expected to result in increased frequency and intensity of wildfires and insect outbreaks over the next century in the Pacific Northwest. BiOp, 151. "One of the largest projected effects" of climate change "on Pacific Northwest forests is likely to come from an increase in fire frequency, duration, and severity." *Id*. Due to climate change, the "area burned annually by wildfires in the Pacific Northwest is expected to double or triple by the 2080s." *Id*. Climate change "will likely exacerbate some existing threats such as the effects of past habitat loss as a result of tree mortality caused by drought-related fires, insects and disease, and increases in extreme flooding, landslides and wind-throw events in the short-term (10 to 30 years)." *Id*. at 35 (scientific references omitted).[10] The effects of climate change are not only affecting existing

---

[10] The BiOp takes care to note that substantial removal of spotted owl habitat was expected and analyzed in the 2016 RMP. BiOp, 61. But importantly, analysis in the RMP was "based upon

spotted owl habitat, but "will also likely alter or interrupt forest growth and development processes . . . and the emergence of suitable habitat attributes in new locations." *Id*. at 151.

The BiOp does acknowledge that "given the increased frequency of large wildfires, and the disproportionate impact of fires in the large reserves in southwest Oregon," habitat protection in the Late-Successional Reserves "may be challenged in the near future," but nevertheless continues to rely on the stability of LSRs for its effects determination.[11] *Id*. at 64.

Because climate change, wildfire, drought, and other stochastic events in southwest Oregon are beyond the control of the agency, the retention and development of such habitat in the LSRs is speculative at best, and amounts to "gestur[ing] at hopeful plans" rather than setting forth a "clear, definite commitment of resources" that is "under agency control or otherwise reasonably certain to occur." *Bernhardt*, 982 F.3d at 743. Simply put, BLM and FWS "lack the power to guarantee the improvements in question." *Bernhardt*, 872 F.3d at 747; *Nat'l Wildlife Fed'n*, 524 F.3d at 936, n.17. Because the BiOp nevertheless relied on the development and retention of habitat in the LSRs to mitigate and offset the action's actual and extensive habitat removal, the BiOp is arbitrary, capricious, and not in accordance with law. *Id*.

### C.    FWS's No Incidental Take Determination Violates the ESA.

When FWS concludes that an action is not likely to jeopardize the existence of a listed species or adversely modify its habitat, but is likely to cause incidental take, FWS must issue an incidental take statement. 16 U.S.C. § 1536(b)(4); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031,

---

historic fire frequency, size, and severity," and did not account for the uncertain and accelerating effects of climate change already affecting the region. *Id*. at 90–91.

[11] To the extent defendants may argue that the action will reduce the likelihood of severe fire, this is belied by the record. Only small portions of the action are expected to increase forest resilience to wildfire, BiOp, 15, 147, and indeed BLM explained that the action will in fact *increase* wildfire risk for the next 50 years, Sexton Decl., ¶¶ 20, 21, 31.

1034 (9th Cir. 2007). An incidental take statement "specifies the impact of such incidental taking on the species[.]" 16 U.S.C. § 1536(b)(4)(C)(i).

In the BiOp, FWS concluded that the action is unlikely to result in incidental take due to: (1) implementation of PDCs discussed above; and (2) in response to surveys of known spotted owl sites in areas proposed for treatment, BLM will either drop the area from treatment or modify the treatment prescription if spotted owls are detected. BiOp, 109. This justification is unlawful for two reasons. First, as discussed above, the PDCs the BiOp relies on are unenforceable, discretionary, and not reasonably certain to occur, and therefore are illusory and unlawful. *Bernhardt*, 982 F.3d at 743.[12]

Second, the BiOp's determination that the action is unlikely to result in incidental take is based on flawed assessment of take. The BiOp adopts a two-part test, where take in the form of harm occurs only when there is a "reasonable certainty that resident/territorial spotted owls are likely to occupy the affected sites *and* biologically respond to altered habitat conditions in a manner that corresponds to the regulatory and statutory definitions of take." BiOp, 78 (emphasis added). According to the BiOp, there is a "reasonable certainty that resident/territorial spotted owls are likely to occupy" a particular site only when surveys confirm occupancy. *Id*. Thus, incidental take purportedly will be avoided entirely by only logging sites where surveys detect non-occupancy of resident owls.[13]

---

[12] The circularity of the BiOp's logic bears mention: FWS determined incidental take is not reasonably certain to occur because of the PDCs, yet the PDCs are not incorporated as mandatory enforceable "Reasonable and Prudent Measures" or "Terms and Conditions" in the ITS precisely because no take is anticipated. *See* 16 U.S.C. §§ 1536(b)(4)(ii) & (iv); *Bernhardt*, 982 F.3d at 744 ("measures can be made enforceable . . . by incorporation into the terms and conditions of an incidental take statement"). This paradoxical outcome is purely of the agencies' own making, and further highlights the action's inconsistency with the law.

