JEAN E. WILLIAMS, Acting Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
SHAUN M. PETTIGREW, Trial Attorney
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, AND CASCADIA WILDLANDS, | Case No.: 1:21-cv-00058-CL |
| Plaintiffs, | DEFENDANT'S RESPONSE TO MOTION FOR A TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE, | |
| Defendant, | |
| and | |
| BOISE CASCADE WOOD PRODUCTS, L.L.C. and TIMBER PRODUCTS COMPANY, | |
| Defendant-Intervenors. | |

Defendant's Response to Motion for a Temporary Restraining Order/Preliminary Injunction - i

# TABLE OF CONTENTS

PAGE

**INTRODUCTION**............................................................................................ 1

**STATUTORY BACKGROUND** ..................................................................... 2

   **I.**  **The Endangered Species Act**.................................................................. 2

   **II.** **The Oregon and California Revested Lands Act** ................................ 3

**FACTUAL BACKGROUND** ........................................................................... 3

   **I.**  **The Northern Spotted Owl**.................................................................. 3

   **II.** **The 2016 Southwestern Oregon Resource Management Plan**....................... 4

   **III.**  **The Bear Grub and Round Oak Projects and Associated BiOp**.................. 6

   **IV.**  **Project Implementation for the Bear Grub and Round Oak Projects**...................... 7

     **A.** **Bear Grub Timber Sale** ................................................................. 7

     **B.** **Lodgepole and Ranchero Timber Sales** ........................................ 8

**STANDARD OF REVIEW** .............................................................................. 9

**ARGUMENT** ..................................................................................................... 10

   **I.**  **Plaintiffs Have Not Met their Burden of Showing They Will be Irreparably Harmed Absent Relief**............................................................... 10

   **II.** **Plaintiffs have Not Demonstrated that they are Likely to Succeed on the Merits of their Claims** ....................................................... 17

     **A.** **Plaintiffs Lack Standing** ............................................................. 17

     **B.** **Plaintiffs' Claim is Precluded Because It Improperly Attempts to Relitigate Prior Challenges to the RMP** ........................................... 18

     **C.** **FWS Thoroughly Analyzed the Lifecycle of the NSO** ............... 20

**D.   FWS Expressly Addressed and Considered the Effects of the Action on "Floater" Owls** ................................................................................ **24**

**E.   FWS's BiOp Appropriately Considered the Barred Owl Removal Program** ........ **25**

**F.   FWS Appropriately Considered Project Design Criteria and Habitat Development in the BiOp** .......................................................................... **26**

**G.   The ITS is Reasonable, Rational, and Supported by the Best Available Science** ... **29**

**III.   Plaintiffs Fail to Demonstrate that the Balance of Harms and Public Interest Weigh In Favor of an Injunction** ......................................................... **33**

**CONCLUSION** ................................................................................ **35**

# TABLE OF AUTHORITIES

CASE                                                                    PAGE

*All. for the Wild Rockies v. Cottrell*,

   632 F.3d 1127 (9th Cir. 2011) ................................................. 15

*All. for the Wild Rockies v. Krueger*,

   35 F. Supp. 3d 1259 (D. Mont. 2014) ........................................ 33

*Allen v. McCurry*,

   449 U.S. 90 (1980) ................................................................ 19

*Am. Forest Res. Council v. Hammond*,

   422 F. Supp. 3d 184 (D.D.C. 2019) ......................................... 34

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,

   *Serv.*, 273 F.3d 1229 (9th Cir. 2001) ...................................... 30

*Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*,

   515 U.S. 687 (1995) .............................................................. 13

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,

   462 U.S. 87 (1983) ................................................................ 10

*Bennett v. Spear*,

   520 U.S. 154 (1997) .............................................................. 18

*Bowman Transp. v. Arkansas-Best Freight Sys.*,

   419 U.S. 281 (1974) .............................................................. 10

*Cascadia Wildlands v. Thrailkill*,

   49 F. Supp. 3d 774 (D. Or. 2014) ........................................... 31

*City of Sausalito v. O'Neill*,

   386 F.3d 1186 (9th Cir. 2004) ................................................ 10

*Conservation Cong. v. Heywood*,

   No. 2:11-cv-02250-MCE-CMK, 2015 WL 5255346 (E.D. Cal. Sept. 9, 2015)..................... 32

*Conservation Cong. v. U.S. Forest Serv.*,

   No. 2:12–cv–02800–TLN–CKD, 2014 WL 2092385 (E.D. Cal. May 19, 2014) ................. 32

*Conservation Cong. v. U.S. Forest Serv.*,

No. 2:13-cv-1977-JAM-DB, 2018 WL 4007093 (E.D. Cal. Aug. 17, 2018) .......................... 13

*Ctr. for Biological Diversity v. Bernhardt*,

982 F.3d 723 (9th Cir. 2020) ................................................................................ 28

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

746 F. Supp. 2d 1055 (N.D. Cal. 2009) .................................................................. 32

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,

807 F.3d 1031 (9th Cir. 2015) .............................................................................. 27

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,

451 F.3d 1005 (9th Cir. 2006) ......................................................................... 28, 30

*Friends of the Clearwater v. Higgins*,

472 F. Supp. 3d 859 (D. Idaho 2020) ................................................................... 35

*Friends of the Earth v. Hintz*,

800 F.2d 822 (9th Cir. 1986) ................................................................................ 10

*Friends of the Earth v. Laidlaw Env't Servs.*,

528 U.S. 167 (2000) ...................................................................................... 14, 17

*Headwaters v. BLM*,

914 F.2d 1174 (9th Cir. 1990) ........................................................................... 3, 34

*Howard v. City of Coos Bay*,

871 F.3d 1032 (9th Cir. 2017) .............................................................................. 20

*Idaho Rivers United v. Army Corps of Eng'rs*,

156 F. Supp. 3d 1252 (W.D. Wash. 2015) .......................................................... 13, 14

*In re Gottheiner*,

703 F.2d 1136 (9th Cir. 1983) .............................................................................. 19

*Lands Council v. McNair*,

537 F.3d 981 (9th Cir. 2008) ................................................................................ 10

*Lands Council v. McNair*,

629 F.3d 1070 (9th Cir. 2010) ......................................................................... 25, 26

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992) ........................................................................................ 10, 17, 18

*Mazurek v. Armstrong*,

    520 U.S. 968 (1997) .................................................................................................... 13

*Miller for & on Behalf of NLRB v. Cal. Pac. Med. Ctr.*,

    991 F.2d 536 (9th Cir. 1993) ..................................................................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ...................................................................................................... 10

*N.C. Fisheries Ass'n v. Pritzker*,

    No. 4:14-cv-138-D, 2015 WL 4488509 (E.D.N.C. July 22, 2015) ........................... 18

*Native Ecosystems Council v. Dombeck*,

    304 F.3d 886 (9th Cir. 2002) ..................................................................................... 10

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

    524 F.3d 917 (9th Cir. 2008) ..................................................................................... 28

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

    886 F.3d 803 (9th Cir. 2018) ..................................................................................... 33

*Oakland Trib. v. Chronicle Publ'g Co.*,

    762 F.2d 1374 (9th Cir. 1985) ................................................................................... 16

*Oceana, Inc. v. Pritzker*,

    75 F. Supp. 3d 469 (D.D.C. 2014) ............................................................................ 13

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,

    (*PCFFA II*), 426 F.3d 1082 (9th Cir. 2005) ...................................................... 21, 22

*Pac. Rivers v. U.S. Bureau of Land Mgmt.*,

    Case No. 6:16-cv-01598-JR, 2019 WL 1232835 (D. Or. Mar. 15, 2019) .......... 19, 35

*Palila v. Haw. Dep't of Land & Nat.*,

    *Res.*, 852 F.2d 1106 (9th Cir. 1988) ......................................................................... 33

*PCFFA I.*,

    265 F.3d 1028 (9th Cir. 2001) .............................................................................. 23, 24

*Portland Audubon Soc'y v. Lujan*,

　795 F. Supp. 1489 (D. Or. 1992) ......................................................... 15

*Pac. Rivers*,

　2018 WL 6735090 ............................................................... 19, 34, 35

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,

　No. 2:13-cv-00042-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) .................. 11, 12, 13

*San Luis & Delta-Mendota Water Auth. v. Jewell*,

　747 F.3d 581 (9th Cir. 2014) ............................................................. 33

*Seattle Audubon Soc'y v. Evans*,

　771 F. Supp. 1081 (W.D. Wash. 1991) ..................................................... 15

*Sierra Club v. Morton*,

　405 U.S. 727 (1972) ....................................................................... 18

*Sierra Forest Legacy v. Rey*,

　691 F. Supp. 2d 1204 (E.D. Cal. 2010) .................................................... 35

*Sierra Forest Legacy v. Sherman*,

　951 F. Supp. 2d 1100 (E.D. Cal. 2013) .................................................... 17

*Swanson Grp. Mfg. LLC v. Bernhardt*,

　417 F. Supp. 3d 22 (D.D.C. 2019) ......................................................... 34

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*,

　322 F.3d 1064 (9th Cir. 2003) ............................................................ 19

*United States v. Tohono O'Odham Nation*,

　563 U.S. 307 (2011) ....................................................................... 20

*Wild Equity Inst. v. City & Cty. of San Francisco*,

　No. C 11-00958 SI, 2011 WL 5975029 (N.D. Cal. Nov. 29, 2011) ......................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,

