IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

KLAMATH SISKIYOU WILDLANDS
CENTER; OREGON WILD; and
CASCADIA WILDLANDS,

        Plaintiffs,

   vs.

UNITED STATES FISH AND WILDLIFE
SERVICE,

        Defendant,

and

BOISE CASCADE WOOD PRODUCTS,
L.L.C., and TIMBER PRODUCTS
COMPANY,

        Defendant-Intervenors.

Case No. 1:21-cv-00058-CL
**OPINION AND ORDER**

---

AIKEN, District Judge:

      This matter comes before the Court on plaintiffs' Motion for a Temporary

Restraining Order/Preliminary Injunction (doc. 16) and defendant's Motion to Strike

Page 1 – OPINION AND ORDER

(doc. 28) the Second Declaration of George Sexton. For the reasons that follow, the motions are DENIED.

## BACKGROUND

Plaintiffs Klamath Siskiyou Wildlands Center ("KS Wild"), Oregon Wild, and Cascadia Wildlands filed this action in January 2021, alleging that defendant United States Fish and Wildlife Service ("FWS") violated the Endangered Species Act ("ESA") and Administrative Procedure Act ("APA"), when it issued a Biological Opinion in July 2020 ("the 2020 BiOp") assessing the likely effects of proposed Bureau of Land Management ("BLM") forest management projects on Northern Spotted Owl (*Strix occidentalis caurina*) ("spotted owl") and its designated critical habitat. The spotted owl is listed as "threatened" under the ESA. 55 Fed. Reg. 2,114 (June 26, 1990).

The 2020 BiOp concerns two forest management projects proposed by BLM's Medford District—the Bear Grub Project and Round Oak Project. For the Bear Grub Project, BLM has authorized the Bear Grub timber sale, and for the Round Oak Project, BLM has authorized the Ranchero and Lodgepole timber sales. Combined, the projects authorize timber harvest and fuel reduction maintenance on 8,142 acres of forested BLM land in southern Oregon. FWS_000505.[1]

The projects are designed to be consistent with BLM's Southwestern Resource Management Plan and Record of Decision, issued in 2016 ("2016 RMP" or "RMP"). *Id.* Lands in the RMP planning area are distributed into six land use allocations,

---

[1] All references to FWS' administrative record are cited as "FWS_######."

including Late-Successional Reserves ("LSR") and the Harvest Land Base ("HLB"). LSR are federal lands primarily dedicated to developing, maintaining, and promoting the development of habitat for the spotted owl. FWS_010475. HLB are federal lands primarily dedicated to "achiev[ing] continual timber production that can be sustained through a balance of growth and harvest." FWS_010467. In creating this land use framework and allocating lands to these two uses, BLM balanced its obligation to protect and support the recovery of the spotted owl under the ESA with its obligation to manage the lands for timber production under the Oregon and California Revised Lands Act.[2] The RMP also prohibits BLM from offering any timber sale that would result in incidental take of spotted owl until a barred owl management program has been implemented. FWS_010526.

In May 2020, BLM completed a biological assessment analyzing the projects' impacts on the spotted owl. In it, BLM concluded that the projects "may affect, and are likely to adversely affect spotted owls and their designated critical habitat." FWS_000421. So BLM commenced formal consultation with FWS under Section 7 of

---

[2] The  Oregon and California Revised Lands Act ("O&C Act") provides that approximately 2.5 million acres of federal land in western Oregon

> classified as timberlands . . . shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the princip[le] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities.

43 U.S.C. § 2601. The O&C Act "establish[es] timber production as the dominant use" of the land. *Headwaters v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1184 (9th Cir. 1990). It requires BLM to determine the allowable sale quantity ("ASQ") of timber from these land to and sell that amount of timber annually, or as "much thereof as can be sold at reasonable prices on a normal market." *Id.* The forests at issue fall within the O&C lands.

the ESA, 16 U.S.C. § 1536. As a result of the consultation, FWS issued the 2020 BiOp and an incidental take statement.

Much of FWS' analysis on the effects of the projects focused on the impacts to spotted owl "sites," "locations with evidence of continued use by spotted owls, repeated location of a pair or single birds, presence of young before dispersal, or some other strong indicator of continued occupancy." FWS_000508. FWS considered impacts to spotted owl sites at several scales: home range, core area, and nest patch. A *home range* is the total area that a pair of spotted owls might use. *Id*. The Medford District uses a circle with a 1.2-mile radius (about 2,895 acres) to approximate a home range in the West Cascades Province and a 1.3-mile radius (about 3,400 acres) for the Klamath Province. *Id*. Home ranges of several owl pairs may overlap. *Id*. A *core area* is the "area around the nest tree that receives disproportionate use." FWS_000509. They are defended by territorial owls and do not generally overlap. *Id.* The Medford District uses a .5-mile radius circle (about 500 acres) to approximate a core area. *Id.* A *nest patch* is the 300-meter radius (70 acre) circle around a known or likely nest site. *Id.*