[13] FWS's approach further disregards two important factors to an accurate assessment of incidental take. First, as discussed *supra* § VI-A-2, floater owls are unlikely to reliably respond

Yet the BiOp acknowledges that *beyond surveys*, a variety of site-specific habitat fitness metrics inform whether spotted owls are present and therefore that sufficiently adverse effects are likely to result in take. The BiOp describes "habitat-based assessments" that have been used to estimate the presence or occupancy of breeding spotted owls, including the percentage of older forest within the core area surrounding a site and the percentage of NRF habitat in a home range. BiOp, 55. "The best available information suggests that . . . the survival and fitness of spotted owls are positively correlated with larger patch sizes of older forest or larger patches of forest habitat with a high proportion of older forest." *Id*.[14]

According to agency direction jointly prepared by FWS and BLM staff to implement the 2016 RMP, precisely this kind of site-specific information should inform whether a timber sale is likely to result in incidental take. Information Bulletin, 15. The Information Bulletin explains that survey history is "not the only source of best available information in determining spotted owl site occupancy[,]" and "other sources of information could include site history (including history of re-occupancy and habitat availability), quantity, quality, and distribution." *Id*. "Any estimate of [incidental take] needs to take into account variance in actual home range/core areas estimated from empirical studies and the composition and arrangement of habitat elements . . . consistent with past and expected future Level 1 Team analysis." *Id*.

---

to auditory surveys. Second, even paired spotted owls are increasingly unlikely to respond to auditory surveys due to the presence of barred owls. BiOp, 146. Both situations result in underreporting and protecting extant owls.

[14] Specifically, the BiOp explains that spotted owl fitness is higher when older forest encompasses at least 30-50% of a spotted owl core area, and occupancy is highest when older forest comprises 60-70% of a core area. BiOp, 55. 26 of the 47 (55.3%) spotted owl sites in the action are already below this threshold for NRF habitat. *Id*. at 72–73. Occupancy is more likely when NRF comprises at least 40-60% of a spotted owl home range. *Id*. at 55. Only one of the 47 spotted owl sites in the action meets this threshold for NRF habitat. *Id*. at 72–73.

FWS failed to heed its own recitation of the habitat-based assessments that may be used to estimate the spotted owl occupancy, and the Information Bulletin it coauthored for evaluating the potential for incidental take in timber sales planned under the 2016 RMP. In doing so, it adopted a flawed view of take that depends on survey-detected occupancy, rather than in combination with other best available information—particularly an assessment of suitable habitat and the likelihood of reoccupation or colonization—for determining spotted owl site occupancy.

In focusing on survey-detected occupancy as the only metric to assess incidental take, the BiOp parrots but then disregards the Ninth Circuit's admonition that take may occur even without evidence of actual mortality or injury to individuals, where habitat degradation significantly impairs the species' breeding or feeding habits and retards recovery of the species. *Compare* BiOp, 50 ("the basis for a finding that a proposed action is likely to significantly impair the breeding, feeding, sheltering and/or dispersal of affected spotted owls relies on the scientifically-recognized range of habitat conditions that are known to adequately provide for spotted owl life history requirements"), 69 ("[a]dverse effects to spotted owls are anticipated because the quantity and quality of habitat would be diminished, likely result in reductions to reproduction, survival, feeding and sheltering"), 61 (NRF removal and downgrade under the action may cause affected spotted owl sites to "become unavailable to spotted owls for decades"); *with Nat'l Wildlife Fed'n v. Burlington N. R. R.*, 23 F.3d 1508, 1513 (9th Cir. 1994). Because implementation of the action may impair spotted owl life functions and preclude reoccupancy of sites for decades, and the BiOp relied unlawfully on the LSR for spotted owl discovery as discussed above, implementation may result in incidental take according to the Ninth Circuit in *Burlington Northern*. FWS unlawfully failed to account for this possibility.

*Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("agency action is lawful only if it rests on a

consideration of the relevant factors").[15]

## VII.  KS WILD WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY IN THE ABSENCE OF A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION.

KS Wild will suffer irreparable harm in two significant ways in the absence of a TRO/PI.

First, the unauthorized taking of spotted owls—a species that is already threatened with

extinction and which continues to decline year after year—is clearly irreparable. *Or. Nat. Desert*

*Ass'n v. Tidwell*, No. 07-1871-HA, 2010 WL 5464269, at *3 (D. Or. Dec. 30, 2010) ("habitat

modification that is reasonably certain to injure an endangered species establishes irreparable

injury") (*citing Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1999)); *see also Earth*

*Island Inst. v. Mosbacher*, 746 F. Supp. 964, 975 (N.D. Cal. 1990), *aff'd*, 929 F.2d 1449 (9th Cir.