　555 U.S. 7 (2008) ................................................................... 9, 10, 11

*Wise v. City of Portland*,

　483 F. Supp. 3d 956 (D. Or. 2020) .......................................................... 9

*Yazzie v. Hobbs*,

    977 F.3d 964 (9th Cir. 2020) ................................................................................. 17


STATUTES

5 U.S.C. § 706(1) ..................................................................................................... 34

16 U.S.C. § 1532(19) ................................................................................................. 2

16 U.S.C. § 1533(d) ................................................................................................... 2

16 U.S.C. § 1536(a)(2) ........................................................................................ 13, 23

16 U.S.C. § 1536(b)(4)(iv) ......................................................................................... 2

16 U.S.C. § 1538(a)(1)(B) .......................................................................................... 2

16 U.S.C. § 1539(a) .................................................................................................. 13

16 U.S.C. § 1539(a)(1)(B) ........................................................................................ 29

16 U.S.C. §§ 1531(b) ............................................................................................... 13

16 U.S.C. §§ 1538(a)(1) ........................................................................................... 29

43 U.S.C. § 2601 ................................................................................................. 3, 34


FEDERAL REGULATIONS

50 C.F.R. § 17.3 ......................................................................................... 12, 13, 33

50 C.F.R. § 17.31(a) ................................................................................................... 2

50 C.F.R. § 402.02 ......................................................................................... 2, 21, 23

50 C.F.R. § 402.14(d) ................................................................................................. 2

50 C.F.R. § 402.14(g)-(h) ........................................................................................... 2

50 C.F.R. § 402.14(i)(1)(ii) ...................................................................................... 26

50 C.F.R. § 402.16 .................................................................................................... 27

50 C.F.R. § 402.16(a)(1) ........................................................................................... 29

50 C.F.R. § 402.16(a)(2) ........................................................................................... 30

86 Fed. Reg. 22,876 (Apr. 30, 2021) .......................................................................... 4

86 Fed. Reg. 4820 (Jan. 15, 2021) ................................................................................. 4

55 Fed. Reg. 26,114 (June 26, 1990) ............................................................................. 3

77 Fed. Reg. 71,876, 71,877 (Dec. 4, 2012) ................................................................. 4

85 Fed. Reg. 81,144 (Dec. 15, 2020) ............................................................................. 3

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FWS | Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserves |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NRF | Nesting, Roosting, and Foraging |
| NSO | Northern Spotted Owl |
| O&C | Oregon and California |
| PDC | Project Design Criteria |
| RMP | Resource Management Plan |
| RR | Riparian Reserve |

# INTRODUCTION

The United States Bureau of Land Management ("BLM") proposed the Bear Grub and Round Oak forest management projects in Oregon as part of meeting its legal obligation to produce a sustained yield of timber in accordance with the Oregon and California ("O&C") Revested Lands Act, reducing forest stand competition, and promoting forest resiliency. BLM formally consulted with the United States Fish and Wildlife Service ("FWS") on the proposed projects under Section 7 of the Endangered Species Act ("ESA") and, based on the agencies' comprehensive analyses, FWS determined in a biological opinion ("BiOp") that the projects are not likely to jeopardize the continued existence of the northern spotted owl ("NSO") or destroy or adversely modify the species' critical habitat.

Plaintiffs argue that the BiOp is arbitrary and capricious and they are entitled to an emergency injunction preventing the projects from going forward. But Plaintiffs have not met their heavy burden of demonstrating this extraordinary relief is warranted. Plaintiffs have not established that they will be irreparably harmed between now and when the case can be resolved on motions for summary judgment (within the next few months, during which only a small proportion of the timber sales will occur). Furthermore, none of the known owl sites that will be adversely affected by the projects are currently occupied by NSOs. Plaintiffs cannot show that a single NSO is likely to be taken by the projects, let alone that the projects will imminently cause irreparable harm to the species or Plaintiffs. In addition, Plaintiffs have not shown that they are likely to succeed on the merits of their claims, or that their allegations even raise "serious questions"—Plaintiffs lack standing and, jurisdictional infirmities aside, Plaintiffs have failed to show that the BiOp and Incidental Take Statement ("ITS") are anything other than reasonable. Finally, the public interest and balance of the equities do not favor Plaintiffs' extraordinary request. For these reasons and those explained below, the Court should deny Plaintiffs' motion.

## STATUTORY BACKGROUND

### I.    The Endangered Species Act

Section 7(a)(2) of the ESA requires federal agencies (known as "action agencies") to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2). If an action may affect listed species, the action agency consults with the appropriate expert "consulting agency" (here, FWS) to analyze the potential impacts of a proposed action. Formal consultation leads to the issuance of a written BiOp by the consulting agency. 50 C.F.R. § 402.14(g)-(h). The BiOp must be based on the "best scientific and commercial data available." 50 C.F.R. § 402.14(d), (g)(8).

Section 9 of the ESA prohibits the "take" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The consulting agency can extend these protections to any threatened species, 16 U.S.C. § 1533(d), and FWS has done so for the NSO, 50 C.F.R. § 17.31(a). If, after consultation, the consulting agency determines that the proposed action will result in  the incidental taking of a listed species in a manner otherwise consistent with Section 7, it will issue an ITS. *Id.* § 1536(b)(4). An ITS specifies the impact of the incidental taking on the listed species, establishes reasonable and prudent measures that are necessary or appropriate to minimize the amount or extent of incidental take, and states the terms and conditions that the action agency must comply with to implement the reasonable and prudent measures. *Id.* § 1536(b)(4)(i)-(iv); 50 C.F.R. § 402.02. Any taking in compliance with the terms and conditions of the ITS is exempt from the general take prohibition in Section 9. 16 U.S.C. § 1536(b)(4)(iv), (o)(2).

II.     **The Oregon and California Revested Lands Act**

Enacted in 1937, the O&C Act provides that approximately 2.5 million acres of federal land in western Oregon "classified as timberlands . . . shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the princip[le] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 2601. The O&C Act "establish[es] timber production as the dominant use" of the land. *Headwaters v. BLM*, 914 F.2d 1174, 1184 (9th Cir. 1990). It requires BLM to determine the allowable sale quantity of timber from these lands and to sell that amount of timber annually, or as "much thereof as can be sold at reasonable prices on a normal market." *Id.*

## FACTUAL BACKGROUND

I.     **The Northern Spotted Owl**

The largest of the three subspecies of spotted owls, the NSO is a medium-sized, dark brown owl with a barred tail, white spots on its head and breast, and dark brown eyes surrounded by prominent facial disks. FWS_000632. FWS listed the NSO as a threatened species on June 26, 1990. 55 Fed. Reg. 26,114 (June 26, 1990). FWS determined in December 2020 that reclassifying the NSO from a threatened species to an endangered species is warranted but precluded by other higher-priority listing actions. 85 Fed. Reg. 81,144 (Dec. 15, 2020).

The NSO's range extends from southwest British Columbia through the Cascade Mountains, coastal ranges, and intervening forested lands in Washington, Oregon, and California. FWS_000632. The species' range has been partitioned into 12 provinces based on landscape subdivisions exhibiting different physical and environmental features. *Id.* The Round Oak and

Bear Grub forest management projects occur within two of those provinces: the Oregon Klamath and the Western Oregon Cascades. FWS_012866; *see also* FWS_000634.

In December 2012, FWS designated approximately 9.5 million acres of land in Washington, Oregon, and California as critical habitat for the NSO. 77 Fed. Reg. at 71,876, 71,877 (Dec. 4, 2012).[1] Some of the treatment areas in the Bear Grub and Round Oak project areas are within this designated critical habitat. FWS_000446-448 (Tables 5 and 6).

The "most pressing threat" to NSO is competition with barred owls. FWS_000536. Native to eastern North America, but expanded to western North America, barred owls are larger and more aggressive than NSO. *See* FWS_000582. Barred owls are able to occupy and use a broader range of forest-types and consume a wider variety of foods than NSO. FWS_000582-83. The best available information is that competition between NSO and barred owls is contributing to NSO population declines. FWS_000584.

## II.    The 2016 Southwestern Oregon Resource Management Plan

Following a decades-long public process conducted under the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"), and after consultation with both FWS and the National Marine Fisheries Service ("NMFS") under the ESA, BLM issued the 2016 Southwestern Oregon Resource Management Plan ("the 2016 RMP"). FWS_010396-727. Under the 2016 RMP, BLM distributed the land in the planning area into six different land use allocations, including Late-Successional Reserves ("LSR") and the Harvest Land Base ("HLB"). LSR are federal lands primarily, but not solely, dedicated to developing,

---

[1] In January 2021, FWS issued a final rule revising the NSO critical habitat designation. *See* 86 Fed. Reg. 4820 (Jan. 15, 2021). However, the final rule has been delayed to at least December 15, 2021, while FWS considers revising or withdrawing the January 2021 rule. 86 Fed. Reg. 22,876 (Apr. 30, 2021).

maintaining, and promoting the development of habitat for the NSO. FWS_010475. HLB, on the other hand, are federal lands primarily dedicated to "achiev[ing] continual timber production that can be sustained through a balance of growth and harvest." FWS_010467. Harvesting timber in the HLB allows BLM to comply with the O&C Act by selling the annual allowable sale quantity of timber. In the 2016 RMP, BLM committed approximately 80% of the 2.5 million acre planning area in the RMP to reserves, including LSRs. Bushue Decl. ¶ 7. BLM allocated the remaining 20% of land in the RMP planning area to the HLB. *Id.*

The RMP requires BLM to refrain from offering any timber sale that would result in incidental take of NSO until a barred owl management program has been implemented. FWS_010526. BLM uses survey protocols based on the best available science to determine whether NSO are present before habitat can be modified. FWS_010435-36. If a resident owl is detected, BLM is required to drop or modify the proposed harvest unit to avoid incidental take. FWS_010436; FWS_000519.