FWS found that the proposed action would impact approximately 11 percent (3,527 acres) of the 31,476 acres of habitat in the action areas suitable for nesting, roosting, and foraging ("NRF habitat").[3] FWS_000499. Of the 43 spotted owl home

---

[3] The "action area" is "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action[,] which for spotted owl "is usually based on the radius circle that would approximate the provincial home range[.]" FWS_000539. So the action areas for these proposed actions include all lands within 1.2 miles of proposed treatment units in the Bear Grub project and 1.3 miles of units within the Round Oak project and all lands within any overlapping home ranges of known spotted owl sites. *Id*. The Bear Grub action area is 78,028 acres and Round Oak

ranges with proposed logging in them, 37 were likely to be adversely affected by the proposed action because of the removal or downgrade of NRF habitat.[4] FWS_000569. Two sites in the action area are considered occupied by resident owls. FWS_000571. FWS concluded that the proposed action would not adversely affect those owls because, at one site, no logging would occur on NRF habitat and no logging would occur in the core area or nest patch scale. *Id*. At the other, only 0.3 acres of NRF and 17 acres of dispersal habitat[5] would be removed at the home-range scale, and none would occur at the core area or nest patch scale. *Id*.

FWS found that "the vast majority of [NRF] habitat in the action areas will be retained on the landscape." FWS_000608. FWS observed that, despite adverse effects from the loss or downgrade of some existing NRF habitat, "the proposed action was specifically designed to disperse habitat impacts on the landscape in a manner that" (1) "avoids take of spotted owls," (2) "enhances the resiliency of remaining stands in the action area to wildfire," and (3) "retains the capability of NRF habitat in the action area to support the life history requirements of the spotted owl." *Id*. Consistent with the RMP's requirement, BLM must drop or modify logging treatments at a timber

---

action area is 57,737 acres and they do not overlap. *Id*. There are 43 owl home ranges completely within the action areas and 16 that overlap. *Id*. at 000569–70.

[4] Removal means logging activities that alter NRF habitat so that it cannot support nesting, roosting, foraging, or even dispersal activities and would not be able to do so for decades post-logging. FWS_000511. Downgrade means activities that alter the condition of NRF habitat so that it no longer contains variables associated with NRF. *Id*. The habitat may still support foraging and continues to support dispersal. *Id*.

[5] Dispersal habitat is habitat that provides sufficient protection from avian predators, foraging opportunities, and temporary resting places for dispersing juvenile owls. FWS_000509.

sale unit if spotted owls are located during ongoing surveys. FWS_000519, 000520, 000528, 000544, 000572, 000578, 000600, 000604, 000607, 000610.

Overall, FWS concluded:

[BLM's] implementation of [the projects], including implementation of measures to avoid take of spotted owls, is not likely to jeopardize the continued existence of the spotted owl or to destroy or adversely modify critical habitat because the proposed Project will not appreciably reduce the likelihood of spotted owl survival or recovery. Further, project impacts, taken together with cumulative effect, are not expected to rise to a level that would affect or disrupt the biology of breeding spotted owl at a territory scale or disrupt the ability of spotted owls to disperse at a landscape scale. The proposed action is consistent with the management direction and strategy contained in the RMP to maintain or enhance the function of large blocks of habitat to support successfully reproducing spotted owls and to facilitate spotted owl movement between those blocks.

FWS_000500.

FWS also issued an incidental take statement that did not authorize any incidental take of spotted owls because "take as defined in the [ESA] is not reasonably certain to occur" during implementation of the projects. FWS_000610. The incidental take statement provided, however, that "[i]f the exempted level of incidental take (zero) is exceeded or is likely to be exceeded based on the monitoring conducted by the District as part of the proposed action, reinitiation of formal consultation is required." FWS_000611.

In August 2020, BLM issued decision records authorizing two timber sales as part of the Round Oak project. On April 14, 2021, BLM awarded Boise Cascade Wood Products, LLC the contract for both sales. Second Decl. of Mark Nystrom (doc. 22-1) ¶8. In October 2020, BLM issued a decision record authorizing a timber sale as part

of the Bear Grub project. At the time of the hearing on this matter, Timber Products Company was the high bidder for that sale, but BLM is still processing and responding to protests to its decision and cannot award the contract unless and until the that process is complete and the protests are denied. Decl. of Barry Bushue (doc. 26) ¶ 11; Second Decl. of Jeremy Wuerfel (doc. 22-3) ¶3.