1991) ("for those species now threatened with extinction, the harm may be irreparable in the

most extreme sense of that overused term"); *Forest Conservation Council v. Rosboro Lumber*

*Co.*, 50 F.3d 781, 785 (9th Cir. 1995) ("Once a member of an endangered species has been

injured, the task of preserving that species becomes all the more difficult").

---

[15] FWS' erroneous zero-take determination also undermines the BiOp's critical habitat analyses, where the zero-take determination is used to justify findings that lead FWS to conclude the action is unlikely to result in the destruction or adverse modification of spotted owl critical habitat. BiOp, 97–98 (removal and downgrade within critical habitat "would not alter the intended subunit function of providing demographic support for spotted owls . . . because while adverse effects are anticipated from habitat removal and downgrade, incidental take of spotted owls is being avoided under the proposed action. As a result, the demographic support function in these subunits is not anticipated to be meaningfully impacted"). Because the BiOp predicates its finding of no adverse modification of critical habitat in part on its unlawful finding of no incidental take, the BiOp's conclusion of no adverse modification is also arbitrary and capricious. *See Turtle Island Restoration Network v. U.S. Dept. of Commerce*, 878 F.3d 725, 738 (9th Cir. 2017) (invalidating a "no jeopardy" conclusion that rested on a flawed premise); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:10-cv-1129-AC, 2013 WL 1294647, *23–25 (D. Or. Mar. 27, 2013) (same).

Importantly, KS Wild need not show population-level adverse effects to northern spotted owls to secure an injunction. The Ninth Circuit has held in the context of Section 9 of the ESA that requiring harm to a species as a whole to secure an injunction would be "contrary to the spirit of the" ESA. *Burlington Northern*, 23 F.3d at 1512 n.8; *see also Ctr. for Biological Diversity v. FWS*, No. C-08-1278 EMC, 2011 WL 6813200, *4 (N.D. Cal. Dec. 28, 2011) ("Although Defendants argue that harm to the species as a whole is required, Ninth Circuit case law does not support this proposition"). Instead, to prove irreparable harm, plaintiffs must demonstrate their stated interests will be irreparably harmed without equitable relief, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010), which KS Wild has done here. *See* Sexton Decl., ¶¶ 4, 11, 12, 15-21, 23-25, 31-48, 57, 63. As the Ninth Circuit noted in the context of Section 7 of the ESA, proving the prospect of irreparable harm should not be "onerous," in "light of the stated purposes of the ESA in conserving endangered and threatened species[.]" *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

While harm to threatened and endangered species in general is significant and irreparable, harm to spotted owls is especially so. Despite being listed as a threatened species since 1990, the population of owls continues to experience a significant decline, including in the planning area. BiOp, 36–37. In the planning area, habitat fragmentation from past and current logging on private and public lands and the invasion of the barred owl threatens the continued existence of the spotted owl. FWS 2021b, 2, 4. The logging authorized by the BiOp will compound the high likelihood of extinction already faced by the species. *Id.*

Second, the loss of mature and old-growth forest habitat, which KS Wild uses and enjoys—and which by definition cannot grow back within its members' lifetimes—is irreparable. *Cottrell,* 632 F.3d at 1135 (logging causes "actual and irreparable injury" to plaintiffs' ability to

view, experience, and utilize forested areas in their natural state, even when other areas nearby would remain unlogged); *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992) ("Courts in this circuit have recognized that timber cutting causes irreparable damage and have enjoined cutting when it occurs without proper observance of NEPA procedures and other environmental laws"); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994) ("timber sales constitute per se irreversible and irretrievable commitments of resources" under the ESA). Because logging is currently underway, trees comprising suitable spotted owl habitat cannot be put back on the stump once cut: the harm to KS Wild is irreparable and a TRO/PI should issue to preserve the status quo. *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd*, 952 F.2d 297 (9th Cir. 1991) ("To bypass the environmental laws, either briefly or permanently, would not fend off the changes transforming the timber industry. The argument that the mightiest economy on earth cannot afford to preserve old growth forests for a short time, while it reaches an overdue decision on how to manage them, is not convincing today. It would be even less so a year or a century from now").

KS Wild has demonstrated a real interest in the health and recovery of the spotted owl in Oregon and across its range. Sexton Decl., ¶¶ 4, 11, 12, 15-21, 23-25, 31-48, 57, 63. KS Wild has substantial concerns that the logging authorized by FWS has been and will continue to prevent them from seeing, experiencing, and otherwise enjoying northern spotted owls in the project area. KS Wild also uses, recreates in, and otherwise enjoys the specific areas that are being logged and destroyed by FWS' authorization, and plan to continue to do so in the future. *Id*. KS Wild enjoys these areas in their natural state because they are natural and beautiful and will not be able to use and enjoy these areas if and when they are logged. *Id*. Moreover, there are no "substitute" areas where KS Wild may go to have the same experience: in *Cottrell*, the Ninth

Circuit specifically rejected the federal agency's argument that having other places to go, even places nearby and in a similar natural state, would prevent KS Wild from suffering irreparable harm from the loss of a particular forested area from a specific logging project. 632 F.3d at 1135.