In its BiOp on the 2016 RMP, FWS concluded that, notwithstanding adverse effects to NSOs associated with habitat removal in the HLB, the RMP provides a net benefit to the species and its designated critical habitat, based on considerations including: that the RMP "will conform to the Spotted Owl Recovery Plan, including the location and function of large blocks of habitat for reproducing spotted owls and the ability of the landscape to support spotted owl movement between those blocks"; that there will be a "a net increase in designated forest reserve acreage from the current baseline and [that] overall forest ingrowth will outpace the amount of habitat lost to harvest during the life of the []RMP"; that "BLM will avoid take of spotted owl territorial pairs or resident singles from timber harvest until implementation of a barred owl management program

has begun"; and that "BLM will support barred owl management as informed by the outcome of the barred owl removal experiment that is currently underway." FWS_039007-10.

## III.    The Bear Grub and Round Oak Projects and Associated BiOp

BLM developed the Bear Grub and Round Oak forest management projects in conformance with the RMP and to accomplish the RMP's objectives. The projects were designed to produce a sustained yield of timber in accordance with the O&C Act, reduce forest stand competition, and promote forest resiliency, all while not jeopardizing northern spotted owls or adversely modifying the species' critical habitat. *See* FWS_000430-433. Together, the Bear Grub and Round Oak forest management projects will result in 8,142 acres being treated over the course of several years—approximately 0.9% of the BLM managed lands in the Medford District where the projects will occur. FWS_000499; FWS_000506; FWS_012842.

Although BLM completed ESA Section 7 consultation with FWS on the RMP, BLM will also consult with FWS on individual projects to determine site-specific impacts on the NSO and its critical habitat. On May 21, 2020, BLM submitted a comprehensive 81-page biological assessment ("BA") for the Bear Grub and Round Oak projects to FWS, analyzing the projects' impacts on the NSO. *See* FWS_000417-497. Based on its analysis in the BA, BLM concluded that the projects "may affect, and are likely to adversely affect spotted owls and their designated critical habitat." FWS_000421. In light of this conclusion, BLM commenced formal consultation with FWS under Section 7 of the ESA. *Id.*

On July 24, 2020, FWS issued a BiOp analyzing the Bear Grub and Round Oak forest management projects. *See* FWS_000498-729. The BiOp analyzed: (1) the status of the species (evaluating its range-wide condition, the factors responsible for that condition, and its survival and recovery needs); (2) the NSO's environmental baseline (evaluating its condition in the action area,

the factors responsible for that condition, and the relationship of the action area to the survival and recovery of the species); (3) the effects of the proposed action on the owl (evaluating the direct and indirect impacts of the action and the effects of any interrelated or interdependent activities on the species); and (4) cumulative effects on the owl (evaluating the effects of future, non-Federal activities in the action area). *Id.* Based on this comprehensive analysis, FWS ultimately concluded that the Bear Grub and Round Oak projects are "not likely to jeopardize the continued existence of the spotted owl, and [are] not likely to destroy or adversely modify spotted owl critical habitat." FWS_000606.

> Among other things, FWS found that:
>
> [T]he vast majority of spotted owl [nesting, roosting, and foraging ("NRF")] habitat in the action areas will be retained in a functional condition on the landscape. Although the loss or downgrade of existing NRF habitat is certainly an adverse effect to the spotted owl, the proposed action was specifically designed to disperse habitat impacts on the landscape in a manner that avoids take of spotted owls, enhances the resiliency of remaining stands in the action area to wildfire, and retains the capability of NRF habitat in the action area to support the life history requirements of the spotted owl.

FWS_000608.

## IV.    Project Implementation for the Bear Grub and Round Oak Projects

The BLM is implementing the Bear Grub and Round Oak projects through individual timber sales. As discussed below, one sale (Bear Grub) has not yet been contracted. Two other sales (Lodgepole and Ranchero) are currently operating.

### A.    Bear Grub Timber Sale

On October 1, 2020, BLM issued a decision record authorizing a timber sale and non-commercial fuels reduction treatment (known as the "Bear Grub Timber Sale") as part of the Bear Grub forest management project. Bushue Decl., Ex. F. Defendant-Intervenor Timber Products is the high bidder for the Bear Grub Timber Sale. However, BLM is still in the process of

administratively processing and responding to 18 protests to the Bear Grub decision and cannot award or approve the timber sale contract unless and until that process is complete and all 18 protests are denied. *See* Bushue Decl. ¶ 11. BLM does not anticipate that it will complete this process within the next three months, and therefore no work on this Timber Sale may occur at this time or until a contract is awarded. *Id.*

If BLM awards the contract and Timber Products is able to begin operations within the Bear Grub Timber Sale, Timber Products has indicated that between now and October 15, 2021, it may harvest up to 16 units, for a total of 375 acres of remove or downgrade of NRF and remove of dispersal habitat. Thrailkill Decl. ¶¶ 46, 47. This harvest would not impact any occupied known NSO sites and would not materially diminish the NSO's prospects for future survival or recovery or appreciably diminish the value of its critical habitat. Thrailkill Decl. ¶¶ 41, 46. October 15 marks the end of the operating period for this sale, and no further harvesting would occur until May 2022. *See* Wuerfel Decl. ¶ 22 (ECF No. 12).

### B.    Lodgepole and Ranchero Timber Sales

In August 2020, BLM issued decision records authorizing two timber sales (known as the "Lodgepole Timber Sale" and "Ranchero Timber Sale") as part of the Round Oak forest management project. Bushue Decl., Exh. D, E. The Lodgepole Timber Sale authorizes the purchaser to conduct timber harvests and follow-up fuel treatments on approximately 460.6 acres. Bushue Decl., Exh. D at 34. The Ranchero Timber Sale authorizes the purchaser to conduct timber harvest, follow-up fuel treatments, and planting activities on 576.9 acres. Bushue Decl., Exh. E at 55. Both timber sales also involve road maintenance and road construction work. On April 14, 2021, BLM awarded Defendant-Intervenor Boise Cascade Wood Products with the contract for

both Timber Sales. Nystrom Decl. ¶¶ 13, 22 (ECF No. 11). The contracts have 36-month terms. Bushue Decl. ¶ 13.

The overwhelming majority of the land comprising the Lodgepole and Ranchero Timber Sales is in the HLB. Thrailkill Decl. ¶ 30. No treatments are proposed in the LSR and only a few acres of treatment are proposed in the land use allocation known as the Riparian Reserve ("RR"), and those treatments are designed for forest resiliency. *Id.* Only 823 of the acres occur within NSO critical habitat. *Id.* ¶ 31. There are nine known NSO territories where the Lodgepole and Ranchero Timber Sales harvest units occur. *Id.* ¶ 35. Though suitable for NSO use, these sites have been unoccupied for three or more years, and ongoing spot checks of the areas this year have confirmed that there are no spotted owls occupying the area. *Id.*; Bushue Decl., Exh. C.

Based on information provided to Federal Defendants, over the next few months Boise Cascade may harvest three units in the Lodgepole Timber Sale and seven to nine units in the Ranchero Timber Sale. Second Nystrom Decl. ¶¶ 5, 11 (ECF No. 22). If all of these units are harvested, it would affect (via removing or downgrading NRF and removing dispersal habitat) a total of 716 acres. Thrailkill Decl. ¶ 47. This harvest would not impact any occupied known NSO sites and would not materially diminish the NSO's prospects for future survival or recovery or appreciably diminish the value of its critical habitat. *Id.* ¶¶ 41, 48.

## STANDARD OF REVIEW

Temporary restraining orders and preliminary injunctions are extraordinary remedies never awarded as of right. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Wise v. City of Portland*, 483 F. Supp. 3d 956, 966 (D. Or. 2020). The same four factors govern the court's decision on whether to issue a preliminary injunction or a temporary restraining order. *Wise*, 483 F. Supp. 3d at 965-66. A plaintiff must make a "clear showing" establishing *each* of these four

requirements: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20, 22. Moreover, a plaintiff must establish standing to pursue its claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The Court's assessment of the merits of Plaintiffs' claims is governed by the Administrative Procedure Act ("APA"). *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004). Under the APA, final agency decisions must be upheld unless they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). As such, the Court's task "is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.") (footnote omitted).

The scope of review under the APA is narrow and judicial review of federal agency actions is "particularly deferential"—the Court may not substitute its judgment for that of the agency. *See Lands Council v. McNair*, 537 F.3d 981, 987, 992-94 (9th Cir. 2008) (en banc); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. v. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285-86 (1974) (citations omitted).