As mentioned, plaintiffs filed this action in January 2021. In April 2021, Boise Cascade and Timber Products intervened as defendants. Doc. 15. Plaintiffs filed this Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") on May 5, 2021, alleging that logging was underway[6] and seeking an order prohibiting logging of suitable spotted owl habitat. Doc. 16. On May 12, 2021, the Court held a telephonic status conference to set a briefing schedule and date for the hearing on the Motion. Doc. 19. At it, the parties agreed to an expedited briefing schedule and a consolidated hearing on the TRO and PI requests. Defendants filed their responses on May 20, 2021. Docs. 22, 24. On June 4, 2021, plaintiffs filed a Second Declaration of George Sexton (doc. 27) in support of their motion. On June 7, 2021, FWS filed a Motion to Strike (doc. 28) the declaration, which intervenor-defendants joined (doc. 29). The Court heard oral argument on June 8, 2021. Doc. 30. As requested by the Court, plaintiffs filed their Response to the Motion to Strike on June 9, 2021 (doc. 31) and supplemental briefing on June 14, 2021 (doc. 33). The Court took the matters under advisement on June 14, 2021.

---

[6] FWS and intervenors confirm that the Lodgepole and Ranchero timber sales are currently being implemented. Decl. of Jim Thrailkill (doc. 25) ¶ 5; Nystrom Decl. ¶¶ 5, 11.

## DISCUSSION

### I. *Standing*

FWS argues that plaintiffs cannot prevail on their motion because they lack standing to pursue their claims.[7] "A threshold question in every federal case is . . . whether at least one plaintiff has standing." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citation and quotation marks omitted). Article III of the United States Constitution confines federal courts to hearing only "[c]ases and [c]ontroversies." U.S. Const. Art. III, § 2, cl. 1. "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court," like this Court, "therefore lacks subject matter jurisdiction over the suit." *City of Oakland v. Lynch*, 789 F.3d 1159, 1163 (9th Cir. 2015) (citation omitted). At the preliminary injunction stage, the plaintiff "must make a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).

To establish Article III standing, plaintiffs must first show an injury-in-fact, which is "an invasion of a legally protected interest" that is "concrete and particularized," and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The interest that individuals have in observing a species or its habitat, 'whether those individuals are motivated by esthetic enjoyment, an interest

---

[7] Defendants assert two other threshold arguments: that plaintiffs are not entitled to the injunctive relief they seek because BLM is not a defendant and that plaintiffs are improperly attempting to relitigate their challenge to the 2016 RMP and corresponding BiOp, which these sales implement. Because the Court concludes that plaintiffs have failed to make a sufficient showing on the merits of their claims, the Court declines to address defendants' joinder and preclusion arguments at this stage.

in professional research, or an economic interest in preservation of the species' is sufficient to confer standing." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (quoting *Lujan*, 504 U.S. at 582 (Stevens, J., concurring)). "'[G]eneralized harm . . . to the environment' is not." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U. S. 488, 494 (2009)). Here, plaintiffs have shown more than generalized harm to the environment. They have shown that at least one of their members has an interest in preserving and observing spotted owl habitat in the project area, which stems from aesthetic and recreational enjoyment and a professional interest in the habitat and species.[8]

George Sexton, KS Wild's Conservation Director and a member of all three plaintiff organizations, submitted a declaration stating that he has dedicated the past 19 years of his career to "attempting to prevent the extirpation and extinction of northern spotted owls and [has] worked for the retention of old-growth forest habitat

---

[8]  Organizational plaintiffs like KS Wild, Cascadia Wildlands, and Oregon Wild "may have standing in [their] own right to seek judicial relief from injury to" themselves. *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019). An organization may also have standing to bring claims on behalf of its members if (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Plaintiffs and FWS focus their standing arguments on whether plaintiffs have representational standing for their members and on the first prong of that three-part test. The other two prongs are also satisfied here. Plaintiffs' members' aesthetic, recreational, and professional interests in the spotted owl and its habitat in Southern Oregon are related to plaintiffs' missions. *See* Compl. ¶¶ 9 (KS Wild "works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California" and "strives to protect . . . the vital biological diversity of the Klamath-Siskiyou region"), 10 (Cascadia Wildlands is "devoted to the conservation of the Cascadia bioregion" and "defend[s] wild places and promote[s] sustainable, restoration-based forestry"), 11 (Oregon Wild is "dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy"). And their claims for declaratory and injunctive relief do not require individualized proof and are thus properly resolved in the group context. *Id.* at 27–28 (Prayer for Relief seeking declarations concerning and vacatur of the BiOp and ITS).

that the species requires to survive." Decl. of George Sexton (doc. 16-2) ¶¶ 1, 4. Sexton also states that "[t]he persistence of the spotted owl population is extremely important to KS Wild and our members, and to me personally" as is "[t]he retention of old-growth forests on public lands" that provides spotted owl "NRF habitat" and that is "deemed by [FWS] to be 'critical to the survival and recovery" of the species. *Id.* ¶¶ 12, 15, 17. Sexton has also visited the old-growth forest stands in the Round Oak and Bear Grub timber sale planning areas regularly for the past 20 years and plans to continue to visit and use them as long as they continue to exist. *Id.* ¶¶ 40– 42. The forests in the Bear Grub timber sale planning area are particularly close to where Sexton lives, and quickly accessible from his home. *Id.* ¶ 42. He estimates that he "view[s] and experience[s]" them "over 100 times a year." *Id.*

Sexton's declaration shows that he has concrete aesthetic, recreational, and professional interests in the spotted owl and old-growth forest stands located in the Bear Grub and Round Oak timber sale planning areas. *See Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2007) (a concrete interest can be "an aesthetic or recreational interest in a particular place, or animal, or plant species"); *see also Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005) ("[P]laintiffs who use the area threatened by a proposed action or who own land near the site of a proposed action have little difficulty establishing a concrete interest.").