## VIII.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF KS WILD.

Having demonstrated they will suffer irreparable harm without injunctive relief, KS Wild need not demonstrate that the balance of the equities tips in its favor because "Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal.*, 413 F.3d at 1035; *Nat'l Wildlife Fed'n*, 422 F.3d at 793 ("In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests"). As discussed previously, courts have continued to follow the Supreme Court's ruling in *Tenn. Valley Auth. v. Hill* in ESA cases after the Supreme Court's decision in *Winter*. *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1302 (D. Or. 2011) (applying standard). As Judge Haggerty explained, "[b]ecause Congress has determined that listed species are to be afforded the highest of priorities, this court finds that plaintiffs have also shown that the balance of equities tips in their favor, and that an injunction is in the public interest." *Or. Nat. Desert Ass'n v. Kimbell*, 07-cv-1871, 2009 WL 1663037 *1 (D. Or. June 15, 2009).

Spotted owls are highly vulnerable and continue to suffer significant population decline. FWS 2021b. The public has a substantial, protectable interest in preventing species from going extinct, and any economic harm to FWS or Defendant-Intervenors does not outweigh the irreparable harm to a threatened species and its habitat. *Tenn. Valley Auth.*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities").

Even if other factors are considered here, they weigh heavily in favor of an injunction. Notably, the injunction sought is preliminary in nature: it would only apply to ongoing logging, and would allow FWS to take steps to address KS Wild's concerns before additional timber sales are advertised, sold, awarded, and implemented. The request for injunction is also narrowly tailored, as KS Wild does not seek an injunction against logging on 2,131 acres that do not currently function as spotted owl habitat but that are proposed for logging: these acres represent 26% of the proposed action. BiOp, 16. Moreover, because the timber sales authorized by the BiOp are designed primarily to meet the BLM's timber target, rather than to reduce hazardous fuels to protect homes and communities, there is no public safety interest at issue in this case. BiOp, 5 ("the primary objective for the Bear Grub and Round Oak Projects are to meet non-spotted owl-specific objectives such as timber production and forest health[16] to attain the District's A[llowable] S[ale] Q[uantity]"), 15–16, 60, 62, 107.

Economic harm to defendant-intervenor or the government does not weigh against an injunction because temporary economic harm cannot outweigh harm that is permanent and irreparable (i.e., timber harvest). *Los Angeles Mem. Coliseum v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980); *Cottrell*, 632 F.3d at 1138–39 ("the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim"). As the Supreme Court held in *Sampson v. Murray*, "mere injuries, however substantial, in terms of money, time and energy necessarily expended…are not enough. The possibility that adequate compensatory

---

[16] Importantly, "there is an abundance of early and mid-closed structural classes" in the planning area, which are considered a high wildfire hazard, BiOp, 11; to the contrary, "older mixed conifer forests are less susceptible to high-severity fire than other successional stages, even under high fire weather conditions," *id*. at 12. It is this older mixed conifer forest that is suitable habitat for spotted owls. *Id*. at 8–9.

or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." 415 U.S. 61, 90 (1974); *see also Seattle Audubon Soc'y*, 771 F. Supp. at 1095 ("while the loss of old growth is permanent, the economic effects of an injunction are temporary and can be minimized in many ways").

Once cut, the forests at issue here will not be suitable for spotted owls for nearly a century, if not longer. Given Congress' clear direction in cases involving threatened species, the vulnerability of spotted owls in particular, and the destructive and irreparable nature of the authorized logging, the public interest and the balance of equities clearly favor an injunction.

## IX.    NO BOND SHOULD BE REQUIRED IN THIS CASE.

Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond, because of the potential chilling effect on litigation to protect the environment and the public interest. *California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir. 1985) (no bond); *Wilderness Soc'y v. Tyrrel*, 701 F. Supp. 1473 (E.D. Cal. 1988), *rev'd on other grounds*, 918 F.2d 813 (9th Cir. 1990) ($100 bond). KS Wild has testified that a bond in this case would chill citizen enforcement of the ESA, which is contrary to congressional intent. Sexton Decl., ¶¶ 4, 11, 12, 15-21, 23-25, 31-48, 57, 63.

## X.    CONCLUSION.

Given the forgoing, KS Wild urges the court to GRANT KS Wild's motion for a temporary restraining order/preliminary injunction.

Respectfully submitted and dated this 10th day of May, 2021.

   /s/ Susan Jane M. Brown
SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.

Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

Sangye Ince-Johannsen (osb #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

*Attorneys for Plaintiffs*