## ARGUMENT

### I.     Plaintiffs Have Not Met their Burden of Showing They Will be Irreparably Harmed Absent Relief

A temporary restraining order and preliminary injunction serve a specific purpose—preventing imminent, irreparable harm that will occur "before a decision on the merits can be rendered." *Winter*, 555 U.S. at 7, 20, 22 (citation omitted); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. 2:13-cv-00042-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013). In this case, FWS has already submitted the administrative record and the parties could file competing motions for summary judgment within 1-2 months as the merits of the BiOp have already been briefed as a result of Plaintiffs' emergency motion. Therefore, to establish irreparable harm, Plaintiffs need to show that they will be irreparably harmed in the next few months.

But the NSO and Plaintiffs will not be irreparably harmed by the actions that will occur in that time period. The Bear Grub Timber Sale is not imminent at all; the contract has not even been awarded. While the contract may be granted in several months, even in the most aggressive timeline, only a portion of the total allowable harvest will occur prior to the October 15 end of the annual operating period. Thrailkill Decl. ¶¶ 35, 44; Second Wuerfel Decl. ¶¶ 3-5. Additionally, only a few units are expected to be harvested as part of the Lodgepole and Ranchero Timber Sales in the next few months. Second Nystrom Decl. ¶¶ 5, 11. Whether considering the next few months or next three years of operations, these Timber Sales will not impact any occupied known owl sites and will not result in irreparable harm to NSO or its critical habitat. Thrailkill Decl. ¶ 41, 46. Plaintiffs have failed to meet "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *See* 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 (3d ed.).

Plaintiffs claim that they will be irreparably harmed by the "unauthorized taking of spotted owls." ECF 16 at 30. But Plaintiffs have not provided any evidence that take will occur as a result of the impending Timber Sales. *See id.* Indeed, all of the evidence suggests that take will not occur. For its consultation with FWS, BLM surveyed all known NSO home ranges that could be impacted

by the Bear Grub and Round Oak projects and all NRF habitat within 1.2 (Round Oak) and 1.3 (Bear Grub) miles of the proposed treatment units. FWS_000450. There are 43 known NSO home ranges contained within the Round Oak and Bear Grub forest management projects. FWS_000569. FWS concluded that six of these sites, four of which are unoccupied by NSO and two of which are occupied, would not be adversely affected by the projects as they are "not expected to measurably impact habitat for nesting or foraging activities, which could affect reproduction and survival of spotted owls associated with the sites."[2] FWS_000572. Of the remaining 37 home ranges, the surveys (which are conducted over a period of at least two years) confirmed that 35 are unoccupied. *Id.* at Table 15. BLM had not conducted sufficient surveys at the time of the BiOp to determine occupancy in the remaining two sites, *see id.*, but subsequent surveys have not located NSO at those sites, *see* Thrailkill Decl. ¶ 35; Bushue Decl., Ex C. In accordance with the 2016 RMP and BiOp, BLM must complete protocol surveys for these sites, and drop or modify their planned activities should the surveys confirm NSO occupancy. *See* FWS_000603-04; FWS_000544. Spot checks for NSO will also continue as needed in accordance with the NSO survey protocol. FWS_000544. In sum, the evidence shows that only two NSO sites in the project areas are occupied, and those sites will not be adversely affected by the projects. Moreover, the two occupied sites are not part of the Lodgepole, Ranchero, or Bear Grub Timber Sales, so any impacts to those sites are not imminent. Thrailkill Decl. ¶¶ 25, 35; Bushue Decl., Exh. A, B, C. Plaintiffs have not shown that there will be take—whether through habitat modification or otherwise.[3]

---

[2] The occupied sites will not be adversely affected by the projects as one site (Site 2220O) has no proposed treatment in the NRF habitat or at the core or nest patch scale. FWS_000572. The other site (Site 3561B) only has approximately 0.3 acres of proposed NRF habitat removal, and 17 acres of dispersal-only habitat removal, at the home range scale. *Id.*

[3] "Harm" means an act which "actually kills or injures wildlife." 50 C.F.R. § 17.3. "Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or

Even if Plaintiffs had managed to produce some evidence of take (which they have not), mere take of any magnitude does not constitute irreparable harm. ESA Section 7 protects against jeopardizing "species," not individual members. 16 U.S.C. §§ 1531(b), 1536(a)(2); *see also Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014). Obviously ESA Section 9, which prohibits take, also contains exceptions reflecting Congress' judgment that not all take is forbidden under the ESA. *See* 16 U.S.C. § 1539(a), (b); *id.* § 1536(o); *Idaho Rivers United v. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262 n.9 (W.D. Wash. 2015). So, while Plaintiffs "need not demonstrate a threat of extinction to the species to meet its burden," they must show irreparable injury and "harm 'significant to the overall population.'" *Conservation Cong. v. U.S. Forest Serv.*, No. 2:13-cv-1977-JAM-DB, 2018 WL 4007093, at *2 (E.D. Cal. Aug. 17, 2018) (citations omitted); *Idaho Rivers United*, 156 F. Supp. 3d at 1262-63; *see also Wild Equity Inst. v. City & Cty. of San Francisco*, No. C 11-00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011) ("The plaintiff may be simply assuming that the death of any listed animal, or any of its eggs, constitutes irreparable harm for purposes of issuing a preliminary injunction. However, the law does not go quite so far. No court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm."). Here, Plaintiffs have not made "a clear showing" that a single NSO will be taken, let alone that the take would be significant to the overall population of NSO. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

Nor have Plaintiffs shown that *they* are likely to be irreparably harmed if take were to

---

sheltering." *Id.*; *see Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*, 515 U.S. 687, 700 n.13 (1995). "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3.

occur. The relevant harm "is not injury to the environment but injury to the plaintiff." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000). Although Plaintiffs have submitted a declaration regarding irreparable harm, the declaration speaks in general terms ("The persistence of the spotted owl population is extremely important to KS Wild and our members, and to me personally," ECF 16-2 at ¶ 15), without explaining how the Plaintiff organizations or the declarant will be irreparably harmed if take were to occur. *See generally* Sexton Decl., ECF 16-2. Notably, while Plaintiffs' brief claims that "KS Wild has substantial concerns that the logging authorized by FWS has been and will continue to prevent them from seeing, experiencing, and otherwise enjoying northern spotted owls in the project area," that sentence is without a citation. ECF 16 at 32. Plaintiffs' declarant does not state that he has seen an NSO, much less seen an NSO in the project areas, nor that he would like to enjoy NSO in the project areas in the future. *See generally id.* Therefore, Plaintiffs cannot show that *they* will be irreparably harmed even if an NSO was taken as a result of the forest management projects.

Plaintiffs' next argument fares no better. Plaintiffs claim that the loss of mature and old-growth forest, on its own, is irreparable. ECF 16 at 31-32. The loss of mature and old-growth forest on its own perhaps could constitute irreparable harm if Plaintiffs had challenged the Timber Sales themselves (i.e., challenging BLM's decision to authorize harvesting under an appropriate statute), asserted a specific interest in the areas that would be impacted, and showed how both the area and Plaintiffs themselves would be irreparably harmed from the action. But that is not what Plaintiffs have done. Plaintiffs have raised an APA challenge to the BiOp issued by the FWS and, therefore, need to show that an ESA-listed species will be irreparably harmed and Plaintiffs, in turn, will be irreparably harmed by the harm that will occur to the ESA-listed species. *Idaho Rivers United*, 156 F. Supp. 3d at 1261 ("[I]f Plaintiffs fail to establish a likelihood of irreparable injury to the [listed

species], they also fail to establish a likelihood of irreparable injury to" themselves). Plaintiffs have not met that burden. FWS has concluded that the NSO will not be irreparably harmed as a result of the ongoing Lodgepole and Ranchero Timber Sales implementing the Round Oak project, nor the Bear Grub Timber Sale implementing the Bear Grub project (if the Bear Grub Timber Sale is awarded). Thrailkill Decl. ¶¶ 41, 48. Plaintiffs have not presented any evidence to the contrary. Nor have Plaintiffs presented sufficient evidence showing that *they* will be irreparably harmed if harm did occur to the NSO. *See generally* Sexton Decl., ECF 16-2.

The cases Plaintiffs cite to for the proposition that the loss of trees alone establishes irreparable harm do not prove their point. In most of those cases, the plaintiff had challenged an action agency's decision to authorize tree harvest under a non-ESA statute. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130, 1335-36 (9th Cir. 2011) (concluding that the plaintiffs had established irreparable harm because the timber project would harm members' ability to "view, experience, and utilize" the areas in their undisturbed state; but plaintiffs' claims were brought pursuant to the Appeals Reform Act, National Forest Management Act, and NEPA); *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1509-10 (D. Or. 1992) (plaintiffs were irreparably harmed due to BLM's failure to comply with NEPA), *aff'd*, 998 F.2d 705 (9th Cir. 1993); *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (court held that plaintiffs were irreparably harmed due to Forest Service's failure to comply with the National Forest Management Act), *aff'd*, 952 F.2d 927 (9th Cir. 1991). And while *Pacific Rivers Council v. Thomas* is an ESA case, the Court did not hold that timber sales *per se* constituted irreparable harm to all plaintiffs. 30 F.3d 1050, 1056-57 (9th Cir. 1994). In fact, it was not a preliminary injunction case at all, but merely cited a holding that timber sales are an irretrievable "commitment of resources" under Section 7(d) of the ESA. *Id.* Further, over the next few months only a small

proportion of the projects are likely to occur and will have more modest impacts than the projects as a whole. Thrailkill Decl. ¶¶ 30-42. Plaintiffs' generalized allegations do not make a clear showing that their members' recreational (or other) interests will be harmed by the harvest that is likely to occur in the near future. *See generally* Sexton Decl.