Sexton's declaration also shows that his interests in the spotted owl and old-growth forest stands are particularized. For an injury to be particularized, "it must

affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). FWS argues that plaintiffs have not shown that their members have a particularized interest in the spotted owl because they do not allege that their members use or observe the spotted owl or explain how they would be directly affected by the projects' effect on the spotted owl. FWS Resp. (doc. 24) at 18. When plaintiffs allege injury in fact based on harm to a species they must show "that one or more of [their] members would thereby be 'directly' affected apart from their 'special interest' in th[e] subject." *Defenders of Wildlife*, 504 U.S. at 562–63.

FWS asserts that this case is like *North Carolina Fisheries Association v. Pritzker*, where the court found that the plaintiffs lacked standing to pursue their ESA claims stemming from defendants' failure to regulate recreational fisheries, which the plaintiffs alleged caused illegal takings of listed sea turtle species. In *N.C. Fisheries*, the standing issue came before the court on a motion to dismiss. The plaintiffs were nonprofits dedicated to the "study, promotion, and development of growth and conservation of fish, seafood, and other marine resources." *N.C.* Fisheries, No. 4:14-cv-138-D, 2015 WL 4488509,*2 (E.D.N.C. July 22, 2015). They alleged only that they and their members "have suffered injury to their economic and environmental interests which are uniquely entwined with endangered and threatened sea turtles." *Id.* at *4. The court held that the plaintiffs failed to establish standing in their own right because they did not allege facts showing that they, as organizations, suffered economic harm or had any special interest in sea turtles, let alone an interest directly affected by sea turtle takings. *Id.* at *5. The court also

observed that the plaintiffs' organizational interests in studying, promoting, and developing fish, seafood, and other marine resources was, at best tangentially related to sea turtles. *Id*.

By contrast, all three plaintiffs here are nonprofits that work directly to conserve biodiversity in Southern Oregon, including by working to conserve threatened species like the spotted owl and those species' habitat. Moreover, Sexton, a member of all three organizations, has alleged a specific, professional interest in the owl. He has spent nearly two decades working to conserve the species in southern Oregon and to prevent its extinction. He explains that the logging planned on the Round Oak and Bear Grub projects will harm the owl by removing suitable habit and imposing greater stress on populations that are already experiencing severe demographic distress. These impacts directly undermine and affect Sexton's decades of work to conserve the spotted owl.

Sexton has similarly alleged particularized injury to his aesthetic, recreational, and professional interests in old-growth forest stands located in the Round Oak and Bear Grub project areas, which he regularly visits and uses, and intends to continue to use as long as they exist. Both projects threaten to remove the old growth features of many of these stands, destroying Sexton's ability to use and enjoy them in their mature state.

At oral argument, FWS argued that plaintiffs cannot rely on harm to forests to establish standing in this case. According to FWS, because this is an ESA case, plaintiffs must allege injury arising out of harm from a species. In FWS's view,

plaintiffs sued to protect the owls not the trees, and if plaintiffs wanted to protect the trees, they needed to assert claims under the National Environmental Policy Act challenging BLM's decision to authorize the timber sales and logging.

A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Separate from Article III's requirements, the APA requires that those seeking judicial review under § 702 show that they have "suffer[ed] legal wrong because of" the challenged action or be "adversely affected or aggrieved by" it "within the meaning of the relevant statute." 5 U.S.C. § 702. To have standing under the APA, "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883 (1990).

Here, plaintiffs allege violations of section 7 of the ESA, 16 U.S.C. § 1536, which requires federal agencies to consult with FWS to "insure" that any proposed agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." § 1536(a)(2). From its text, the purpose of the consultation requirement in section 7 it to protect listed species *and their critical habitat*, which includes certain old-growth forest stands in the project area. Plaintiffs' claims that the projects will threaten their members' interest in old-growth forests

that are critical habitat for spotted owl are plainly within the zone of interests that section 7 protects.

Finally, Sexton's alleged injuries are sufficiently imminent, not "conjectural or hypothetical" because he has concrete plans to continue to visit and use the forests in the project areas on a regular basis. *Defenders of Wildlife*, 504 U.S. at 560, 564; *see also Ecological Rights Found.*, 230 F.3d at 1149 ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of that area is injurious to that person."). In sum, plaintiffs have sufficiently shown injury-in-fact at this stage.