Plaintiffs' argument that they are irreparably harmed is also undercut by their own delay in seeking injunctive relief. *Oakland Trib. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (a "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm"). Plaintiffs bring this challenge against the BiOp, which was issued on July 24, 2020. Yet Plaintiffs chose not to challenge the BiOp until January 14, 2021. ECF 1. The decision records for the Lodgepole and Ranchero Timber Sales were issued August 24, 2020, and the decision record for the Bear Grub Timber Sale on October 1, 2020. Yet Plaintiffs waited almost another four months before filing the present motion demanding emergency relief. ECF 16.[4] At bottom, this emergency is a result of Plaintiffs' own delay. A lack of planning on Plaintiffs' part does not constitute irreparable harm. *Miller for & on Behalf of NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("[T]he district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim relief has allowed the status quo to change through unexplained delay.") (citation omitted).

---

[4] Plaintiffs might claim that they could not have filed a motion for a temporary restraining order/preliminary injunction until BLM's administrative process challenging the decision records was resolved and Plaintiffs were notified that BLM had denied their protest for the Lodgepole and Ranchero Timber Sales on April 19, 2021. But Plaintiffs filed their lawsuit in January and filed the present motion while the administrative process for the Bear Grub Timber Sale is ongoing. These facts demonstrate that Plaintiffs could have filed the present motion before they did so in May.

In sum, Plaintiffs have not clearly shown that they would be irreparably harmed absent relief before the Court could issue a decision on the merits and, therefore, Plaintiffs' motion should be denied.

## II.   Plaintiffs have Not Demonstrated that they are Likely to Succeed on the Merits of their Claims

### A.   Plaintiffs Lack Standing

To establish Article III standing and put themselves in a position to even litigate the merits of this case, Plaintiffs must prove three elements: (1) an injury in fact that is both concrete and particularized and actual or imminent; (2) a causal connection between the injury and FWS's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan,* 504 at 560-61. At the preliminary injunction stage, Plaintiffs must make a "clear showing of each element of standing."  *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam).  But Plaintiffs have not made a clear showing of an injury in fact caused by the challenged BiOp, and instead rest upon vague and conclusory statements of their interests.  *See* Sexton Decl. ¶¶ 17, 42 (asserting NSOs are "important" to him and that the project will "harm my personal and professional interests," without explaining how).  Plaintiffs' standing declaration is devoid of any specific, individualized injury to Plaintiffs themselves and fails "to show a particularized injury to their interests rather than an abstract injury to the environment."  *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1111 (E.D. Cal. 2013) (citing *Friends of the Earth*, 528 U.S. at 180-81).  A general interest in the physical area, without sufficiently specific allegations of injury, causation, and redressability, cannot make the "clear showing" required.

While "the desire to use or observe an animal species" is a "cognizable interest for purpose of standing," Plaintiffs never allege that they use or observe the NSO or intend to do so in the near future. *Lujan*, 504 U.S. at 562-63. Plaintiffs express no particularized interest in the NSO or show

how their members would be directly affected by the projects' effects on the NSO. *See* Complaint, ECF 1 (failing to mention that the organizations have any specific interest in NSO); Sexton Decl., ECF 16-2.[5] Plaintiffs failed to show "through specific facts, not only that listed species were in fact being threatened by [the challenged action], but also that one or more of [their] members would thereby be 'directly' affected apart from their 'special interest in th[e] subject.'" *Lujan*, 504 U.S. at 562-63 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also N.C. Fisheries Ass'n v. Pritzker*, No. 4:14-cv-138-D, 2015 WL 4488509, at *5 (E.D.N.C. July 22, 2015) ("Plaintiffs fail to allege a special interest in sea turtles, let alone that [the plaintiff organizations] are being directly 'affect[ed] . . . in a personal and individual way' by the sea-turtle takings. Plaintiffs have not alleged that they have an 'aesthetic' or 'recreational' interest in sea turtles or even a 'desire to use or observe' sea turtles" and therefore "failed to allege any facts to support the naked assertion that the organizations have personally suffered an environmental injury." (citations omitted)).

### B.     Plaintiffs' Claim is Precluded Because It Improperly Attempts to Relitigate Prior Challenges to the RMP

Several of Plaintiffs' claims (ECF 1 ¶¶ 89, 91, 92, 101, 104-07) are barred by the doctrine of claim preclusion. While Plaintiffs purport to challenge the BiOp on the Bear Grub and Round Oak forest management projects, their claims actually attempt to relitigate the 2016 RMP and FWS's BiOp on the 2016 RMP. The RMP adopted the general approach of providing for commercial timber harvest in suitable but unoccupied NSO habitat primarily from areas the BLM

---

[5] Because Plaintiffs' claims challenging FWS's administration of Section 7 of the ESA arise under the APA, and not the ESA citizen-suit provision, Plaintiffs must be within the "zone of interests" of ESA Section 7 to have standing. *See Bennett v. Spear*, 520 U.S. 154, 172-75 (1997). Plaintiffs do not assert a specific interest in "species preservation" that is threatened by the challenged action or directly regulated under Section 7, and they do not explain any other way that their interests lie within the zone of interests protected by that specific provision. *Id.* at 175-77.

Defendant's Response to Motion for a Temporary Restraining Order/Preliminary Injunction - 18

allocated to the HLB, instead of from various reserve land use allocations intended to support conservation of the NSO. *See* FWS_010467-75; FWS_015222-35; FWS_010435-36. In the RMP BiOp, FWS found this approach would not jeopardize the NSO or destroy or adversely modify its critical habitat. Thrailkill Decl. ¶¶ 6-11; FWS_015202-04; FWS_015222-36; FWS_015252. The projects challenged here implement the RMP's approach, and FWS's analysis relied largely on the same rationale to find that this approach would not jeopardize the NSO or destroy or adversely modify its critical habitat in this specific application.

Plaintiffs are barred from relitigating the 2016 RMP and associated BiOp. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."). Claim preclusion applies whenever there is (1) "privity between parties," (2) a "final judgment on the merits," and (3) an "identity of claims." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (citations omitted).

Here, there is privity between the parties because, in both this case and *Pacific Rivers*, Plaintiffs (Klamath-Siskiyou Wildlands Center, Oregon Wild, and Cascadia Wildlands) asserted claims against FWS. *See In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983). Second, this Court issued a final judgment on the merits upholding the 2016 RMP, which the Ninth Circuit affirmed. *Pac. Rivers v. U.S. Bureau of Land Mgmt.*, Case No. 6:16-cv-01598-JR, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, 815 F. App'x 107 (9th Cir. 2020). This Court held that "the record establishes FWS . . . considered the relevant facts, available data, and scientific information, and supplied a reasoned analysis in determining the 2016 RMPs would avoid jeopardy and adverse modification." *Pac. Rivers*, 2018 WL 6735090, at *14 (citation omitted). The Ninth Circuit agreed. *Pac. Rivers*, 815 F. App'x at 109.

Finally, there is identity of claims because the cases share "factual overlap" and involve "claims arising from the same transaction." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011) (citation omitted); *Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017) (the most important factor courts consider in analyzing identity of claims is "whether the two suits arise out of the same transactional nucleus of facts") (citations omitted). The claims arise out of the same transactional nucleus of facts because they both challenge terms and conditions established in the same RMP. Plaintiffs' attacks on BLM's "no-take" strategy, the survey methodology utilized to identify occupied habitat, and the agencies' analyses of the effects on NSO recovery of sustained-yield timber management in the HLB all stem from the same transactional nucleus of facts as Plaintiffs' prior lawsuit—BLM's decision to approve the 2016 RMP based on the analyses provided in the accompanying Final Environmental Impact Statement and BiOp prepared by Federal Defendants. While Plaintiffs did not focus their previous claims challenging the 2016 RMP and BiOp on the exact management directions and land use allocations at issue here, equity suggests that Plaintiffs should not be given multiple bites at the apple to argue that a single harvesting approach violates the ESA.

### C.    FWS Thoroughly Analyzed the Life Cycle of the NSO

Contrary to Plaintiffs' suggestion, there can be no credible dispute that FWS considered the life cycle of the NSO. *See* ECF 16 at 13-15; *see generally* FWS_000631-43 (entitled "Life History"). In fact, and with particular relevance to Plaintiffs' argument, there is a specific section within the larger discussion of the life cycle that focuses exclusively on NSO reproductive biology and population dynamics. FWS_000640 (discussing lifespan, sexual maturity, and ability to reproduce over time); FWS_000642-43 (discussing factors affecting population dynamics).

Perhaps in light of FWS's thorough consideration of the NSO life cycle, Plaintiffs shift their argument and contend that, when a species has a "short" life cycle, FWS must analyze the near-term effects of the agency action under consultation. ECF 16 at 13 ("FWS 'must consider near-term habitat loss to populations with short life cycles.'" (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation* (*PCFFA II*), 426 F.3d 1082, 1094 (9th Cir. 2005))). While "short" is inherently a relative term, the BiOp expressly found that the NSO does not have a "short" life cycle. FWS_000642 ("The spotted owl is relatively *long-lived*, has a *long reproductive life span*, invests significantly in parental care, and exhibits *high adult survivorship* relative to other North American owls." (emphasis added)).[6]

Nevertheless, and putting aside Plaintiffs' factual misstep, FWS agrees that a BiOp must discuss and fully evaluate the near-term effects of the agency action under consultation, regardless of the length of the species' life cycle. 50 C.F.R. § 402.02 ("Effects of the action are all consequences to listed species . . . and may occur later in time . . ."). But, like the BiOp's discussion of the NSO's life cycle, here again there can be no credible dispute that FWS analyzed the near-term effects to habitat. The BiOp comprehensively discusses all of the effects of the action on the species and its habitat. FWS_000558-600. The contention that FWS failed to candidly consider near-term, direct habitat effects is incorrect. FWS_000593-600 (discussing the downgrade or removal of NSO habitat as a result of the proposed action and its effects on NSO).