After showing injury, to demonstrate standing, plaintiffs must also show that there is "a causal connection between the injury and the conduct complained of" and that "the injury will [likely] be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 560–61. Although defendants do not argue that plaintiffs failed to adequately allege causation or redressability, courts have an independent duty to ensure that standing exists. *Summers*, 555 U.S. at 499. To establish causation, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (alterations normalized). A "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013) (internal quotation marks omitted). To establish

redressability, "the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Bellon*, 732 F.3d at 1146.

The fairly traceable requirement for causation "does not exclude injury produced by determinative or coercive effect [of the defendant's action] upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Although the FWS's BiOp "theoretically serves an 'advisory function,' 51 Fed. Reg. 19928 (1986), in reality it has a powerful coercive effect on the action agency[.]" *Id*. If the action agency deviates from the recommendations in a BiOp, it must "not only articulate its reasons for disagreement (which ordinarily requires species and habitat investigations that are not within the action agency's expertise), but [it also] runs a substantial risk if its (inexpert) reasons turn out to be wrong." *Id*. Here, plaintiffs' injuries, which are threatened by the logging authorized by BLM, are fairly traceable to FWS's BiOp given its "virtually determinative effect." *Id*. at 170. Plaintiffs' injuries are also likely to be redressed—that is, BLM will not allow the logging to continue, if the BiOp is set aside. *Id*.

## II.   *Motion to Strike*

After defendants filed their responses to plaintiffs' motion, plaintiffs filed a second declaration from George Sexton. Doc. 27. Defendants move to strike the declaration as prejudicial and inconsistent with the Federal and Local Rules of Civil

Procedure. Docs. 28, 29. Because the Court did not rely on the declaration to find that plaintiffs have standing, the Motion to Strike (doc. 28) is denied as moot.

II.    ***Motion for Temporary Restraining Order or Preliminary Injunction***

Plaintiffs ask this Court to enjoin logging of older forest that currently functions as suitable spotted owl habitat until this case is decided on the merits. A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the

merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

As discussed below, the first *Winter* factor—success on the merits—weighs strongly against granting plaintiffs' requested relief, and the Court need not address the three remaining factors.

Plaintiffs allege that FWS' determinations violate the APA and section 7 of the ESA because (1) the agency's no jeopardy and no adverse modification determinations fail to consider important aspects of spotted owl conservation, (2) the agency's no jeopardy and no adverse modification determinations rely on uncertain, unenforceable conservation measures, and (3) the agency's incidental take statement relies on unenforceable and uncertain conservation measures and on a flawed assessment of take. Before turning to the merits of each claim, the Court will provide an overview of relevant ESA provisions and of the APA's standards for judicial review of agency decisions.

A.    *Legal Framework*

1.    *The Endangered Species Act*

Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and to "provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A threatened species is "any species which is likely to become an endangered species

within the foreseeable future throughout all or a significant portion of its range. *Id.*
§ 1532(20).

The ESA requires expert agencies, here FWS, to designate any critical habitat
for listed species. *Id.* § 1533(a)(3). The ESA defines critical habitat as "the specific
areas within the geographical area occupied by the species, at the time it is listed[,] .
. . on which are found those physical or biological features (I) essential to the
conservation of the species and (II) which may require special management
considerations or protection[.]" *Id.* § 1532(5)(A)(i). The ESA also directs FWS to
develop and implement recovery plans for listed species. *Id.* § 1533(f)(1).

Section 7 requires federal agencies to consult with an expert federal agency to
ensure that any action they authorize, fund, or carry out "is not likely to jeopardize
the continued existence or any endangered species or threatened species or result in
the destruction or adverse modification" of the species' designated critical habitat. 16
U.S.C. § 1563(a)(2). Consultation leads to the issuance of a written BiOp by the expert
agency, 50 C.F.R. § 402.14(g)–(h). During consultation, the expert agency also
considers whether the proposed action is likely to result in a "take" of the species
within the meaning of the ESA.[9] If the expert agency determines that the proposed
action will result in a "take" of a listed species in a manner otherwise consistent with
Section 7, the agency will issue an incidental take statement. *Id.* § 1536(b)(4). An

---

[9] In the ESA, "take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1538(a)(1)(B). In regulation, FWS has defined "harm" to mean "an act which actually kills or injures wildlife[,]" including "significant habitat modification or degradation" that "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

incidental take statement specifies the impact of the incidental taking on the listed species, establishes reasonable and prudent measures that are necessary or appropriate to minimize the amount or extent of incidental take, and states the terms and conditions that the action agency must comply with to implement the reasonable and prudent measures. *Id.* § 1536(b)(4)(i)–(iv); 50 C.F.R. § 402.02. Any taking in compliance with the terms and conditions of the ITS is exempt from the general take prohibition in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4)(iv), (o)(2).