Faced with a BiOp that both thoroughly discusses the NSO life cycle and near-term, direct effects of the projects, Plaintiffs again shift their argument and suggest that there is some unlawful legal inconsistency when a species has a purportedly "short" life cycle and the proposed action has

---

[6] This is particularly true when compared to salmonid life cycles at issue in the *PCFFA* cases, on which Plaintiffs rely. *See* 426 F.3d at 1086 ("The SONCC coho has a three-year life cycle, spending half its life in fresh water and half in salt water.").

long-term adverse effects. ECF 16 at 14 ("FWS unlawfully failed to analyze how these dire effects enduring for many decades is consistent with the far shorter life cycle of the northern spotted owl . . . ."). While novel, this argument presents a false standard effectively precluding FWS from ever reaching any reasonable no-jeopardy determination.

Plaintiffs' first mistake is the misapplication of *PCFFA II*. In that case, the Ninth Circuit faulted the NMFS for focusing exclusively on long-term beneficial effects while ignoring the near-term adverse effects of the proposed agency action. 426 F.3d at 1089, 1091 (describing how water flow sufficient to meet the needs of the coho would not occur during the first eight years of the proposed operation). For those listed salmon, whose entire life cycle is generally three years, the failure to analyze the first eight years of the proposed action was problematic because multiple generations could be extirpated before any long-term beneficial effects came to fruition. *Id.* at 1091. Thus, the focus on long-term mitigation, excluding consideration of short-term adverse effects, failed to ensure the proposed action was not likely to jeopardize the species. Under those circumstances, the BiOp was found to be arbitrary and capricious. 426 F.3d at 1094 ("Five full generations of coho will complete their three-year life cycles—hatch, rear, and spawn—during those eight years. Or, if there is insufficient water to sustain the coho during this period, they will not complete their life cycle, with the consequence that there will be no coho at the end of the eight years."). Here, by contrast, FWS did consider the near-term, direct effects and did not simply rely on long-term mitigation to justify its no-jeopardy determination. Instead, FWS fully analyzed the effects throughout the duration of the projects and thoroughly considered what those effects mean for the NSO as a species and its habitat. FWS_000517-18 (description of projects); FWS_000560-67 (effects to habitat); FWS_000558-600 (effects to species and critical habitat).

Plaintiffs' attempted analogy with *PCFFA I* is similarly inapt. Here, there was no failure to analyze near-term adverse effects (as discussed above), nor was there reliance on long-term mitigation to reach a no-jeopardy conclusion. FWS never relied on the regeneration of the timber stands to justify its no-jeopardy conclusion, as the Ninth Circuit found fault with in *PCFFA I.* 265 F.3d 1028, 1037 (9th Cir. 2001) ("The NMFS predicts that more trees will grow within the watershed during the ensuing decade than are cut in the proposed project and, therefore, concludes that the 'short-term' and 'localized' effects of the logging will be naturally mitigated by regrowth."). FWS is not waiting for 100 years for timber regeneration to offset near-term adverse effects, but instead concluded that, although there may be adverse effects from the Bear Grub and Round Oak forest management projects, these effects do not rise to the level of jeopardy or adverse modification, as those terms are used in the ESA. Moreover, any concerns Plaintiffs have regarding BLM's focus of harvest activities in the HLB, while protecting and maintaining forested landscapes in areas allocated to reserves, should have been addressed at the time the BLM adopted the 2016 RMP or when the FWS determined the 2016 RMP did not jeopardize the NSO. While it may be anathema to Plaintiffs' organizational goals, ESA Section 7(a)(2) does not require the maintenance of an ecological status quo, but rather requires agencies, like BLM here, to ensure that its actions are "not likely to jeopardize the continued existence" of listed species, like the NSO. 16 U.S.C. § 1536(a)(2). As FWS found, the Bear Grub and Round Oak forest management projects do not "reduce appreciably" the likelihood of survival and recovery of the NSO. 50 C.F.R. § 402.02 (definition of jeopardy). Therefore, Plaintiffs' reliance on *PCFFA I* is misguided.

FWS candidly evaluated the effects of the Bear Grub and Round Oak forest management projects. It looked at the near-term effects and evaluated the long-term effects within the context of the NSO life cycle. It did not rely on speculative, future mitigation to reach its determination

that the projects are not likely to jeopardize the NSO or adversely modify designated critical habitat; it appropriately considered the BLM RMP management requirements. Nothing in the ESA or regulations precludes projects from moving forward just because there are near-term effects and long-term benefits, especially when FWS has thoroughly analyzed those effects and set forth a well-explained, reasonable explanation in the BiOp. FWS's analysis is sound.

### D.     FWS Expressly Addressed and Considered the Effects of the Action on "Floater" Owls

A "floater" owl is a non-territorial (i.e., non-breeding) owl that is present on the landscape and uses closed canopy forest habitat to support transient and colonization phases until recruiting into the breeding population. FWS_000566. Plaintiffs' argument that FWS failed to analyze how the Bear Grub and Round Oak forest management projects "may affect floater owls or their habitat" is simply incorrect. ECF 16 at 17. There is an entire section of the BiOp entitled "Effects to Non-breeding 'floater' spotted owls", FWS_000566-67, in which FWS concluded that the floater owls (if any were present) would be able to utilize the landscape after the projects.

Ultimately, FWS determined that "as much as 96 and 83 percent [nesting, roosting, foraging] habitat in the Bear Grub and Round Oak actions areas will not be impacted by the proposed action. . . . [a]nd therefore, nonbreeding spotted owls should be able to access some of this habitat." FWS_000566. FWS also determined that there are over 3,000 acres of available habitat outside of the NSO home ranges in the project areas that floaters could utilize. *See id.* "Given the lack of territory occupancy [by resident NSO in the project areas], these acres should be accessible to nonbreeding spotted owls to [] colonize." *Id.* Contrary to Plaintiffs' assertion that "floaters will be unable to colonize the action area in the future because BLM does not intend to allow suitable habitat to regrow here because it is located in the [HLB]" (ECF 16 at 17-18), the BiOp specifically concludes that "habitat in the Reserves along with HLB habitat not impacted in

the action area, is likely to provide habitat for temporary home ranges for spotted owl currently in — or that will enter [—] the nonbreeding population." FWS_000566-67.

> E.    **FWS's BiOp Appropriately Considered the Barred Owl Removal Program**

Plaintiffs attempt to fault the BiOp because they assert the agency did not adequately consider the "possible success of the ongoing experimental barred owl control program." ECF 16 at 18. But, as Plaintiffs themselves point out, FWS did consider the barred owl experimental removal plan in its BiOp. *See, e.g.*, FWS_000584 (describing removal studies and barred owl removal experiment), FWS_000666-68 (elaborating on the barred owl removal experiment). This is not a situation where the agency "entirely failed to consider an important aspect of the problem," as Plaintiffs incorrectly assert. ECF 16 at 20 (citing *Lands Council v. McNair*, 629 F.3d 1070, 1072 (9th Cir. 2010)).

As to the "possible success" of a post-experiment barred owl removal program, Plaintiffs' premise is utterly speculative. Plaintiffs posit hypotheticals like "if barred owl control is effective," ECF 16 at 20, but do not provide any information to show that the barred owl control program is or will soon be so successful that barred owls no longer limit the ability of NSO to disperse to new habitat. In contrast, the BiOp scrutinizes relevant studies pertaining to barred owl removal and discusses the barred owl removal experiment, but confirms that long-term effectiveness of removal is still being evaluated and the final report on the progress of the barred owl control experiment is not anticipated until 2022. FWS_000668. Plaintiffs cannot point to any evidence that barred owl removal has such a level of "impending success" that it should render the analysis in the BiOp unlawful. ECF 16 at 20. Moreover, only a small percentage of the suitable NSO habitat in the area is being impacted by the Bear Grub/Round Oak projects, *see, e.g.*, FWS_000506, contradicting

Plaintiffs' implication that there would be insufficient habitat to support reoccupying NSOs as a result of a barred owl removal program.

Ultimately, the future success of the barred owl removal program would improve the circumstances of the species, and not undermine FWS's no jeopardy conclusion.

### F.    FWS Appropriately Considered Project Design Criteria and Habitat Development in the BiOp

Plaintiffs take issue with two measures that they claim are improperly relied on in the BiOp because they are not "reasonably certain to occur": (1) project design criteria ("PDC"); and (2) the future development of spotted owl habitat in the LSR land use allocation. ECF 16 at 21. Plaintiffs' claim fails because the FWS did not rely on either as a "mitigation measure" and because they are not "generalized contingencies or [gestures] at hopeful plans," as Plaintiffs contend. *Id.* (citation omitted).