### 2.    *APA Standard of Review*

Judicial review of agency decisions under the ESA are governed by the APA, which requires an agency action to be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir.1986). This deferential standard is designed to "ensure that the agency considered all of the relevant factors and that its decision contained no 'clear error of judgment.'" *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir.1987) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Essentially,

courts must ask "whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Natural Resources Defense Council v. United States Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir.1997) (quoting *Resources, Ltd. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir.1993), in turn quoting *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir.1990)).

The scope of review under the APA is narrow and judicial review of federal agency actions is "particularly deferential"—the Court may not substitute its judgment for that of the agency. *See Lands Council v. McNair*, 537 F.3d 981, 987, 992-94 (9th Cir. 2008) (en banc); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42–43. "While [courts] may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . [courts] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285–86 (1974) (citations omitted).

### B.    *Important Aspects of Spotted Owl Conservation*

Plaintiffs assert that, in reaching its no jeopardy and no adverse modification determinations, FWS failed to consider three important aspects of spotted owl conservation.

First, plaintiffs argue that FWS failed to consider the long-term effects of the action on the spotted owl given the comparatively shorter life span of the species. Mot. for TRO/PI at 13–15. Plaintiffs note that FWS expects the NRF habitat removed by the proposed action will remain unsuitable for spotted owls for decades, while

spotted owls have an average lifespan of 6.5 years. *Id.* at 15. And they assert that the BiOp "is silent on what will happen to the local rangewide populations of spotted owls in the intervening 'decades[.]'" *Id.*

According to plaintiffs, the BiOp therefore "ignores the life cycle" of the spotted owl and is arbitrary and capricious under the Ninth Circuit's decisions in *Pacific Coast Federation of Fishermen's Associations v. National Marine Fisheries Service* (*PCFFA I*), 265 F.3d 1028 (9th Cir. 2001), and *Pacific Coast Federation of Fishermen's Associations v. U.S. Bureau of Reclamation* (*PCFFA II*), 426 F.3d 1082 (9th Cir. 2005), ESA cases involving salmon. In *PCFFA I*, the Ninth Circuit "stressed that the agency must consider near-term habitat loss to populations with short life cycles, and faulted the agency for only considering the impact of its actions over a" time frame of 10 to 20 years. *PCFFA II*, 426 F.3d at 1094 (citing *PCFFA I*, 265 F.3d at 1037–38). Similarly, in *PCFFA II*, the Ninth Circuit faulted the Bureau of Reclamation for failing to analyze how the first eight years of the proposed action might impact coho salmon, which has a three-year lifespan. *Id.* at 1093–95.

Unlike in the consulting agencies in those cases, here FWS considered both the short- and long-term effects of the proposed action on spotted owl and their habitat at a range of geographic scales.  FWS_000558, 000560–571, 000593–600, 000606–610.  Additionally, FWS did not find, as plaintiffs suggested at oral argument, that the proposed NRF treatments would cause spotted owls to "blink out" in the action area. Instead, it found that the majority of NRF in the action area—96% in Bear Grub and 83% in Round Oak—would remain untreated and available to support current

and future spotted owl populations. FWS_000561 (Table 12), 000607. FWS also found that the amount and distribution of dispersal habitat remaining in the action area would maintain the connectivity between habitat patches in the action area and across critical habitat units that is needed to support spotted owl recovery. FWS_000569–70 (NRF and dispersal), 000598–600 (critical habitat), 000606–10 (summary of both). Thus, FWS did not rely solely on future development of habitat to reach its determinations.

Second, plaintiffs argue that FWS failed to consider the effects of the action on nonresident owls known as "floaters." Mot. for TRO/PI at 15–18. "Floaters" are "nonterritorial (non-breeding) adult" spotted owls that "use closed canopy forest habitat to support transient and colonization phases until they recruit into the breeding population." FWS_000566. They "may buffer the territorial population [of spotted owls] from decline[,]" FWS_000635, but the precise "degree to which floaters influence or regulate populations is unknown[,]" FWS_000566. Plaintiffs assert that the BiOp should have addressed (1) how the lack of floater recolonization of vacant territories might influence spotted owl conservation and recovery, (2) the fact that the action area might never be recolonized due to continual harvest of suitable habitat. Mot. for TRO/PI at 18. The BiOp included a section on floater owls and concluded that, after the projects, floaters would be able to use the landscape— habitat both within the project areas an in the reserves—for both colonization and dispersal. FWS_000566–67. The BiOp also explains that FWS conducted spotted owl population modeling to evaluate conservation scenarios under the recovery plan and

revised RMPs, which incorporated floater owls, and the results showed that "additional protection of habitat on the landscape does not necessarily improve the situation for spotted owls, while barred owls are on the landscape, unless barred owls are reduced." FWS_000566. Thus, the BiOp reasonably concluded that recolonization was dependent on competition from barred owls and the availability of large reserve habitats, rather than the availability of NRF in the HLB.