As to the PDC, Plaintiffs allege that these are "not reasonably certain to occur for two reasons": (1) the BiOp does not list them as mandatory "Terms and Conditions" or "Reasonable and Prudent Measures" in its ITS; and (2) the PDC are discretionary. Regarding the first point, "Terms and Conditions" and "Reasonable and Prudent Measures" are only required if take is anticipated. *See* 50 C.F.R. § 402.14(i)(1)(ii). Here, where the ITS does not allow for any take, there is no requirement to include those sections (or, for that matter, include PDC in those sections). Plaintiffs' underlying accusation that FWS's no take conclusion was "unlawful" is addressed further below.

Regarding the second point, Plaintiffs point to the possibility of waiver to show that the PDC are discretionary. It is true that the BiOp allows waiver of PDC in two narrow circumstances—"to protect public safety (as in the case of emergency road repairs or hazard tree removal" or if "nesting or reproductive success surveys conducted according the U.S. Fish and

Wildlife Service endorsed survey guidelines reveal that spotted owls are non-nesting or that no young are present that year." FWS_000713. These allowances do not make the PDC "discretionary" in the sense that they are no longer "reasonably certain to occur." ECF 16 at 23. Rather, FWS has provided narrow allowances for emergency situations that threaten public safety and the particular circumstance where FWS confirms that special conditions have arisen rendering the PDC unnecessary. Moreover, BLM cannot modify the PDC unilaterally; it must coordinate with the FWS and obtain agreement. *See* FWS_000528 ("If the PDC are not implemented as described or per agreed upon deviations between the Service and BLM, reinitiation of consultation may be warranted."); *see also* Thrailkill Decl. ¶ 28 (describing the waiver coordination process).

Plaintiffs themselves note that the PDC are defined as "conservation measures . . . integrated into the project design." FWS_000527. It is evident in both the BA and the BiOp that the PDC are a part of the proposed action itself. *See* FWS_000440 (discussing project design criteria as part of the "Description of the Proposed Action"); FWS_000527-30. In general, where conservation measures are part of the proposed action, their implementation is required under the terms of consultation. FWS_015814. Here, if BLM does not implement the PDC as they are described (or per agreed-upon deviations between FWS and BLM), reinitiation of consultation may be warranted under 50 C.F.R. § 402.16. FWS_000528. Because there is an ESA recourse mechanism for failure to comply, i.e., reinitiation of consultation, the PDC are "enforceable" as much as any condition that could be imposed in a BiOp. *Cf. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1046 (9th Cir. 2015) (finding enforceable BiOp conservation measures included as part of the project and triggering reinitiation of consultation for failure to meet the measures).

Plaintiffs miss the mark with the two cases they use to support their claim that the BiOp impermissibly relies on "uncertain" PDC. ECF 16 at 21. Both cases involved an agency's consideration of "mitigation" measures, a concept not at issue here. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743-47 (9th Cir. 2020); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008). Unlike the mitigation measures in *Bernhardt* that were merely offered as examples of potential strategies that could be taken to protect the polar bear, and the mitigation measures in *National Wildlife Federation* that relied on future installation of structural improvements to fish habitat, the PDC are concrete, specific measures, such as distances to be maintained between certain project activity and occupied spotted owl sites, that are not relied on to "mitigate" the project's impacts but are fundamental parts of the proposed action itself. *See* FWS_000528-31; FWS_000713.

As to the protection and management of spotted owl habitat in the LSR land use allocation, this is also a part of the proposed action itself, rather than a mitigation measure recommended to offset the effects of the action. *See, e.g.*, FWS_000522; FWS_000551. Just as the PDC are enforceable, protection and management of habitat in the LSR is ensured by mandatory management directions and the LSR framework established in the RMP. Plaintiffs fault FWS for discussing the benefits of the LSR in various sections throughout the BiOp, but the Ninth Circuit has noted that it would be odd for FWS *not* to recognize the recovery benefits of LSRs. *See Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 n.4 (9th Cir. 2006) ("Importantly, [a previous Ninth Circuit ruling] does not mandate that agencies ignore LSRs altogether, and expressly approved reliance on compliance with the [forest plan at-issue], especially the LSRs, when analyzing jeopardy to the species (as opposed to its critical habitat) under the ESA.").

Contrary to Plaintiffs' assertions, PDC and the protection and management of NSO habitat

in the LSR land use allocation are more than "mitigation measures" or "general commitment[s] to future improvements" but are part of the proposed action itself and are required to be implemented in order to remain in compliance with Section 7(a)(2) of the ESA.

> **G.    The ITS is Reasonable, Rational, and Supported by the Best Available Science**

FWS's ITS authorizes no take of NSO because, after evaluating the proposed actions, FWS reasonably concluded that the projects are not expected to cause any take. Plaintiffs' criticisms of the ITS and FWS's take analysis are unsupported and incorrect.

First, Plaintiffs allege that the expectation of no take is flawed because it relies on allegedly "unenforceable" and "discretionary" PDC. ECF 16 at 27. As explained in the previous section, the PDC are not optional—they are mandatory under the 2016 RMP. FWS did not err in relying upon the PDC in its BiOp analysis and estimate of what level of take is reasonably certain to occur. Further, the fact that the BiOp includes an ITS setting a take limit of zero spotted owls actually strengthens the incentives for PDC to be followed and for take to be avoided. If any take does occur, BLM and the timber companies would not be shielded from liability under Section 9 of the ESA because the take would not be covered by an ITS. 16 U.S.C. §§ 1538(a)(1), 1539(a)(1)(B). And, if even a single spotted owl take occurs, BLM would be obligated to reinitiate consultation with FWS. *See* 50 C.F.R. § 402.16(a)(1); FWS_000611 ("If the exempted level of incidental take (zero) is exceeded or is likely to be exceeded based on the monitoring conducted by the District as part of the proposed action, reinitiation of formal consultation is required."). Similarly, reinitiation of consultation would be required if "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion," i.e., if PDC are no longer implemented as part of the action, or if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an

extent not previously considered." 50 C.F.R. § 402.16(a)(2), (3).

Second, Plaintiffs disagree with FWS's analysis of the likelihood of take. ECF 16 at 27. However, the BiOp thoroughly and reasonably evaluates the projects' effects. In its analysis, FWS considered, first, whether NSO are reasonably certain to occupy the affected sites, and if so, whether altered habitat conditions resulting from the project are reasonably certain to create a biological response that results in take. FWS_000579. As explained above, only two NSO sites in the project areas are occupied. However, those sites will not be adversely affected by the projects because of the modest scope of actions in those areas and no take will occur. FWS_000572. Two additional sites lacked adequate survey data to draw a conclusion about occupancy, but since then surveys have not located owls in those sites. Thrailkill Decl. ¶ 39. For all owl sites, BLM must conduct further surveys and meet with FWS to ensure that appropriate consultation has occurred if NSOs are discovered. BLM will also conduct protocol surveys at prescribed intervals before modifying any NSO habitat and, if resident NSOs are located, the District will alter its proposed actions as necessary to avoid incidental take of NSOs. *Id.* FWS's conclusion that habitat effects in unoccupied areas will not harm or harass NSOs is a logical and reasonable exercise of the agency's scientific expertise. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1244-47 (9th Cir. 2001) (holding that incidental take was not established where the evidence indicated that the species at issue were not present on the land in question).

Contrary to Plaintiffs' assertions, it was not arbitrary or capricious for FWS to rely primarily on the survey protocol to determine occupancy. ECF 16 at 27-28, 27 n.13. The survey protocol is based upon the best available science on locating NSOs and determining occupancy. *See* FWS_013740-41.[7] The survey protocol has been used effectively for decades, has been

---

[7] The protocol takes into account lower response rates in areas where barred owls are present, *see*

periodically updated to incorporate advancements in scientific knowledge on the NSO (most recently in 2012), and has been upheld by this Court and the Ninth Circuit. *See Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 779-80 (D. Or. 2014), *aff'd*, 806 F.3d 1234 (9th Cir. 2015). Plaintiffs cite to studies showing a correlation between occupancy and certain habitat characteristics but provide no evidence that habitat-based estimation would be more accurate than FWS's survey protocol. ECF 16 at 28.[8]  Plaintiffs also do not show that utilizing a habitat-based occupancy model would have materially altered FWS's conclusion. Indeed, Plaintiffs admit that "[o]nly one of the . . . spotted owl sites in the action meets [the] threshold for NRF habitat" cited in one study as correlating with greater likelihood of occupancy. ECF 16 at 28 n.14.

Additionally, the Information Bulletin cited by Plaintiffs does not require FWS to use habitat assessment in lieu of survey data. ECF 16 at 28. Rather, it merely states that "*[i]n cases where surveys are not current* when consultation occurs, Level 1 teams are encouraged to evaluate habitat information, history of occupancy, barred owl presence, habitat models (e.g., Glenn *et al*. 2016), and other information as appropriate to inform the likelihood of occupancy." ECF 16-1 at 617 (emphasis added). In the sites analyzed in the BiOp, survey data was or will be available (and in fact, BLM has conducted additional surveys since the BiOp, *see* Bushue Decl., Ex. C). Further, the BiOp relies upon historical information and incidental observations to supplement the survey data. FWS_000542. The Information Bulletin's other statements about the importance of habitat

---

ECF 16 at 27 n.13, and requires additional spot checks prior to harvest in areas where barred owls have been detected. FWS_013753-55.