Third, plaintiffs argue that FWS failed to consider the effects of the action given the possible success of the ongoing experimental barred owl control program. Mot. for TRO/PI at 18–20. Throughout the BiOp, FWS emphasized that barred owl competition currently functions as the primary threat to spotted owl persistence and recovery in Southern Oregon. *See* FWS_000538, 000567. To address that threat, FWS is conducting an experimental barred owl control program. Plaintiffs assert that preliminary results suggest that barred owl control "is working." Mot. for TRO/PI at 19. According to plaintiffs the BiOp is arbitrary and capricious because it fails to consider the possibility that "suitable habitat will be substantially lacking in the action area and may undermine the conservation of the species" once barred owls are no longer limiting factor on the landscape. *Id.*

The Court defers to FWS on whether and how to use the preliminary results of the barred owl control experiments in this BiOp. *See Conservation Congress v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("The determination of what constitutes the best scientific data available belongs to the agency's special expertise, and thus when examining such a determination, a reviewing court must generally be at its most

deferential.'" (Emphasis and internal quotation marks omitted.)). The barred owl control studies are ongoing. Although the investigators provide annual progress reports, the final report is not anticipated until 2022 and the experiments could be extended if results from initial removal are not definitive. FWS_000666. Moreover, though the results have been promising, with a nearly 10 percent increase in apparent spotted owl survival over the 5 years before removal at the California site, statistical analyses have not been performed on data from the three study sites in Oregon and Washington. FWS_000666, 000668. Consulting agencies are not required to "make decisions on data that does not yet exist." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 917, 995 (9th Cir. 2014).

C.    ***Conservation Measures***

Plaintiffs also assert that FWS erroneously relied on two categories of conservation measures—project design criteria ("PDC") and the future development of spotted owl habitat in the LSR—to make its no jeopardy and no adverse modification determinations. Mot. for TRO/PI at 21–26. Conservation measures intended to mitigate the impact of a proposed action on a listed species "must be enforceable under the ESA to factor into a biological opinion's jeopardy determination." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.* ("*CBD v. FWS*"), 807 F.3d 1031, 1045 (9th Cir. 2015) (internal quotation marks omitted). The measures must constitute a "clear, definite commitment of resources," and be "under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 & n.17 (9th Cir. 2008). A "sincere general

commitment to future improvements"—without more specificity—is insufficient. *Id.* at 935–36. The measures "must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002).

Here, the BiOp provides that PDC are "conservation measures" that are "integrated into the project design to avoid and minimize potential adverse effects of the activity on the listed species and critical habitat." FWS_000527. They include seasonal restrictions for activities; dropping units if spotted owls are located in surveys having wildlife biologists review activities; and not removing known nest trees, large diameter trees in areas with a lot of spotted owl activity but no nest trees, or large standing snags and down wood. FWS_000528–31, 000713–15. The BiOp also provides that the PDC are "expected to be implemented to the fullest extent practicable" and "[i]f the PDC are not implemented as described or per agreed upon deviations between the Service and BLM, reinitiation of consultation may be warranted." FWS_000528. When conservation measures are included as part of the project and failure to comply with a measure requires reinitiation of consultation, those measures are "enforceable" under the ESA. *CBD v. FWS*, 807 F.3d at 1046.

Nevertheless, plaintiffs argue that the PDC are not sufficiently enforceable or reasonably certain to occur because the BiOp does not define "fullest extent practicable" and maybe waived at the discretion of BLM and FWS. Mot. for TRO/PI at 22–23. In context, "fullest extent practicable" imposes an affirmative, albeit

pragmatic, obligation on BLM to ensure that the PDC are implemented as described or consistent with deviations that FWS and BLM have already developed. Further, plaintiffs fail to show that the PDC may be unilaterally changed or waived by BLM or FWS. First, plaintiffs rely on the statement that "BLM wildlife and forestry staff will work together to develop and implement the prescriptions to maintain spotted owl habitat per the prescriptions and will change the prescriptions and implementation procedures as needed to fulfill this PDC." FWS_000577. This statement means that BLM staff will change prescriptions for logging activities in order to meet the PDC. Plaintiffs also point to the fact that certain PDC, outlined in Appendix B to the BiOp, may be waived. These PDC are seasonal or daily restrictions designed to reduce disturbance to nesting owls in occupied spotted owl nest sites. *Id.* at 713. They may be waived "if necessary to protect public safety[,]" in which circumstances emergency consultation may be initiated, or in years when surveys show non-nesting and no young present. *Id.* These narrow circumstances for waiver do not render these seasonal PDC or the PDC in general unenforceable or uncertain.

Like PDC, the protection and development of spotted owl habitat in LSRs is a part of the proposed action and ensured by mandatory management directions and the LSR framework established in the RMP. FWS_000522, 000551. But plaintiffs argue that these benefits are not reasonably certain to occur because of impacts of climate change, given FWS' finding that climate change is increasing wildfire frequency, size, and severity. The BiOp addressed climate change and fires on spotted owl critical habitat and the LSRs in general. As the BiOp notes, the reserve system

was developed in the 2016 RMP with wildfires in mind and based on models that analyzed the effects of wildfire on spotted owl habitat and populations. FWS_000590– 92. Although plaintiffs fault FWS for using historical wildfire data in the models, "the determination of what constitutes the best scientific data available" is squarely within the agency's expertise and is entitled to significant deference. *Conservation Congress*, 774 F.3d at 620.