[8] The studies cited on page 55 of the BiOp are predominantly observational studies that analyze the habitat relationship of locations *already occupied by spotted owls*. These studies do not conclude that habitat characteristics can be used to estimate NSO occupancy with more reliability than protocol surveys. *See* FWS_000556. For example, Zabel et al. (2003) promotes the use of habitat-association models to estimate occupancy because they are less resource-intensive than surveys, not because they are more accurate. FWS_033088. Their models were not able to detect occupancy in all of the occupied sites identified by surveys. *Id.*

in assessing take are fully consistent with FWS's analysis, which thoroughly analyzed habitat impacts. *See* ECF 16-1 at 617; FWS_000560-65. It was reasonable for FWS to rely on the best available method for determining occupancy, in conjunction with other available information, and not to presume occupancy where no evidence of occupancy has been detected.

Finally, the projects' adverse effects to habitat, which FWS candidly acknowledges and accounts for in its analysis, *see* FWS_000560-65, do not mean that FWS's determination of no incidental take is arbitrary or capricious. *See, e.g., Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1121 (N.D. Cal. 2009) (rejecting similar, unsubstantiated arguments that actions with adverse effects cause "take" that must be addressed in an ITS); *Conservation Cong. v. Heywood*, No. 2:11-cv-02250-MCE-CMK, 2015 WL 5255346, at *14 (E.D. Cal. Sept. 9, 2015) (rejecting the argument that habitat degradation from timber harvest will lead to unaccounted-for take of NSOs), *aff'd*, 690 F. App'x 541 (9th Cir. 2017); *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12–cv–02800–TLN–CKD, 2014 WL 2092385, at *11 (E.D. Cal. May 19, 2014) (same). FWS reasonably found that, while the projects would reduce available NRF or dispersal habitat in some areas, it would not significantly impair essential behavioral patterns for the NSO to the extent that it would cause actual injury or death because no NSOs are present in those areas. FWS_000579. And since "most of the NRF habitat in the action areas will not be impacted by the proposed action," the projects were not expected to prevent future NSO dispersal. FWS_000562. *National Wildlife Federation v. Burlington Northern Railroad*, which Plaintiffs rely upon, ECF 16 at 29-30, actually supports FWS's reasoning. 23 F.3d 1508, 1513 (9th Cir. 1994). In *Burlington Northern*, the habitat modification in that case did not constitute take because the plaintiffs had not shown "*significant habitat modification or degradation* where it actually kills or injures wildlife by *significantly impairing* essential behavioral patterns, including breeding,

feeding or sheltering." *Id.* (quoting 50 C.F.R. § 17.3). Similarly, Plaintiffs here have not shown that the habitat modification analyzed in the BiOp will "actually kill[] or injure[]" spotted owls "by significantly impairing essential behavioral patterns."[9]

FWS's BiOp relied on the best available science to evaluate the habitat impacts of the projects and determine the likelihood that NSOs would be "taken" as defined in Section 9 of the ESA. The Court should defer to FWS's scientific judgment and uphold its reasonable conclusion that take is unlikely to occur on sites that are not currently occupied by spotted owls. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 626 (9th Cir. 2014) (affording FWS "substantial [deference]" in the context of an ITS determination).[10]

## III. Plaintiffs Fail to Demonstrate that the Balance of Harms and Public Interest Weigh In Favor of an Injunction

Finally, the public interest and balance of harms weigh against emergency injunctive relief. Plaintiffs categorically argue that no balancing of harms is required because their claims relate to the ESA. ECF 16 at 33. In cases involving the ESA, courts employ a presumption that the balance of interests weighs in favor of endangered and threatened species; they do not avoid the inquiry entirely. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018) (citation omitted). Nor may a court "merely assume that the Plaintiffs are acting in the species' best interest." *All. for the Wild Rockies v. Krueger*, 35 F. Supp. 3d 1259, 1270 (D. Mont. 2014),

---

[9] *Burlington Northern* noted that the Ninth Circuit previously had "specifically declined" to rule on whether "habitat degradation that merely retards recovery" constitutes take. *Id.* at 1512 (citing *Palila v. Haw. Dep't of Land & Nat. Res.*, 852 F.2d 1106 (9th Cir. 1988)).

[10] Plaintiffs' footnote attack on FWS's conclusion that the projects would not destroy or adversely modify critical habitat likewise fails. First, FWS's critical habitat determination thoroughly considered habitat impacts and did not rely solely on the lack of occupancy for its conclusion. FWS_000593-601; FWS_000593 (analyzing "how the proposed action is likely to affect the capability of affected critical habitat [physical or biological features] to support spotted owl life history requirements regardless of the species' presence or absence in the affected critical habitat"). Second, any reliance on the incidental take conclusion was not arbitrary and capricious because, as explained in this section, that conclusion was reasonable and well-supported.

*aff'd*, 664 F. App'x 674 (9th Cir. 2016). Here, Plaintiffs have not established an interest in NSO (i.e., that they have seen or enjoy NSO, that their organizations act in the best interest of NSO), nor any imminent threat to the NSO.

Moreover, through the O&C Act, Congress identified a strong public interest in providing for sustained-yield timber harvest on O&C lands. In particular, Congress provided that O&C lands designated as timberlands "shall be managed . . . for permanent forest production," 43 U.S.C. § 2601, and the Ninth Circuit has characterized sustained-yield timber production as the "dominant use" of O&C timberlands under the Act. *Headwaters*, 914 F.2d at 1184.

The timber sales at issue in this case support BLM's compliance with the O&C Act. *See* Bushue Decl. ¶¶ 4, 7, 10, 12. The 2016 RMP under which the timber sales were approved carefully allocated lands to reserves to be managed for the benefit of ESA-listed species, including the NSO, and the HLB to provide for sustained-yield timber harvest under the O&C Act. *Id.* ¶¶ 6, 8.[11] BLM determined the allowable sale quantity of the lands allocated to the HLB, and the O&C Act provides that timber in that amount "shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." 43 U.S.C. § 2601; Bushue Decl. ¶ 7.

Enjoining the timber sales would foreclose the benefits that sustained-yield timber harvest under the O&C Act provides to local communities and industries, as expressly determined by Congress. *See Pac. Rivers,* 2018 WL 6735090, at *17 ("[M]anaging O&C lands pursuant to sustained-yield principles by definition protects watersheds, regulates stream flows, and

---

[11] A recent district court decision held that allocation of lands to reserves violated the O&C Act by not providing for sustained-yield timber harvest on *all* O&C timberlands. *See Am. Forest Res. Council v. Hammond*, 422 F. Supp. 3d 184, 189-91 (D.D.C. 2019). Another recent decision held that BLM had a mandatory, non-discretionary duty to sell or offer for sale the declared allowable sale quantity each year that is enforceable under 5 U.S.C. § 706(1). *See Swanson Grp. Mfg. LLC v. Bernhardt*, 417 F. Supp. 3d 22, 26-27 (D.D.C. 2019). These cases are still pending a decision on remedy in the district court.

contributes to the economic stability of surrounding communities."), *adopted by* 2019 WL 1232835, *aff'd*, 815 F. App'x 107. Proceeds from these sales directly benefit western Oregon counties. Bushue Decl. ¶ 14. In addition, these timber sales provide an important boost to the local economy. *Id.* Courts have found that these types of benefits, even for timber harvest on non-O&C Act lands, weigh against preliminary injunctive relief. *See, e.g.*, *Friends of the Clearwater v. Higgins*, 472 F. Supp. 3d 859, 877 (D. Idaho 2020) (finding public interest and balance of harms weighs against a preliminary injunction in part because "[t]he project will also contribute to the local economy and is broadly supported by the local community."), *aff'd*, -- F. App'x --, No. 20-35623, 2021 WL 672859 (9th Cir. Feb. 22, 2021); *Sierra Forest Legacy v. Rey*, 691 F. Supp. 2d 1204, 1213-14 (E.D. Cal. 2010) (finding public interest supported, among other things, by providing timber production and supporting industry and local communities). That weight is even stronger in this case where the timber sales Plaintiffs seek to halt come from O&C lands and are intended to directly contribute to the economic stability of local communities and industries. *Cf. Pac. Rivers*, 2018 WL 6735090, at *18 (emphasizing economic benefits of sustained-yield timber harvest under the O&C Act). Moreover, planning for sustained yield timber harvest requires ensuring a timely balance of growth and harvest. Bushue Decl. ¶ 13. A preliminary injunction of these timber sales would disrupt this careful planning contrary to the public interest as reflected in Congress's direction to sell, cut, and remove timber using sustained-yield principles.

## CONCLUSION

Plaintiffs' motion for emergency injunctive relief must be denied as Plaintiffs have failed on all fronts: they have not shown that they will be irreparably harmed before the Court can render a decision on the merits, that they are likely to succeed on the merits (or even that their claims can be heard by this Court), or that the public interest and balance of harms weighs in their favor.

Dated: May 20, 2021               Respectfully submitted,

JEAN E. WILLIAMS, Acting Assistant Attorney General
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Section Chief

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW (CA Bar No. 254564)
Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Tel: (206) 526-6881
shaun.pettigrew@usdoj.gov

SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 307-6623
Email: kaitlyn.poirier@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2021, a true and correct copy of the above document was electronically filed with the Clerk of Court using CM/ECF. Copies of the document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW (CA Bar No. 254564)
Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Tel: (206) 526-6881
shaun.pettigrew@usdoj.gov

*Attorney for Defendants*