> ### D. *Incidental Take Statement*

Finally, plaintiffs challenge FWS' incidental take statement, which did not authorize any incidental take. Mot. for TRO/PI at 30–33. FWS determined that the proposed action was not likely to result in an incidental take based on its earlier analysis of the projects' effects on spotted owl and their habitat and because of the implementation of the PDC, which include "restrictions to avoid or minimize disturbance of spotted owls" and the specific requirement that BLM drop or modify treatments at locations where BLM surveys reveal spotted owl occupancy. FWS_000610. Plaintiffs argue that FWS improperly relied on the PDC because they are not enforceable or reasonably certain to occur. Mot. for TRO/PI at 27. This argument fails for the reasons stated above.

Next, plaintiffs argue that FWS' incidental take analysis "adopted a flawed view of take that depends on survey-detected occupancy" without considering "other best available information" like habitat assessments and the likelihood of reoccupation of presently vacant sites or colonization of suitable habitat. *Id.* at 29. They note that the BiOp acknowledges that "habitat-based assessments" have been

used to estimate the presence or occupancy of breeding spotted owls. *Id.* at 28. They also note that an Information Bulletin prepared by FWS and BLM staff to guide implementation of the 2016 RMP explains that site-specific information should also inform whether a timber sale is likely to result in incidental take. *Id.* (quoting Information Bulletin (doc. 16-1 ex. H at 15)). The Information Bulletin does not require the use of habitat-based occupancy assessments. Instead, it suggests that the agencies will rely heavily on surveys to estimate occupancy and supplement with other forms information when surveys are not up-to-date. Here, when the BiOp issued, FWS had completed the two years of surveys at all but two of the known spotted owl sites in the action areas, and found that the fully-surveyed sites were not occupied. FWS_000579. Thus, FWS' primary reliance on survey results as the best available scientific information on site occupancy was not inconsistent with the Information Bulletin's guidance.

At oral argument, plaintiffs also argued that FWS' exclusive reliance on surveys fails to consider an important aspect of the problems–floaters do not tend to show up in surveys, resident owls do not consistently respond to surveys when barred owls are on the landscape, and spotted owls recolonize vacant territory. But the survey protocols and additional measures in the proposed actions account for these concerns. The current version of the survey protocol includes updates to address concerns that past surveys do not account for barred owl effects on spotted owl detection rate, based on analyses of historical survey data, including additional methods when barred owls or unknown *strix* species are detected. FWS_13740–41,

000647. The protocol also follow-up requires spot check surveys of the project area for two years after the initial survey period. FWS_13753–56. And, as part of the proposed action, units must be dropped or modified if any owl is detected, either in spot check surveys or an incidental observation. FWS_000520.

Although, as plaintiffs point out, habitat modification may constitute a take where it significantly impairs essential behavioral patterns of a species, *see* 50 C.F.R. § 17.3, FWS reasonably concluded that the likely adverse effects of the proposed actions on non-occupied spotted owl sites did not rise to this level.

## CONCLUSION

For the reasons stated above, the Court finds that plaintiffs have demonstrated that they have standing but failed to show serious questions going to the merits of their ESA claims. Plaintiffs are, therefore not entitled to preliminary injunctive relief. The Court's decision on a motion for a preliminary injunction is not a ruling on the merits. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). And on this preliminary review, FWS appears to have considered the relevant factors and articulated a rational connection between the facts found and the decisions it made, as required by the APA. Specifically, FWS found that proposed action would cause adverse effects from the loss or downgrade of NRF habitat, including in 37 of the known spotted owl home ranges in the action area. But FWS explained that those impacts to habitat were unlikely to jeopardize the continued existence of the spotted owl, destroy or adversely modify its critical habitat, adversely effect spotted owls in the occupied home ranges, or otherwise result in "take" of

spotted owl, given that the project would retain the vast majority of NRF habitat in the action areas (96% in Bear Grub and 83% in Round Oak), the project requirement that units be dropped or modified if spotted owls are located within them and other PDCs designed to avoid disturbing spotted owls, and the overall benefits of the proposed action. The Court cannot substitute its judgment for that of FWS.

Plaintiffs' Motion for a Temporary Restraining Order/Preliminary Injunction (doc. 16) is DENIED. Because the Court did not consider the Second Declaration of George Sexton in ruling on this motion, defendants' Motion to Strike (doc. 28) is also DENIED as moot.

IT IS SO ORDERED.

Dated this  23rd  day of  March    2022.


                    /s/Ann Aiken
                    Ann Aiken
              United States District Judge